# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPEN SPECIALTY INSURANCE COMPANY,<br><br>               Plaintiff,<br><br>v.<br><br>HOSPITALITY SUPPORTIVE SYSTEMS, LLC, EDWARD E. SNOW, individually,  THE CARMAN CORPORATION, SELECTIVE RISK MANAGEMENT, LLC, SELECTIVE LAW GROUP, LLC, TRIGEN INSURANCE SOLUTIONS, INC., TRIGEN HOSPITALITY GROUP, INC., PATRIOT UNDERWRITERS, INC.,  PATRIOT NATIONAL, INC., and ABC CORPORATIONS 1-25,<br><br>               Defendants. | **Civil Action**<br><br>**No. 2:16-cv-01133**<br><br><br><br>**AMENDED COMPLAINT** |
| HOSPITALITY SUPPORTIVE SYSTEMS, LLC,<br><br>               Plaintiff,<br><br>v.<br><br>ASPEN SPECIALTY INSURANCE COMPANY,<br><br>               Defendant. | |

Plaintiff Aspen Specialty Insurance Company (hereinafter "Aspen"), by and through its attorneys, Connell Foley LLP, brings this action for equitable rescission, declaratory judgment and other relief against Defendants Hospitality Supportive Systems, LLC ( "HSS"), Edward E. Snow, individually ("Snow"), The Carman Corporation ("Carman"), Selective Risk Management, LLC ("Selective Risk"), Selective Law Group, LLC ("Selective Law"), Trigen Insurance Solutions, Inc. ("Trigen Insurance"), Trigen Hospitality Group, Inc. ("Trigen Hospitality") (together with Trigen Insurance, "Trigen"), Patriot Underwriters, Inc. ("Patriot Underwriters"), Patriot National, Inc. ("Patriot National") (together with Patriot Underwriters, "Patriot"), and ABC Corporations 1-25 (collectively, "Defendants"), and alleges on knowledge as to its own acts and otherwise upon information and belief as follows:

## **PARTIES**

1.     Aspen is a corporate entity organized under the laws of the State of North Dakota with its principal place of business at 590 Madison Ave., 7th Floor, New York, New York.

2.     HSS is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

3919402-1

3.     Snow is an individual conducting business at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

4.     Carman is a corporate entity organized under the laws of the State of Pennsylvania with its principal place of business at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

5.     Selective Risk is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

6.     Selective Law is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 760 W. Sproul Rd., Suite 301, Springfield, Pennsylvania.

7.     Trigen Insurance is a corporate entity organized under the laws of the State of Delaware with its principal place of business located at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida, and offices at 940 W. Sproul Rd., Suite 201, Springfield, Pennsylvania.

8.     Trigen Hospitality is a corporate entity organized under the laws of the State of Delaware with its principal place of business located at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida, and offices at 940 W. Sproul Rd., Suite 201, Springfield, Pennsylvania.

3919402-1

9.     Patriot Underwriters is a corporate entity organized under the laws of the State of Delaware with its principal place of business at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida, and offices at 940 W. Sproul Rd., Suite 201, Springfield, Pennsylvania.

10.     Patriot National is a publicly-traded corporation listed on the New York Stock Exchange, organized under the laws of the State of Delaware and with its principal place of business at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida.

11.     Defendants ABC Corporations 1-25 are as yet unidentified entities which own or are owned by or share common ownership of HSS, Carman, Selective Risk, Selective Law, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or Patriot National.

## JURISDICTION AND VENUE

12.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, inasmuch as the parties have diverse citizenship and the alleged sum or value in controversy, exclusive of interest and costs, exceeds the amount of $75,000.

13.     This Court has personal jurisdiction over HSS as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

3919402-1

14.    This Court has personal jurisdiction over Snow as he is an individual that maintains an office and conducts business in the Commonwealth of Pennsylvania.

15.    This Court has personal jurisdiction over Carman as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

16.    This Court has personal jurisdiction over Selective Risk as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

17.    This Court has personal jurisdiction over Selective Law as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

18.    This Court has personal jurisdiction over Trigen Insurance as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

19.    This Court has personal jurisdiction over Trigen Hospitality as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

20.    This Court has personal jurisdiction of Patriot Underwriters as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

21.    This Court has personal jurisdiction over Patriot National as it conducts business in the Commonwealth of Pennsylvania and is the alter-ego of

3919402-1

the above-enumerated defendant entities that are incorporated, maintain an office and/or conduct business in the Commonwealth of Pennsylvania.

22.     Venue is proper pursuant to 28 U.S.C. § 1391(b)(2), inasmuch as a substantial part of the events or omissions giving rise to this action took place in this District.

## INTRODUCTION

23.     This is an action for rescission of insurance policies and a declaration of the respective rights and obligations, if any, of Aspen and HSS under policies of liability insurance issued by Aspen with respect to certain alleged liabilities of HSS and/or various additional named insureds.  Additionally, Aspen seeks recovery of the millions of dollars of defense and indemnity costs incurred as result of the numerous misrepresentations, misstatements, omissions and/or concealments of fact by HSS and/or certain other Defendants in connection with the applications for the various insurance policies issued by Aspen.

## FACTUAL ALLEGATIONS

**The HSS Programs**

24.     HSS is an insurance purchasing group which solicits business owners and operators within the hospitality and restaurant industry to enter into property and liability insurance sharing programs (the "HSS Programs" as further defined below).

6

3919402-1

25.    As of April 1, 2015, Snow was the sole shareholder, principal and/or member of HSS.

26.    HSS holds itself out to be sophisticated and knowledgeable within the hospitality and restaurant industry and in securing and understanding the liability insurance coverage for the associated risks.

27.    HSS markets the HSS Programs to business owners directly, as well as indirectly through local insurance agents.

28.    Participants in the HSS Program are required to enter into a Management Services Agreement with HSS, which sets forth the details of the particular Program, as well as the rights and obligations of the parties thereto.

29.    HSS secures insurance coverage through various property and liability insurance carriers as the First Named Insured on such policies.

30.    Individual restaurant, tavern and bar owners who elect to enter the HSS Programs are added as additional named insureds to, and share the insurance limits of, the policies procured by HSS.

31.    Through the Management Services Agreement, these restaurant, tavern and bar owners delegate full authority to HSS for the primary rights and responsibilities under any insurance policies issued to the HSS Programs, including but not limited to the negotiations, procurement and claims handling for said policies.

7

32.     In order for individual restaurant, tavern and bar owners to qualify for the HSS Programs, each must meet certain minimum requirements as set forth in the underwriting guidelines of the HSS Programs (the "HSS Underwriting Guidelines").

33.     The HSS Underwriting Guidelines require, among other things, that: (a) prospective participants submit currently valued loss runs from prior insurance carriers detailing any claims asserted against said prospective participants over the specified preceding number of years; (b) no prospective participant exceed the maximum number of permissible claims asserted against it over the specified period; (c) no single claim asserted against a prospective participant during the specified period exceed a value of $15,000; and (d) no liquor liability claims have been asserted against a particular prospective participant during the specified period.

34.     HSS was to proffer restaurant, bar and tavern owners that met the minimum requirements of the HSS Underwriting Guidelines as participants in the HSS Programs.

35.     Pursuant to the Management Services Agreement, HSS retained the primary rights and responsibilities under the insurance policies procured for the HSS Programs.

36.    HSS also specifically assumed and retained the role of claims processor, purportedly acting as the claims liaison between the participants and insurance carriers, such as Aspen.

37.    In its capacity as First Named Insured and intermediary between the participants/additional named insureds and the insurance companies, HSS charges and receives from each participant/additional named insured a distinct and augmented premium as a fee for its services.

38.    In order to implement and effectuate its claim processing role, HSS retained the services of Selective Risk as its third-party claims administrator, and Selective Law as its claims defense counsel.

39.    HSS Program participants would report liability claims to HSS; HSS and Selective Risk would then manage those claims and engage Selective Law to defend the interests of the participants.

40.    As of April 1, 2015, Edward Snow and Charles O'Donnell ("O'Donnell") were the sole shareholders, principals and/or members of Selective Risk.  O'Donnell is currently the President and Chief Executive Officer of Selective Law.

**The Aspen Policies**

41.    Aspen is, and during all relevant times has been, in the business of underwriting and issuing policies of commercial liability insurance and is

9

authorized to transact the business of insurance in the Commonwealth of Pennsylvania.

42.    Aspen issued multiple consecutive primary and excess commercial liability insurance policies to the HSS Programs from 2011 to 2015, providing general liability, liquor liability and excess liability coverage (the "Aspen Policies" as further defined below).

43.    The Aspen Policies consist of seven primary and seven excess liability insurance policies issued to and delineated into three HSS Programs: HSS (A), (B) and (C).

44.    Consistent with the Management Services Agreement entered into by HSS and the restaurant, tavern and bar owners, the Aspen Policies list HSS as First Named Insured.  The individual restaurant, tavern and bar owners are listed as additional named insureds under the Aspen Policies.

45.    HSS (A), (B) and (C) are primarily defined by their distinct lists of patricipants/additional named insureds, although there is also some variation in limits, amounts of self-insured retention ("SIR") and other endorsements that distinguish each of these Programs.

46.    With respect to the issuance and renewal of each of the Aspen Policies, Aspen relied upon, inter alia, insurance applications, loss runs and other

information provided by HSS, including but not limited to representations concerning the nature and claims history of the risks to be covered by Aspen.

***HSS (A)***

47.     On or around September 21, 2011, Aspen received a request from CRC Insurance Services ("CRC"), an insurance broker, to quote general and liquor liability insurance for HSS.

48.     Aspen was provided with an insurance application, loss runs and a schedule of prospective participants/additional named insureds and insured locations by HSS.

49.     In or around December 2011, Aspen issued Commercial Liability Policy No. CRA8YY411 to HSS as First Named Insured, with effective dates of December 31, 2011 to December 31, 2012; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $5 million; and a SIR of $10,000.

50.     The policy period of CRA8YY411 was extended to June 30, 2013 by Endorsement No. 55 on June 18, 2012.

51.     Approximately one hundred and fifteen (115) restaurant, tavern and bar owners participated in and were additional named insureds on CRA8YY411.

52.     In or around June 2013, Aspen renewed Policy No. CRA8YY411 with the issuance of Policy No. CRA8YY413, with effective dates of June 30, 2013 to December 31, 2014, and the same limits and SIR as CRA8YY411.

53.     Aspen's decision to renew HSS (A) was due primarily to the number and severity level of claims reported to Aspen during the prior policy period and in the renewal application and loss runs submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

54.     In or around March 2014, Aspen issued Excess Liability Policy No. CXAE6MU14 to HSS with effective dates of March 25, 2014 to December 31, 2014, and excess liability limits of $15 million.

55.     In or around December 2014, Aspen renewed CRA8YY413 with the issuance of Commercial Liability Policy No. CR0038P14, with effective dates of December 31, 2014 to June 30, 2016; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $10 million; and a SIR of $10,000 for all participants with thirty percent (30%) or more in liquor receipts and $2,500 for those with less than thirty percent (30%) in liquor receipts.

12

56.     Aspen's decision to again renew HSS (A) was due primarily to the number and severity level of claims reported to Aspen during the prior policy period and in the renewal application and loss runs submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

57.     In or around December 2014, Aspen renewed CXAE6MU14 with the issuance of Excess Liability Policy No. CX0038Q14A, with effective dates of December 31, 2014 to June 30, 2016, and excess liability limits of $2 million.

58.     Aspen's decision to renew the excess coverage of HSS (A) was due primarily to the number and severity level of claims reported to Aspen during the prior policy period and in the renewal application and loss runs submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

59.     In or around December 2014, Aspen also issued Excess Liability Policy No. CX0038U14, with effective dates of December 31, 2014 to June 30, 2016, with excess liability limits of $5 million above Policy Nos. CR0038P14, CX0038Q14A and an $8 million second-level excess liability policy issued by Zurich American Insurance Company.

60.     Aspen's decision to issue Policy No. CX0038U14 was due primarily to the number and severity level of claims reported to Aspen during the prior

3919402-1

policy period and in the insurance application and loss runs submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

61.     Throughout the course of the HSS (A) Program, HSS was responsible for providing updated schedules to reflect the current participants/additional named insureds for HSS (A) and the applicable Aspen Policies.  HSS periodically added and/or deleted participants from HSS (A), often without Aspen's prior knowledge and/or authorization.

***HSS (B)***

62.     In or around December 2012, Aspen issued Commercial Liability Policy No. CRAC26P12 to HSS as First Named Insured, with effective dates of December 31, 2012 to June 30, 2014; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $5 million; and a SIR of $10,000.

63.     HSS provided a distinct schedule of approximately two hundred and fifty-eight (258) participants/additional named insureds and insured locations for this first policy in HSS (B).

64.     Aspen's decision to issue Policy No. CRAC26P12 was due primarily to the number and severity level of claims reported to Aspen during the prior

14

policy period of HSS (A) and in the application and loss runs submitted by HSS for HSS (B), as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

65.     In or around June 2014, Aspen renewed Policy No. CRAC26P12 with the issuance of Commercial Liability Policy No. CRAC26P13, with effective dates of June 30, 2014 to December 31, 2015; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $10 million; and a SIR of $10,000.

66.     Aspen's decision to renew HSS (B) was due primarily to the number and severity level of claims reported to Aspen during the prior policy period and in the renewal application and loss runs submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

67.     In or around March 2014, Aspen issued Excess Liability Policy No. CXAE6N114 to HSS as First Named Insured, with effective dates of March 25, 2014 to July 25, 2014, and excess liability limits of $15 million.

68.     In or around July 2014, Aspen renewed CXAE6N114 with the issuance of Excess Liability Policy No. CX0020Y14A, with effective dates of July

15

25, 2014 to December 31, 2015, and excess liability limits of $2 million above CRAC26P13.

69.    Aspen's decision to renew CXAE6N114 was due primarily to the number and severity level of claims reported to Aspen during the prior policy period and in the renewal application and loss runs submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

70.    In or around July 2014, Aspen also issued Excess Liability Policy No. CX0027W14 to HSS as First Named Insured, with effective dates of July 25, 2014 to December 31, 2015, and excess liability limits of $5 million above CRAC26P13, CX0020Y14A and an $8 million second-level excess policy issued by Zurich Insurance Company, Ltd.

71.    Throughout the course of the HSS (B) Program, HSS would provide updated schedules to reflect the current participants/additional named insureds of HSS (B).   HSS periodically added and/or deleted participants from HSS (B) without Aspen's prior knowledge and/or authorization.

*HSS (C)*

72.    In or around December 2013, Aspen issued Commercial Liability Policy No. CRADJ9K13 to HSS as First Named Insured, with effective dates of December 13, 2013 to June 13, 2015; general liability limits of $1 million per

"occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $5 million; and a SIR of $2,500 for general liability claims.

73.   HSS initially provided a distinct schedule of approximately twenty-four (24) participants/additional named insureds and insured locations for this first policy in HSS (C).  By September 2014, the number of participants/additional named insureds in HSS (C) grew to approximately one hundred and seven (107).

74.   In or around April 2014, Aspen issued Excess Liability Policy No. CXAEH714 to HSS as First Named Insured, with effective dates of April 24, 2014 to June 13, 2015, and excess liability limits of $15 million.

75.   In June 2013, HSS requested that Aspen renew HSS (C) and provided loss runs and a schedule of participants/additional named insureds.  The loss runs provided included losses from HSS (A), (B) and (C).

76.   In or around June 2015, Aspen renewed Policy No. CRADJ9K13 with the issuance of Commercial Liability Policy No. CR003UL15, with effective dates of June 13, 2015 to December 13, 2016; general liability limits of $1 million per "occurrence" and $2 million in the aggregate, as well as a combined total aggregate limit cap of $10 million for general liability claims; liquor liability limits of $1 million per common cause and in the aggregate, as well as a $1 million liquor general aggregate limit; and a SIR of $2,500 for general liability claims.

17

77.    Aspen's decision to renew HSS (C) was due primarily to the number and severity level of claims reported to Aspen during the prior policy periods of HSS (A), (B) and (C) and in the application and loss runs submitted for HSS (C), as well as the continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

## Patriot's Acquisition of HSS

### *Common Ownership of HSS, Selective Risk, Carman and Selective Law*

78.    As noted, in addition to his ownership interest in HSS, as of April 1, 2015, Snow was one of two shareholders, principals and/or members of Selective Risk, the third-party claims administrator chosen by HSS to assist in the administration and/or servicing of the HSS Programs.

79.    As of April 1, 2015, the second shareholder, principal and/or member of Selective Risk was O'Donnell, who also serves as President and Chief Executive Officer of Selective Law -- HSS' chosen defense counsel for representing the participants/additional named insureds in the HSS Programs against third-party claims.

80.    Neither HSS, Snow, Selective Risk nor Selective Law disclosed to Aspen that the three entities were related parties by virtue of Snow's and O'Donnell's common ownership interests.

18

81.     Snow is also the President, Chief Executive Officer and Treasurer of Carman.

### *Patriot's Acquisition of HSS and Selective Risk Assets through Trigen*

82.     Patriot National is provider of technology and outsourcing services to members of the insurance industry, particularly within the workers' compensation, property and casualty, healthcare and employment sectors.

83.     In or around 2012, Patriot National formed Trigen Insurance, a multi-purpose property and casualty insurance agency, as a wholly-owned affiliate.

84.     On or around January 31, 2013, Patriot National spun-off Trigen Insurance through a sale of the latter to Trigen Insurance's then-CEO and -President.

85.     On or around March 31, 2015, Patriot National reacquired Trigen Insurance through a Stock Purchase Agreement between Trigen Holdings Group, Inc. ("Trigen Holdings"), its shareholders and Patriot Services, Inc. ("Patriot Services"), a wholly-owned Patriot National subsidiary (the "Trigen Stock Purchase Agreement").

86.     Upon consummation of the Trigen Stock Purchase Agreement or soon thereafter, Trigen Insurance merged with Trigen Holdings, with Trigen Insurance as the surviving entity.  Trigen Insurance, in turn, became a wholly-owned direct subsidiary of Patriot National.

19

87.    On or around April 1, 2015, Patriot acquired HSS and Selective Risk through a series of Asset Purchase Agreements.

88.    The first Asset Purchase Agreement was entered into by Trigen Insurance, HSS and Snow, as sole shareholder, principal and/or member of HSS (the "HSS Asset Purchase Agreement").

89.    Pursuant to the HSS Asset Purchase Agreement, HSS and Snow agreed to transfer to Trigen Insurance all of HSS' rights under certain contracts, as well as certain other assets and liabilities, specified in various schedules purportedly attached thereto but not made publicly available.

90.    In return, Trigen Insurance agreed to pay HSS and/or Snow $5.605 million upon closing, with up to an additional $4.045 million in future earn-out payments tied to HSS' estimated Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA").

91.    On the same day, Trigen Insurance entered into an Asset Purchase Agreement with Selective Risk, as well as Snow and O'Donnell in their capacities as sole shareholders, principals and/or members thereof (the "Selective Risk Asset Purchase Agreement").

92.    In exchange for the transfer of certain assets and liabilities of Selective Risk and Selective Risk's rights under certain contracts -- all delineated in schedules purportedly attached to the Selective Risk Asset Purchase Agreement

20

but not made publicly available -- Trigen Insurance agreed to pay Selective Risk, Snow and/or O'Donnell $1.9225 million upon closing, with the potential for a maximum future earn-out payment of the same amount based upon Selective Risk's estimated EBITDA.

93.     Pursuant to the HSS and Selective Risk Asset Purchase Agreements, Trigen Insurance retained to the sole right to use the name "Hospitality Supportive Systems, LLC."

94.     However, the Agreements also endowed Trigen Insurance with the power to, inter alia, unilaterally transfer its rights thereunder "in whole or in part to any of its Affiliates or to any Person which becomes a successor in interest (by purchase of assets or stock, or by merger or otherwise) to [Trigen Insurance]."

95.     On or around April 8, 2015, Patriot National issued and filed with the SEC a Press Release announcing Patriot National's acquisition of HSS' assets "and the assets of its claims service affiliate Selective Risk" for a total purchase price of approximately $13.5 million.

96.     On or around May 14, 2015, Trigen Insurance, HSS, Selective Risk, Snow and O'Donnell executed Amendments to the respective Asset Purchase Agreements that provided for the immediate accelerated payment of all outstanding earn-out compensation available thereunder: $4.045 million under the

21

HSS Asset Purchase Agreement and $1.9225 under the Selective Risk Asset Purchase Agreement.

97.    Thereafter, Patriot National and/or Trigen Insurance spun-off the HSS business and/or assets into a separate entity, Trigen Hospitality.  Trigen Hospitality is a wholly-owned subsidiary of Patriot Underwriters.  Patriot Underwriters, in turn, is a wholly-owned subsidiary of Patriot National.

98.    Following the execution of the HSS and Selective Risk Asset purchase agreements, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 submitted an application for coverage under Policy No. CR003UL15 in HSS (C) under the name "Hospitality Supportive Systems, Inc."

99.    HSS and Snow executed the HSS Asset Purchase Agreement without Aspen's prior knowledge and/or authorization.

100.    With respect to the Aspen Policies, no duly-authorized endorsements substituting any other entity for HSS as First Named Insured thereunder were ever issued by Aspen.

101.    To date, HSS remains the sole First Named Insured under the Aspen Policies.

**<u>Numerous Known Claims Not Disclosed in Applying for Coverage with Aspen</u>**

22

102.   As noted, throughout the history of the HSS Programs up until late 2015, the loss experience under the Aspen Policies was minor, with a comparatively-small number of reported claims and few, if any, of significant value.

103.   However, following Aspen's issuance of Notices of Nonrenewal for Policy Nos. CR0038P14, CRAC26P13 and CR003UL15 in September 2015, HSS began notifying Aspen of a significantly-increased number of claims against various additional named insureds under the Aspen Policies.

104.   The curiously late stage of many of the recently-reported underlying proceedings spurred Aspen to investigate their history, as well as HSS' knowledge thereof.

105.   Aspen's initial investigation revealed that HSS was aware of a significant number of underlying claims that were not disclosed to Aspen in the applications for coverage under certain of the Aspen Policies.

### *The Crowley Claim*

106.   On or around April 26, 2013, Liam Crowley suffered fatal injuries as a result of a motor vehicle accident when his motorcycle was struck by a vehicle operated by a patron of the tavern known as Timothy's of West Chester ("Timothy's").   On or around May 20, 2014, the Estate of Crowley filed an amended complaint in a wrongful death action styled <u>Crowley v. Timothy's West</u>

23

Chester LLC, et al., Docket No. 13-05394, in Chester County Court of the Commonwealth of Pennsylvania (the "Crowley Claim").

107.  Timothy's, a participant/additional named insured in HSS (A), was served with the amended complaint on May 23, 2014.

108.  HSS was aware of the Crowley Claim and engaged the services of Selective Law to represent Timothy's. Selective Law entered an appearance on behalf of Timothy's on June 20, 2014.

109.  Aspen was first notified of the Crowley Claim on January 6, 2015, approximately twenty-one (21) months after the injury/occurrence, seven (7) months after suit, and two (2) months before the scheduled trial date of March 12, 2015.

110.  Aspen defended Timothy's pursuant to a reservation of rights and ultimately settled the Crowley Claim on Timothy's behalf under Policy No. CRA8YY411 in HSS (A).

111.  Despite the knowledge of this significant claim, HSS failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies.  Moreover, HSS failed to notify Aspen of the Crowley Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited

24

to Policy Nos. CR0038P14, CX0038Q14A, CX0038U14, CRA8YY413, CXAE6MU14, CRAC26P13, CX0020Y14A, CX0027W14 and CRADJ9K13.

112.   In June 2015, during the renewal process for HSS (C), specifically Policy No. CR003UL15, Aspen inquired with HSS about its material failures to report the Crowley Claim.  HSS made an affirmative representation to Aspen that there were no other claims pending in the HSS Programs of which Aspen had not been notified.

113.   The loss runs submitted with certain applications and renewal applications for the above noted policies did not include the Crowley Claim.

### The Glynn Claim

114.   On or around December 9, 2012, Brendan Glynn suffered severe bodily injury as result of being struck by a motor vehicle.  Immediately before the accident, Brendan Glynn was a patron at Cavanaugh's Restaurant and Bar (owned by and hereinafter referred to as "39[th] and Sansom Street Corp.").  On or around May 30, 2014, Brendan Glynn filed a civil action captioned <u>Brendan D. Glynn v. Cavanaugh's Restaurant and Bar, et al.</u>, filed in the Court of Common Pleas, Philadelphia County, Case ID 1405004081 (the "Glynn Claim").

115.   39th and Sansom Street Corp., a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Glynn Claim on or before June 12, 2014.

25

116.   HSS assigned Selective Law to defend 39th and Sansom Street Corp., and an appearance was entered by Selective Law on June 12, 2014.

117.   Aspen was first notified of the Glynn Claim on January 19, 2016, over four (4) years after the injury/"occurrence" and twenty (20) months after suit was filed.

118.   Aspen defended 39th and Sansom Street Corp. pursuant to a reservation of rights and ultimately contributed towards the settlement of the Glynn Claim under Policy No. CRA8YY411 in HSS (A).

119.   Despite the knowledge of this significant claim, HSS failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies.   Moreover, HSS failed to notify Aspen of the Glynn Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to   Policy   Nos.   CR0038P14,   CX0038Q14A,   CX0038U14,   CRA8YY413, CXAE6MU14, CRAC26P13, CX0020Y14A, CX0027W14 and CRADJ9K13. Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Glynn Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

120.   The   loss   runs   submitted   with   the   applications   and   renewal applications for the above noted policies did not include the Glynn Claim.

26

### *The Egan Claims*

121.   On or around June 22, 2013, Neil and Scott Egan suffered severe bodily injury resulting from a physical altercation with other patrons of Drinker's Tavern (owned by and hereinafter referred to as "Alaska Waffle House, LLC"). On or around June 19, 2014, the Egans filed civil complaints captioned <u>Neal Egan v. Drinkers Tavern, et al.</u>, and <u>Scott Egan v. Drinkers Tavern, et al.</u>, filed in the Court of Common Pleas, Philadelphia County, Case ID 140602738 and 140602739, respectively (the "Egan Claims").

122.   Alaska Waffle House, LLC, a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Glynn Claim on or around June 19, 2014.

123.   HSS assigned Selective Law to defend Alaska Waffle House, LLC, and an appearance was entered by Selective Law on July 17, 2014.

124.   Aspen was first notified of the Egan Claims on January 19, 2016, thirty (30) months after the injury/"occurrence," eighteen (18) months after suit was filed and three (3) weeks before the scheduled trial date.

125.   Aspen has disclaimed coverage for the Egan Claims based upon HSS's breach of the terms, conditions and duties contained within the Aspen Policies, including but not limited to the notice conditions.

3919402-1

126.   Despite the knowledge of these significant claims, HSS failed to immediately notify Aspen of the injuries, "occurrence" and "suits" in breach of the express terms and conditions of the Aspen Policies.   Moreover, HSS failed to notify Aspen of the Egan Claims during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos.   CR0038P14,   CX0038Q14A,   CX0038U14,   CRA8YY413, CXAE6MU14,   CRAC26P13,   CX0020Y14A,   CX0027W14,   CRADJ9K13   and CXAEH714.   Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Glynn Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

127.   The loss runs submitted with the applications and renewal applications for the above noted policies did not include the Egan Claims.

### *The Possinger Claim*

128.   On or around July 11, 2013, Kyla Possinger was caused to suffer severe bodily injuries as a result of a motor vehicle accident when her motorcycle was struck by a vehicle operated by a patron of the tavern known as R.P. McMurphy's (owned by and subsequently referred to as "Brother Williams, Inc."). On or around October 22, 2014, Kyla Possinger filed a civil action styled <u>Possinger</u>

28

v. R.P. McMurphy's, et al., in the Court of Common Pleas, Philadelphia County, Case ID 141002590 (the "Possinger Claim").

129.   The patron of Brother Williams, Inc., who allegedly caused the motor vehicle accident, was apprehended by the Police inside Brother Williams, Inc., shortly after the accident.

130.   Brother Williams, Inc., a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Possinger Claim on or around October 22, 2014.

131.   HSS assigned Selective Law to defend Brother Williams, Inc., and an appearance was entered by Selective Law on January 13, 2015.

132.   Aspen was first notified of the Possinger Claim on January 20, 2016, thirty (30) months after the injury/"occurrence" and fifteen (15) months after suit was filed.

133.   Aspen defended Brother Williams, Inc., pursuant to a reservation of rights and ultimately settled the Possinger Claim on Brother Williams, Inc.'s behalf under Policy No. CRA8YY413 in the HSS (A) Program.

134.   Despite the knowledge of this significant claim, HSS failed to immediately notify Aspen of the injuries, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies.   Moreover, HSS failed to notify Aspen of the Possinger Claim during the application and renewal application

for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CR0038P14, CX0038Q14A, CX0038U14, CX0020Y14A, CX0027W14, CRADJ9K13 and CXAEH714.  Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Glynn Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

135.  The loss runs submitted with the applications and renewal applications for the above noted policies did not include the Possinger Claim.

### The Kocher Claim

136.  On or around March 21, 2014, Shawn Kocher was caused to suffer severe bodily injuries, including traumatic brain injury, as a result of a motor vehicle accident while he was a passenger in a vehicle operated by a patron of the tavern known as Roosevelt's 21 (owned by and subsequently referred to as "Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc.").  On or around July 14, 2014, Shawn Kocher filed a civil action styled Kocher v. Backjama G. Enterprises Inc., et al., in the Court of Common Pleas, Northampton County, Docket No. 2014-6545 (the "Kocher Claim").

137.  Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc., participants/additional named insureds in the HSS (B) Program, were served with the complaint in the Kocher Claim shortly after it was filed on July 14, 2014.

138.   HSS assigned Selective Law to defend Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc., in connection with the Kocher Claim.

139.   Aspen was first notified of the Kocher Claim on January 20, 2016, two (2) years after the injury/"occurrence," eighteen (18) months after suit was filed and two (2) months before the scheduled trial date.

140.   Aspen defended Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc., pursuant to a reservation of rights and ultimately contributed towards the settlement of the Kocher Claim under Policy No. CRAC26P12 in the HSS (B) Program.

141.   Despite the knowledge of this significant claim, HSS failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies.   Moreover, HSS failed to notify Aspen of the Kocher Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to   Policy   Nos.   CR0038P14,   CX0038Q14A,   CX0038U14,   CX0020Y14A, CX0027W14 and CXAEH714.   Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Glynn Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

142. The loss runs submitted with the applications and renewal applications for the above noted policies did not include the Kocher Claim.

***The Howard Claim***

143. On or around January 24, 2013, Charalynn Howard was caused to suffer severe bodily injuries as a result of being struck by patron who was extricated from the tavern known as Kildare's of Manayunk (owned by and subsequently referred to as "Kildare's Manayunk, Inc.") by an employee (bouncer). On or around October 15, 2014, Charalynn Howard filed a civil action styled Howard v. Kildare's Inc., et al., in the Court of Common Pleas, Philadelphia County, Case ID 141001658 (the "Howard Claim").

144. Kildare's Manayunk, Inc., a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Howard Claim shortly after it was filed on October 15, 2014.

145. HSS assigned Selective Law to defend Kildare's Manayunk, Inc., in connection with the Howard Claim. Selective Law entered its appearance on December 5, 2014.

146. Aspen was first notified of the Howard Claim on January 19, 2016, three (3) years after the injury/"occurrence" and fifteen (15) months after suit was filed.

147. The Howard Claim was settled with contributions from both Aspen and HSS.

148. Despite the knowledge of this significant claim, HSS failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, HSS failed to notify Aspen of the Howard Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CRA8YY413, CXAE6MU14, CR0038P14, CX0038Q14A, CX0038U14, CRAC26P13, CX0020Y14A, CX0027W14, CRADJ9K13 and CXAEH714. Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Glynn Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

149. The loss runs submitted with the applications and renewal applications for the above noted policies did not include the Howard Claim.

### *Aspen's Discovery of Additional Undisclosed Known Claims*

150. Since November 2015, Aspen has been put on notice of approximately two hundred and thirty-six (236) additional claims made in the HSS Programs. Approximately forty percent (40%) of these claims occurred from 2012 to 2014.

33

151.  For comparison, Aspen received approximately 7-10 claims per year from the HSS Programs during each of the prior 5 years.

152.  HSS and/or the participants/additional named insureds in the HSS Programs were aware of these injuries, "occurrences" or "suits" when applying for, and renewing one or more of the Aspen Policies.  With respect to the application for coverage under Policy No. CR003UL15 in HSS (C), Trigen Insurance, Trigen Hospitality, Patriot Underwriters, ABC Corporations 1-25 and/or the participants/additional named insureds thereunder were aware of these injuries, occurrences or "suits" when applying for renewal coverage.

153.  On or around February 29, 2016, Aspen notified HSS that Aspen was cancelling Aspen Policies CR003UL15, CX0038Q14A, CX0038U14 and CR0038P14 as of March 30, 2016.

154.  Aspen's investigation of the material misrepresentations and/or omissions made by the various Defendants in connection with the applications for coverage under the Aspen Policies is ongoing.

155.  Since the filing of the instant litigation in March 2016, Aspen has uncovered no less than ninety-five (95) additional claims asserted against participants/additional named insureds in HSS (A) within Philadelphia County, Pennsylvania, alone that were not disclosed to Aspen in conjunction with the initial application for coverage under Policy No. CRA8YY411 in HSS (A).

34

## COUNT I - EQUITABLE RESCISSION
### (as to HSS)

156.   The allegations contained in paragraphs 1-155 are incorporated by reference as if fully set forth herein.

157.   Notwithstanding the various asset and purchases set forth above, HSS was and remains the sole First Named Insured under the Aspen Policies.

158.   The applications and renewal applications for the Aspen Policies contain the following provisions:

*ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIALS THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND CIVIL PENALTIES, INSURANCE BENEFITS MAY ALSO BE DENIED.*

*THE UNDERSIGNED IS AN AUTHORIZED REPRESENTATIVE OF THE APPLICANT AND REPRESENTS THAT REASONABLE ENQUIRY HAS BEEN MADE TO OBTAIN THE ANSWERS TO QUESTIONS ON THIS APPLICATION.   HE/SHE REPRESENTS THAT THE ANSWERS ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS/HER KNOWLEDGE.*

159.   In the applications for the issuance and renewal of the Aspen Policies and thereafter, HSS misrepresented, misstated, omitted and/or concealed material information regarding the injuries, losses, claims and/or "suits" that had occurred in the HSS Programs.  Such misrepresentations include but are not limited to the

Crowley, Glynn, Egan, Possinger, Kocher and Howard Claims.   If HSS had disclosed such information, Aspen would not have issued the Aspen Policies as written, if at all.

160.   The acts and omissions of HSS constitute misrepresentations, misstatements, omissions and/or concealments of facts to Aspen in the application for and/or negotiation of the Aspen Policies.

161.   The misrepresentations, misstatements, omissions and/or concealments of facts regarding prior and pending claims under the HSS Programs and loss experience were material to the acceptance of the risk and material to the hazards accepted by Aspen.

162.   The number and severity of the injuries, "occurrences," claims and "suits" was material to the acceptance of the risk by Aspen.

163.   HSS was aware of the materiality and falsity of the misrepresented, omitted and/or concealed information that was not submitted and was aware that Aspen would either not have issued and renewed the Aspen Policies or would have issued and/or amended the Aspen Policies under different terms and conditions -- including but not limited to a different premium rate -- if Aspen had known the misrepresented, omitted, false and/or concealed information.

164.   Indeed, it was discovered by Aspen after the issuance of all the Aspen Policies, contrary to what was represented to it at the time of the quoting and

issuance of the Aspen Policies, that HSS was aware of and concealing dozens of injuries, "occurrences," claims and "suits" within the HSS Program in order to procure the Aspen Policies.

165.   Aspen relied on HSS' material misrepresentations to its detriment.

166.   The last premium payment for the Aspen Policies was received by Aspen on August 13, 2015, in the amount of $1,016,400.

167.   During the course of the investigation of the aforementioned claims, Aspen discovered HSS' material misrepresentations.   Aspen accepted no further premium payments thereafter.

168.   As a result of the misrepresentations, misstatements, omissions and/or concealments of facts set forth above, the Aspen Policies should be rescinded ab initio, including but not limited as to any and all purported insureds, named insureds and additional insureds.

169.   Aspen has provided and/or is currently providing defense and/or indemnity insurance coverage for various past and pending liability claims and lawsuits under the HSS Programs (the "Underlying Claims").

170.   Upon rescission of the Aspen Policies, Aspen is entitled to retain some or all of the premium paid for the Aspen Policies as an off-set to the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies,

including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

171. Upon rescission of the Aspen Policies, Aspen is entitled to restitution of the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

## COUNT II - RESCISSION BASED ON FRAUD
### (as to HSS)

172. The allegations contained in paragraphs 1-171 incorporated by reference as if fully set forth herein.

173. HSS knowingly made false representations and concealed material information with the intention of inducing Aspen to issue the Aspen Policies. Specifically, HSS failed to notify Aspen of injuries, "occurrences," claims and "suits" within the HSS Programs, including but not limited to the Crowley, Glynn, Egan, Possinger, Kocher and Howard Claims, on the applications for certain Aspen Policies.

174. HSS knew that the information regarding the pending injuries, "occurrences," claims and "suits" within the HSS Programs was material to Aspen's underwriting process and assessment of the risk.

175. HSS intended for Aspen to rely on the false and concealed information in its procurement of the Aspen Policies.

38

176.   The misrepresentations, concealment of facts, omissions and incorrect statements provided to Aspen by HSS were fraudulent.

177.   Aspen did in fact rely upon the false information provided by HSS, to its detriment, in issuing and maintaining the Aspen Policies

178.   As a result of the foregoing, Aspen has suffered and will continue to suffer damages if the Aspen Policies are not rescinded, in an amount that exceeds the jurisdictional limits of this Court.

179.   Since the misrepresentations, misstatements, omissions and/or concealments of facts recited above, individually and together, were fraudulent, the Aspen Policies should be rescinded ab initio, including but not limited as to any and all purported insureds, named insureds and additional insureds.

180.   Aspen has provided and/or is currently providing defense and/or indemnity insurance coverage for various Underlying Claims.

181.   Upon rescission of the Aspen Policies, Aspen is entitled to retain some or all of the premium paid for the Aspen Policies as an off-set to, and/or for restitution of, the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

182.   Upon rescission of the Aspen Policies, Aspen is entitled to restitution of the costs and expenses Aspen has incurred as a result of the issuance of the

3919402-1

Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

## COUNT III - DECLARATORY RELIEF
**(as to HSS)**

183.   The allegations contained in paragraphs 1-182 are incorporated by reference as if fully set forth herein.

184.   Pleading alternatively, if the Aspen Policies are not rescinded, there is an actual and justiciable controversy and Aspen is uncertain as to its rights.  Aspen states that the misrepresentations, misstatements, omissions and/or concealments of facts -- because they were fraudulent, material to the acceptance of the risk and/or material to the hazard assumed -- and further because Aspen in good faith would not have issued the Aspen Policies had the true information been known, renders the Aspen Policies inapplicable to various pending Underlying Claims, and any claim brought or to be brought as a result thereof or to be made under the Aspen Policies.

185.   In the event that this Court does not exercise its equitable powers and completely rescind the Aspen Policies, Aspen seeks a declaration that there is no coverage under the Aspen Policies for various pending Underlying Claims, and any claim brought or to be brought as a result thereof or to be made under the Aspen Policies.

186.   Aspen seeks a judicial determination from this Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., declaring whether and to what extent Aspen has a coverage obligation to HSS and/or any additional named insureds under the Aspen Policies.

## COUNT IV - DECLARATORY RELIEF - FRAUD
### (as to HSS)

187.   The allegations contained in paragraphs 1-186 are incorporated by reference as if fully set forth herein.

188.   Pleading alternatively, HSS knowingly made misrepresentations, misstatements, omissions and/or concealments of facts with the intent of deceiving and inducing Aspen to issue the Aspen Policies.

189.   These misrepresentations, misstatements, omissions and/or concealments of facts include, but are not limited to, failing to disclose known injuries, "occurrences," claims and "suits" within the HSS Programs, including but not limited to the Crowley, Glynn, Egan, Possinger, Kocher and Howard Claims, on the applications for certain Aspen Policies.

190.   These misrepresentations, misstatements, omissions and/or concealments of facts were made by HSS with the intention of deceiving and inducing Aspen to issue policies that it would otherwise not issue.

191.   Aspen relied upon the misrepresentations, misstatements, omissions and/or concealments of facts in issuing the Aspen Policies.

41

192.   Aspen has suffered and will continue to suffer damages as a result of this fraud.

193.   As a result, if the Aspen Policies are not rescinded, an actual and justiciable controversy exists, Aspen is uncertain of its rights, and Aspen seeks a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., that there is no coverage under the Aspen Policies for various pending Underlying Claims, and any claim brought or to be brought as a result thereof or to be made under the Aspen Policies.

## COUNT V - DECLARATORY RELIEF - NO COVERAGE
### (as to HSS)

194.   The allegations contained in paragraphs 1-193 are incorporated by reference as if fully set forth herein.

195.   HSS has requested insurance coverage under one or more Aspen Policies for various Underlying Claims in several jurisdictions around the country.

196.   These coverage claims made by HSS have given rise, and likely will continue to give rise, to disputes between and among Aspen and HSS, including without limitation disputes concerning the proper interpretation of various policy terms and the existence, scope and extent of coverage, if any, with respect to the Underlying Claims under the Aspen Policies.

3919402-1

197.   The Aspen Policies contain various terms, conditions, provisions and exclusions which must be satisfied or found not to apply for coverage to exist with respect to the Underlying Claims, which may include but are not limited to:

a.   Coverage is or may be barred to the extent that an insured has failed to notify Aspen as soon as practicable of an injury, "occurrence" or an offense, regardless of the amount, which may result in a claim and/or to provide written notice of a claim or suit as soon as practicable in connection with the Underlying Claims as required pursuant to the Aspen Policies;

b.   Coverage is or may be barred to the extent that the Underlying Claims involve damages or injuries for which an insured has voluntarily made payment, assumed an obligation or incurred an expense without Aspen's consent;

c.   Coverage is or may be barred to the extent that an insured has failed to satisfy all duties and conditions precedent in connection with the Underlying Claims, including without limitation compliance with the assistance and cooperation provisions set forth in the Aspen Policies;

d.   Coverage is or may be barred to the extent that an insured has failed to provide quarterly written summaries (loss runs) of all

43

"occurrences," claims, "suits", or offenses which have or may result in payments within the Retained Limit of the Aspen Policies;

e.   Coverage is or may be barred to the extent that any person or entity seeking coverage in connection with the Underlying Claims does not qualify as a named insured or insured under the Aspen Policies.

198.   Aspen seeks a judicial determination from this Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., declaring whether and to what extent Aspen has a coverage obligation, under the Aspen Policies, to HSS and/or other insureds in connection with the Underlying Claims.

## COUNT VI - RESERVATION TO ASSERT ADDITIONAL GROUNDS FOR RESCISSION OR DECLARATORY JUDGMENT
### (as to HSS)

199.   The allegations contained in paragraphs 1-198 are incorporated by reference as if fully set forth herein.

200.   Aspen's investigation with respect to potential coverage under the Aspen Policies is ongoing.

201.   Aspen brings this action for, inter alia, rescission and a declaration of its rights and obligations under the Aspen Policies in order to promptly address the issues set forth herein.

3919402-1

202.   Additional independent grounds may be available to support rescission or a declaration that coverage is limited and/or not available with respect to the HSS Programs.

203.   By not specifically raising any such limitations or exclusions at this time, Aspen expressly does not waive any of its rights under the Aspen Policies, in equity and/or at law.

204.   To the contrary, Aspen's investigation is ongoing, and it continues to fully reserve all of its rights under the Aspen Policies and/or at law, and specifically reserves all of its rights to amend this Complaint to assert additional grounds to support rescission and/or a declaration that coverage is limited and/or not available with respect to the HSS Programs.

## COUNT VII - FRAUD
### (as to HSS)

205.   The allegations contained in paragraphs 1-204 are incorporated by reference as if fully set forth herein.

206.   Pleading alternatively and as set forth more fully above, prior and up to April 1, 2015, HSS committed numerous instances of knowing misrepresentation, misstatement, omission and/or concealment of facts in connection with the applications for coverage under certain of the Aspen Policies.

207.   These misrepresentations by HSS involved, inter alia, information concerning known losses and/or claims asserted against participants/additional

45

named insureds under the HSS Programs, which were material to the risk assumed by Aspen in issuing the Aspen Policies.

208.   The purpose of these knowing material misrepresentations and/or misstatements was to procure the Aspen Policies and/or more favorable terms of coverage for the HSS Programs.

209.   Aspen   relied   upon   the   material   misrepresentations   and/or misstatements made by HSS in electing to issue the Aspen Policies and setting the terms of coverage thereunder.

210.   As a result of the above-noted misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages, in that Aspen has incurred and will continue to incur substantial costs under the Aspen   Policies   for   the   defense   and   indemnification   of   various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## COUNT VIII - FRAUD
### (as to HSS)

211.   The allegations contained in paragraphs 1-210 are incorporated by reference as if fully set forth herein.

212.   Pleading alternatively and as set forth more fully above, prior and up to April 1, 2015, HSS  repeatedly represented that it would ensure compliance with

46

the HSS Underwriting Guidelines by any proposed participants/additional named insureds for the HSS Programs.

213.  These representations by HSS involved, <u>inter alia</u>, strict enforcement of the HSS Underwriting Guidelines' limitations on acceptable loss history for proposed participants/additional named insureds for the HSS Programs.

214.  The purpose of these representations was to procure the Aspen Policies and/or more favorable terms of coverage for the HSS Programs.

215.  Aspen relied upon the representations by HSS in electing to issue the Aspen Policies and setting the terms of coverage thereunder.

216.  Contrary to its repeated representations, HSS did not ensure that proposed participants/additional named insureds qualified pursuant to the HSS Underwriting Guidelines, particularly but not limited to those specifications concerning acceptable loss history.

217.  As a result of the above-noted misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages, in that Aspen has incurred and will continue to incur substantial costs under the Aspen Policies for the defense and indemnification of various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## COUNT IX - NEGLIGENCE
### (as to HSS)

218.   The allegations contained in paragraphs 1-217 are incorporated by reference as if fully set forth herein.

219.   Pleading alternatively, HSS owed Aspen an independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines.

220.   HSS breached the aforesaid duty.

221.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT X - ALTER-EGO LIABILITY
### (as to Snow and Carman)

222.   The allegations contained in paragraphs 1-221 are incorporated by reference as if fully set forth herein.

223.   Pleading alternatively and as set forth above, Snow was at all relevant times and/or remains sole shareholder, principal and/or member of HSS.

224.   Additionally, Snow was at all relevant times and/or remains President, CEO, and Treasurer -- as well as shareholder, principal and/or member -- of Carman.

225.   HSS and Carman share a common office location.

48

226.   HSS and Carman share common officers and personnel with respect but not limited to the HSS Programs and the Aspen Policies, including but not limited to Snow.

227.   Snow completely dominates both HSS and Carman, such that effectively no other officers thereof function.

228.   HSS and Carman do business and/or operate in some capacity as if they were one entity, including but not limited to:

      a.     The listing of Carman as applicant on certain application forms for coverage under the Aspen Policies issued to HSS as First Named Insured;

      b.     The listing of shared HSS/Carman personnel's contact information in their capacity as Carman employee(s) on a complaint filed on behalf of HSS with the Pennsylvania Department of Insurance concerning the Aspen Policies; and

      c.     Correspondence sent from shared HSS/Carman personnel in their capacity as Carman employee(s) to Aspen with respect to claims arising under the Aspen Policies issued to HSS as First Named Insured.

229.   HSS, Snow and/or Carman failed to observe the corporate formalities and/or keep adequate corporate records.

230.  HSS, Snow and/or Carman failed to maintain segregated bank accounts and accounting records, and commingled accounts and funds, such that the corporate formalities and separateness of each should be disregarded.

231.  Following the execution of the HSS Asset Purchase Agreement, HSS is merely an empty-shell entity devoid of any substantial assets.

232.  Snow and/or Carman used HSS to defraud Aspen through repeated misrepresentations, misstatements, omissions and/or concealment of facts in connection with the applications for coverage under the Aspen Policies.

233.  As set forth above, Snow and/or Carman have used HSS as their alter ego.

234.  Fundamental injustice will result if Aspen is not permitted to recover from Snow and/or Carman because Aspen's damages will exceed any premium paid for the Aspen Policies and HSS is without substantial assets.

235.  Accordingly, Aspen is entitled to disregard the corporate formalities and separateness of HSS, Snow and/or Carman, such that liability against one constitutes liability against all.

## COUNT XI - NEGLIGENCE
### (as to Snow and Carman)

236.  The allegations contained in paragraphs 1-235 are incorporated by reference as if fully set forth herein.

237. Pleading alternatively, Snow and/or Carman owed Aspen an independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines.

238. Snow and/or Carman breached the aforesaid duty.

239. As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XII - PARTICIPATION LIABILITY
### (as to Snow)

240. The allegations contained in paragraphs 1-239 are incorporated by reference as if fully set forth herein.

241. Prior to and from the inception of the HSS Programs, Snow participated directly in the negotiation and procurement of the Aspen Policies, as well as the various representations made to Aspen concerning the proposed participants'/additional named insureds' loss history and compliance with the HSS Underwriting Guidelines.

242. Furthermore, Snow participated directly in the numerous material misrepresentations and/or misstatements made by HSS regarding known losses and/or claims asserted against participants/additional named insureds, as well as the failure to ensure compliance with the HSS Underwriting Guidelines.

51

243.   Accordingly, Snow is liable as an individual participant in the above-enumerated acts of fraud committed by HSS with respect to the HSS Programs and/or Aspen Policies.

244.   To the extent that the Court finds liability as to HSS, Snow is and should be held personally liable for any damage caused to Aspen in connection with same.

## COUNT XIII - SUCCESSOR LIABILITY
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

245.   The allegations contained in paragraphs 1-244 are incorporated by reference as if fully set forth herein.

246.   Pleading alternatively and as set forth above, by way of the HSS Asset Purchase Agreement, Trigen Insurance acquired substantially all of HSS' assets, as well as those liabilities necessary to carry on HSS' general business operations.

247.   Pursuant to the terms of the HSS Asset Purchase Agreement, Trigen Insurance retained to the sole right to use the name "Hospitality Supportive Systems, LLC," from the effective date thereof onward.

248.   Thereafter, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 continued the general business operations of HSS as they had previously existed.

249.   Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 utilized the same personnel in the continuance of HSS' general business operations as previously used by HSS prior to the sale of its assets.

250.   Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 continued to utilize the same management in the continuance of HSS' general business operations, including but not limited to Snow.

251.   By way of a February 2016 issuance and/or transfer of Patriot National Common Stock from Patriot National to Snow -- which resulted in Snow becoming the third-largest shareholder of Patriot National with approximately 5.6% of all issued and outstanding shares -- Snow became a constituent part of Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, and continued as an owner and/or shareholder of the HSS general business operations and assets.

252.   In light of the provision in the HSS and Selective Risk Asset Purchase Agreements endowing Trigen Insurance with the sole right to use the name "Hospitality Supportive Systems, LLC," from the effective date thereof onward, as well HSS' consequential lack of any substantial assets, HSS as it previously existed ceased to operate.

53

253.   As set forth above, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 assumed the liabilities of HSS by way of the HSS Asset Purchase Agreement.

254.   Accordingly, to the extent the Court finds liability on the part of HSS, Aspen should be able to recover any damages caused thereby from Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in their capacity as liable successors.

## COUNT XIV - FRAUD
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

255.   The allegations contained in paragraphs 1-254 are incorporated by reference as if fully set forth herein.

256.   Pleading alternatively and as set forth more fully above, by way of the HSS Asset Purchase Agreement dated April 1, 2015, Trigen Insurance acquired substantially all of HSS' assets and rights pursuant to certain contracts delineated in schedules purportedly attached thereto but not made publicly available.

257.   Additionally, pursuant to the terms of the HSS and Selective Risk Asset Purchase Agreements, Trigen Insurance retained the sole right to use the name "Hospitality Supportive Systems, Inc." from the effective date thereof onward.

258.   The respective Asset Purchase Agreements also gave Trigen Insurance the unrestricted authority to transfer any and all of its rights thereunder to any of its affiliates.

259.   Thereafter, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 submitted an application for renewal coverage under Policy No. CR003UL15 in HSS (C), under the name "Hospitality Supportive Systems, LLC."

260.   The application for Policy No. CR003UL15 submitted by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 contained several instances of knowing misrepresentation, misstatement, omission and/or concealment of facts.

261.   These misrepresentations by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 involved, inter alia, information concerning known losses and/or claims asserted against participants/additional named insureds under the HSS Programs, which were material to the risk assumed by Aspen in issuing Policy No. CR003UL15.

262.   The purpose of these knowing material misrepresentations and/or misstatements was to procure Policy No. CR003UL15 and/or more favorable terms of coverage for the HSS Programs.

3919402-1

263.   Aspen   relied   upon   the   material   misrepresentations   and/or misstatements made by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in electing to issue Policy No. CR003UL15 and setting the terms of coverage thereunder.

264.   As a result of the above-noted misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages, in that Aspen has incurred and will continue to incur substantial costs under the Aspen   Policies   for   the   defense   and   indemnification   of   various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## <u>COUNT XV - FRAUD</u>
**(as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)**

265.   The allegations contained in paragraphs 1-264 are incorporated by reference as if fully set forth herein.

266.   Pleading alternatively and as set forth more fully above, following the execution of the HSS and Selective Risk Asset Purchase Agreements dated April 1, 2015, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 submitted an application for renewal coverage under Policy No. CR003UL15 in HSS (C), under the name "Hospitality Supportive Systems, LLC."

56

267.   In conjunction with the CR003UL15 application, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 -- using the name "Hospitality Supportive Systems, LLC" -- represented to Aspen that they would ensure compliance with the HSS Underwriting Guidelines.

268.   These representations by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 involved, inter alia, strict enforcement of the HSS Underwriting Guidelines' limitations on acceptable loss history for proposed participants/additional named insureds for the HSS Programs.

269.   The purpose of these representations was to procure Policy No. CR003UL15 and/or more favorable terms of coverage for the HSS Programs.

270.   Aspen relied upon the representations by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in electing to issue Policy No. CR003UL15 and setting the terms of coverage thereunder.

271.   Contrary to their repeated representations, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 did not ensure that proposed participants/additional named insureds qualified pursuant to the HSS Underwriting Guidelines, particularly but not limited to those specifications concerning acceptable loss history.

272.   As a result of the above-noted misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages,

in that Aspen has incurred and will continue to incur substantial costs under the Aspen Policies for the defense and indemnification of various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## COUNT XVI - UNJUST ENRICHMENT
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

273.   The allegations contained in paragraphs 1-272 are incorporated by reference as if fully set forth herein.

274.   Pleading alternatively and as noted above, prior and up to April 1, 2015, in its capacity as First Named Insured and intermediary between the HSS Programs' participants/additional named insureds and Aspen, HSS charged each participant/additional named insured a distinct and augmented premium with respect to the Aspen Policies as a fee for its services.

275.   Following the HSS and Selective Risk Asset Purchase Agreements dated April 1, 2015, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 retained these independently charged augmented premiums paid by participants/additional named insureds in the HSS Programs.

276.   This significant pecuniary benefit was conferred upon Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25

3919402-1

by Aspen through the issuance of Policy No. CR003UL15 to HSS as First Named Insured.

277.   Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 accepted and continue to retain any premium-related fees collected pursuant to their assumption of HSS' rights by way of the HSS and Selective Risk Asset Purchase Agreements.

278.   Aspen's conferral of the above-noted pecuniary benefit on Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 through the issuance of Policy No. CR003UL15 was in reliance on the misrepresentations, misstatements, omission and/or concealment of facts by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25.

279.   Accordingly Trigen Insurance's, Trigen Hospitality's, Patriot Underwriters' and/or ABC Corporations 1-25's retention of the benefit conferred by Aspen would be inequitable without payment to Aspen for the value of the actual hazard insured and/or risk assumed by Aspen through the issuance of Policy No. CR003UL15.

## COUNT XVII - NEGLIGENCE
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

280.   The allegations contained in paragraphs 1-279 are incorporated by reference as if fully set forth herein.

3919402-1

281. Pleading alternatively, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 owed Aspen an independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines.

282. Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 breached the aforesaid duty.

283. As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XVIII - ALTER-EGO LIABILITY
### (as to Patriot National)

284. The allegations contained in paragraphs 1-283 are incorporated by reference as if fully set forth herein.

285. Pleading alternatively and as set forth above, Patriot National completely dominates Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25.

286. Patriot National directed Patriot Services to enter into the March 31, 2015 Trigen Stock Purchase Agreement on its behalf.

287. As a condition to Patriot Services' purchase of the Trigen shares, Trigen and/or certain of its shareholders were required to immediately pay certain

60

outstanding Demand Notes issued in favor of and held by Patriot National's Chairman, CEO and majority shareholder in his individual capacity.

288.   Patriot National's Chairman, CEO and majority shareholder executed the Trigen Stock Purchase Agreement on behalf of Patriot Services as its President and Chief Executive Officer.

289.   Immediately upon closing of the Trigen Stock Purchase Agreement or shortly thereafter, Patriot National spun-off the recently-acquired Trigen shares into Trigen Insurance, itself a direct subsidiary of Patriot National.

290.   By way of an April 1, 2015 Press Release, Patriot National notified the public and the SEC that Patriot National had acquired Trigen Insurance.

291.   That same day, using Trigen Insurance is a façade for its own purposes, Patriot National acquired the assets of HSS and Selective Risk through the HSS and Selective Risk Asset Purchase Agreements.

292.   Thereafter, Patriot National directed Trigen Insurance to spin-off the purchased HSS assets into Trigen Hospitality, a wholly-owned subsidiary of Patriot Underwriters.

293.   At the time of execution of the HSS and Selective Risk Management Asset Purchase Agreements, Trigen Insurance was insufficiently capitalized to meet its obligations thereunder.

61

294.   On or around April 8, 2015, Patriot National issued and filed with the SEC a Press Release announcing Patriot National's acquisition of HSS' assets.

295.   Patriot National strategically placed its own officers within executive positions for Patriot Services, Trigen Insurance, Patriot Underwriters, Trigen Hospitality and/or ABC Corporations 1-25.

296.   In most if not all instances -- including but not limited to the Asset and Stock Purchase Agreements set forth above -- significant corporate actions undertaken by Patriot Services, Trigen Insurance, Patriot Underwriters, Trigen Hospitality and/or ABC Corporations 1-25 are executed by individuals serving as officers in both Patriot National and its affiliates.

297.   In light of the ubiquity of this occurrence and the circumstances surrounding each of the relevant transactions, the executing officers have effectively ceased to function independently of their capacity as Patriot National executives.

298.   Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have utilized and continue to utilize common key personnel with respect to HSS' operations, including but not limited to Snow.

299. Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have failed to observe the corporate formalities and keep adequate records as purportedly independent entities.

300. Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have failed to maintain separate bank accounts and accounting records and commingled accounts and funds.

301. This disregard for the corporate formalities and commingling of funds includes but is not limited to the issuance and/or transfer of 1,579,166 shares of Patriot National Common Stock by Patriot National to Snow in February 2016, even though all payments owed to Snow and/or HSS under the HSS and Selective Risk Asset Purchase Agreements entered into by Trigen Insurance at the direction and on behalf of Patriot National were purportedly made by or around May 14, 2015.

302. Neither Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters nor ABC Corporations 1-25 have ever paid shareholder dividends.

303. Patriot National exercises total control over the assets of Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, and uses such assets as its own.

304. Specifically, Patriot National repeatedly used the assets of its affiliates -- including those of Trigen Insurance, Trigen Hospitality, Patriot Underwriters

and/or ABC Corporations 1-25 -- as collateral and/or guaranty for various credit and financing agreements Patriot National entered into with third-party lenders.

305.   Patriot National has used Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 to defraud Aspen through misrepresentations, misstatements, omissions and/or concealment of facts in connection with the applications for coverage under the Aspen Policies, including but not limited to Policy No. CR003UL15.

306.   As set forth above, Patriot National has used Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 as its alter egos.

307.   Fundamental injustice will result if Aspen is not permitted to recover from Patriot National because Aspen's damages will exceed any premium paid for the Aspen Policies and HSS, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations are without sufficient assets.

308.   Accordingly, Aspen is entitled to disregard the corporate formalities and separateness of Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, such that liability against one constitutes liability against all.

## <u>COUNT XIX - ACCOUNTING</u>
### (as to HSS, Selective Risk and Selective Law)

309.   The allegations contained in paragraphs 1-308 are incorporated by reference as if fully set forth herein.

310.   Aspen is entitled to an accounting from HSS, Selective Risk and/or Selective Law as to all monies paid to or received by HSS, Selective Risk and/or Selective Law in connection with the HSS Programs and/or the Aspen Policies, including but not limited to HSS', Selective Risk's and/or Selective Law's ultimate disposition of those funds.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Aspen respectfully requests that the Court enter judgment against Defendants and in its favor as follows:

     a.    Rescinding the Aspen Policies due to misrepresentations, misstatements, omissions and/or concealments of facts material to the acceptance of the risk by Aspen;

     b.    Rescinding the Aspen Policies due to misrepresentations, misstatements, omissions and/or concealments of facts material to the hazard assumed by Aspen;

     c.    Rescinding the Aspen Policies because Aspen in good faith would not have issued the Aspen Policies had the misrepresentations, misstatements, omissions and/or concealments of facts not been made to Aspen by and on behalf of HSS, or had the true information been known;

d.    Rescinding the Aspen Policies due to the fraudulent misrepresentations, misstatements, omissions and/or concealments of facts by and on behalf of HSS;

e.    Declaring that Aspen is entitled to retain some or all of the premium paid for the Aspen Policies as an off-set to the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

f.    Declaring that Aspen is entitled to restitution of the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

g.    A declaration as to the respective rights and obligations of Aspen and HSS, and specifically a judgment declaring that Aspen owes no coverage for the pending Underlying Claims or any claim made or to be made under the Aspen Policies;

h.    A declaration as to the respective rights and obligations of Aspen and HSS with respect to defense and indemnity coverage in connection with the Underlying Claims;

i.      Holding that HSS is liable to Aspen for fraud in connection with its knowing misrepresentations, misstatements, omissions and/or concealments of facts in connection with the applications for coverage under certain of the Aspen Policies, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

j.      Holding that HSS is liable to Aspen for fraud in connection with its knowing misrepresentations regarding enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

k.      Holding that HSS is liable to Aspen for negligence arising from its breach of the independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

l.      A declaration that Aspen is entitled to disregard the corporate formalities and purported separateness of HSS, Snow and/or Carman, and permitting Aspen to recover damages from Snow and/or Carman for any liability attributable to HSS in an amount to be determined at trial;

m.      Holding that Snow and/or Carman are liable to Aspen for negligence arising from the breach of the independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

n.      A declaration that Snow is liable to Aspen in his individual capacity as an active participant in HSS' material misrepresentations, misstatements, omissions and/or concealments of facts in connection with the applications for coverage under the Aspen Policies and the failure to ensure compliance with the HSS Underwriting Guidelines, and awarding judgment against Snow as liable participant in an amount to be determined at trial;

68

o.     A declaration that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen as successors to HSS, and permitting Aspen to recover damages from said Defendants for any liability attributable to HSS in an amount to be determined at trial;

p.     Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen for fraud in connection with their knowing misrepresentations, misstatements, omissions and/or concealments of facts in connection with the application for coverage under Policy No. CR003UL15, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

q.     Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen for fraud in connection with their knowing misrepresentations regarding enforcement of the HSS Underwriting Guidelines in connection with the application for coverage under Policy No. CR003UL15, and awarding Aspen's damages, including compensatory and

69

consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

r.     Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have been unjustly enriched through the retention of premium in connection with Aspen's reliance on their representations, and ordering payment to Aspen for the value of the actual hazard insured and/or risk assumed, in an amount to be determined at trial;

s.     Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen for negligence arising from the breach of the independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

t.     A declaration that Aspen is entitled to disregard the corporate formalities and purported separateness of Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, and permitting Aspen to recover damages from

70

Patriot National for any liability attributable to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in an amount to be determined at trial;

u.      Ordering HSS, Selective Risk and Selective Law to provide an accounting to Aspen regarding the HSS Programs and/or Aspen Policies;

v.      A declaration that Aspen is entitled to a judgment for its reasonable attorney's fees and costs of this suit; and

w.      For such other and further relief as the Court deems just and proper.

                              CONNELL FOLEY LLP

Dated: February 10, 2017                  William D. Deveau
                              185 Hudson Street, Suite 2510
                              Jersey City, NJ 07311
                              Tel:   (201) 521-1000
                              Fax:   (201) 521-0100
                              wdeveau@connellfoley.com
                                   and
                              Jonathan P. McHenry (*pro hac vice*)
                              Patrick J. Hughes (I.D. No. 41403)
                              Patrick K. Coughlin (*pro hac vice*)
                              Connell Foley LLP
                              85 Livingston Avenue
                              Roseland, New Jersey 07068
                              Tel: (973) 535-0500
                              Fax: (973) 535-9217
                              Attorneys for Plaintiff,
                              Aspen Specialty Insurance Company

                                     71