# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPEN SPECIALTY INSURANCE COMPANY, | **Civil Action** |
| Plaintiff, | **No. 2:16-cv-01133** |
| v. | |
| HOSPITALITY SUPPORTIVE SYSTEMS, LLC, EDWARD E. SNOW, individually,  THE CARMAN CORPORATION, SELECTIVE RISK MANAGEMENT, LLC, SELECTIVE LAW GROUP, LLC, JOHN W. CONNELLY, JR., individually, CHARLES M. O'DONNELL, ESQ., individually, MCGRIFF SIEBELS & WILLIAMS, INC., INSERVCO INSURANCE SERVICES, INC., TRIGEN INSURANCE SOLUTIONS, INC., TRIGEN HOSPITALITY GROUP, INC., PATRIOT UNDERWRITERS, INC.,  PATRIOT NATIONAL, INC., and ABC CORPORATIONS 1-25, | **SECOND AMENDED COMPLAINT** |
| Defendants. | |

| |
|---|
| HOSPITALITY SUPPORTIVE SYSTEMS, LLC, |
| Plaintiff, |
| v. |
| ASPEN SPECIALTY INSURANCE |

COMPANY,

                                    Defendant.

Plaintiff Aspen Specialty Insurance Company (hereinafter "Aspen"), by and through its attorneys, Connell Foley LLP, brings this action against Defendants Hospitality Supportive Systems, LLC ("HSS"), Edward E. Snow, individually ("Snow"), The Carman Corporation ("Carman"), Selective Risk Management, LLC ("Selective Risk"), Selective Law Group, LLC ("Selective Law"), John W. Connelly, Jr. ("Connelly"), Charles M. O'Donnell, Esq. ("O'Donnell"), McGriff, Siebels, and Williams, Inc. ("McGriff"), Inservco Insurance Services, Inc. ("Inservco"), Trigen Insurance Solutions, Inc. ("Trigen Insurance"), Trigen Hospitality Group, Inc. ("Trigen Hospitality") (together with Trigen Insurance, "Trigen"), Patriot Underwriters, Inc. ("Patriot Underwriters"), Patriot National, Inc. ("Patriot National") (together with Patriot Underwriters, "Patriot"), and ABC Corporations 1-25 (collectively, "Defendants"), and prays for damages and relief, and alleges on knowledge as to its own acts and otherwise upon information and belief as follows:

## **PARTIES**

1.      Aspen is a corporate entity organized under the laws of the State of North Dakota with its principal place of business at 590 Madison Ave., 7th Floor, New York, New York.

2

2.     HSS is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business located at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

3.     Snow is an individual conducting business at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

4.     Carman is a corporate entity organized under the laws of the State of Pennsylvania with its principal place of business at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

5.     Selective Risk is a limited liability company organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

6.     Selective Law is a limited liability company organized under the laws of the Commonwealth of Pennsylvania, with its principal place of business at 760 W. Sproul Rd., Suite 301, Springfield, Pennsylvania.

7.     Connelly is an individual conducting business at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania.

8.     O'Donnell is an individual conducting business at 940 W. Sproul Rd., Suite 103, Springfield, Pennsylvania and 760 W. Sproul Rd., Suite 301, Springfield, Pennsylvania.

9.    McGriff is a corporate entity organized under the laws of the State of Alabama with its principal place of business located at 2211 7th Ave. South Birmingham, Alabama.

10.    Inservco is a corporate entity organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 2 North Second Street, Harrisburg, Pennsylvania.

11.    Trigen Insurance is a corporate entity organized under the laws of the State of Delaware with its principal place of business located at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida, and offices at 940 W. Sproul Rd., Suite 201, Springfield, Pennsylvania.

12.    Trigen Hospitality is a corporate entity organized under the laws of the State of Delaware with its principal place of business located at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida, and offices at 940 W. Sproul Rd., Suite 201, Springfield, Pennsylvania.

13.    Patriot Underwriters is a corporate entity organized under the laws of the State of Delaware with its principal place of business at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida, and offices at 940 W. Sproul Rd., Suite 201, Springfield, Pennsylvania.

14.    Patriot National is a publicly-traded corporation listed on the New York Stock Exchange, organized under the laws of the State of Delaware and with

4

its principal place of business at 401 E. Las Olas Blvd., Suite 1650, Fort Lauderdale, Florida.

15.     Defendants ABC Corporations 1-25 are as yet unidentified entities which own or are owned by or share common ownership of HSS, Carman, Selective Risk, Selective Law, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or Patriot National.

## JURISDICTION AND VENUE

16.     This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332, inasmuch as the parties have diverse citizenship and the alleged sum or value in controversy, exclusive of interest and costs, exceeds the amount of $75,000. This court also has subject matter jurisdiction over this action pursuant to 18 U.S.C. § 1964 and 28 U.S.C. §§ 1338(a), (b).

17.     This Court has personal jurisdiction over HSS as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

18.     This Court has personal jurisdiction over Snow as he is an individual that maintains an office and conducts business in the Commonwealth of Pennsylvania.

19.     This Court has personal jurisdiction over Carman as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

5

20.     This Court has personal jurisdiction over Selective Risk as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

21.     This Court has personal jurisdiction over Selective Law as it is incorporated, maintains an office and conducts business in the Commonwealth of Pennsylvania.

22.     This Court has personal jurisdiction over Connelly as he is an individual that maintains an office and conducts business in the Commonwealth of Pennsylvania.

23.     This Court has personal jurisdiction over O'Donnell as he is an individual that maintains an office and conducts business in the Commonwealth of Pennsylvania.

24.     This Court has personal jurisdiction over McGriff as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

25.     This Court has personal jurisdiction over Inservco as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

26.     This Court has personal jurisdiction over Trigen Insurance as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

27.     This Court has personal jurisdiction over Trigen Hospitality as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

28.     This Court has personal jurisdiction of Patriot Underwriters as it maintains an office and conducts business in the Commonwealth of Pennsylvania.

29.     This Court has personal jurisdiction over Patriot National as it conducts business in the Commonwealth of Pennsylvania and is the alter-ego of the above-enumerated defendant entities that are incorporated, maintain an office and/or conduct business in the Commonwealth of Pennsylvania.

30.     Venue is proper pursuant to 18 U.S.C. § 1965 and 28 U.S.C. § 1391(b)(2), inasmuch as a substantial part of the events or omissions giving rise to this action took place in this District.

## **INTRODUCTION**

31.     Aspen was seriously and significantly defrauded as a result of the actions of Defendants Snow, O'Donnell, Connelly, HSS, Carman, Selective Law, and Selective Risk (collectively, the "HSS Program Enterprise").

32.     This is an action for rescission of insurance policies and a declaration of the respective rights and obligations, if any, of Aspen and HSS under policies of liability insurance issued by Aspen with respect to certain alleged liabilities of HSS and/or various additional named insureds.

33.     Additionally, Aspen seeks recovery of the millions of dollars of defense and indemnity costs incurred as result of the numerous misrepresentations, misstatements, omissions and/or concealments of fact by HSS, Selective Law,

Selective Risk, Carman, Snow, Connelly, and O'Donnell, and/or certain other Defendants in connection with the applications for the various insurance policies issued by Aspen and the administration of those policies.

## FACTUAL ALLEGATIONS

**The HSS Programs**

34.     HSS is an insurance purchasing group which solicits business owners and operators within the hospitality and restaurant industry to enter into property and liability insurance sharing programs (the "HSS Programs" as further defined below).

35.     As of April 1, 2015, Snow was the sole shareholder, principal and/or member of HSS.

36.     HSS holds itself out to be sophisticated and knowledgeable within the hospitality and restaurant industry and in securing and understanding the liability insurance coverage for the associated risks.

37.     HSS, through Snow and Connelly, markets the HSS Programs to business owners directly, as well as indirectly through local insurance agents, including Carman.

38.     Participants in the HSS Program are required to enter into a Management Services Agreement with HSS, which sets forth the details of the particular Program, as well as the rights and obligations of the parties thereto.

8

39.    The Management Services Agreement specifically names McGriff as an agent of HSS, and states "HSS, along with McGriff, Seibels, and Williams and our underwriters are extremely excited to work with your restaurant operations as they share our culture, standards, and model of excellence in risk management including overall operations."

40.    Pursuant to the Management Services Agreement, the scope of McGriff's agency relationship with HSS is described to include underwriting activities, risk management, loss control, claims processing, resolution of claims handling issues, and coverage placement and/or replacement on behalf of HSS.

41.    The Management Services Agreement also names Inservco as an affiliate of the HSS Programs with respect to "Claims Management," in particular, stating "Reducing the costs of claims are the goals of HSS and Selective Risk Management / Inserveco [sic] claims management. This is accomplished through a partnering approach in order to address each claim in an expedient manner, providing rapid response in order to effectively deal with each claim while minimizing costs and providing measurable value and results."

42.    HSS secures insurance coverage through various property and liability insurance carriers as the First Named Insured on such policies.

43.    The specific underwriting process requires HSS to complete underwriting forms for each member-insured and submit them to the insurance carrier through mail, fax, or electronic mail.

44.    Individual restaurant, tavern and bar owners who elect to enter the HSS Programs are added as additional named insureds to, and share the insurance limits of, the policies procured by HSS.

45.    Through the Management Services Agreement, these restaurants, tavern and bar owners delegate full authority to HSS for the primary rights and responsibilities under any insurance policies issued to the HSS Programs, including but not limited to the negotiations, procurement and claims handling for said policies.

46.    In order for individual restaurant, tavern and bar owners to qualify for the HSS Programs, each must meet certain minimum requirements as set forth in the underwriting guidelines of the HSS Programs (the "HSS Underwriting Guidelines").

47.    The HSS Underwriting Guidelines require, among other things, that: (a) prospective participants submit currently valued loss runs from prior insurance carriers detailing any claims asserted against said prospective participants over the specified preceding number of years; (b) no prospective participant exceed the maximum number of permissible claims asserted against it over the specified

10

period; (c) no single claim asserted against a prospective participant during the specified period exceed a value of $15,000; and (d) no liquor liability claims have been asserted against a particular prospective participant during the specified period.

48.     HSS, through and with its agent McGriff, was to proffer to Aspen during the underwriting process the restaurant, bar and tavern owners that met the minimum requirements of the HSS Underwriting Guidelines as participants in the HSS Programs.

49.     McGriff operated as a go-between for HSS and Aspen, with McGriff running most of the information from HSS to Aspen that HSS wanted Aspen to consider.

50.     McGriff also independently vetted the information being submitted by HSS which was ultimately for Aspen's consideration.

51.     Pursuant to the Management Services Agreement, HSS retained the primary rights and responsibilities under the insurance policies procured for the HSS Programs.

52.     HSS also specifically assumed and retained the role of claims processor, purportedly acting as the claims liaison between the participants and insurance carriers, such as Aspen.

11

53.     In its capacity as First Named Insured and intermediary between the participants/additional named insureds and the insurance companies, HSS charges and receives from each participant/additional named insured a distinct and augmented premium as a fee for its services.

54.     In order to implement and effectuate its claim processing role, HSS retained the services of Selective Risk as its third-party claims administrator, and Selective Law as its claims defense counsel.

55.     HSS Program participants would report liability claims to HSS; HSS and Selective Risk would then manage those claims and engage Selective Law to defend the interests of the participants within the self-insured retention ("SIR") of the respective policies (addressed in further detail below on a per-policy basis).

56.     As of April 1, 2015, Edward Snow and Charles O'Donnell were the sole shareholders, principals and/or members of Selective Risk.  O'Donnell is currently the President and Chief Executive Officer of Selective Law.

57.     Although small, the SIR provided the space HSS and its collaborators needed to commit their fraud, because the supposedly independent third-party claims administrator - - Selective Risk - - and law firm - - Selective Law - - used to handle claims within the SIR were actually an integral part of the HSS Program Enterprise.

**The Aspen Policies**

12

58.     Aspen is, and during all relevant times has been, in the business of underwriting and issuing policies of commercial liability insurance and is authorized to transact the business of insurance in the Commonwealth of Pennsylvania.

59.     Aspen issued multiple consecutive primary and excess commercial liability insurance policies to the HSS Programs from 2011 to 2015, providing general liability, liquor liability and excess liability coverage (the "Aspen Policies" as further defined below).

60.     The Aspen Policies consist of seven primary and seven excess liability insurance policies issued to and delineated into three HSS Programs: HSS (A), (B) and (C).

61.     Consistent with the Management Services Agreement entered into by HSS and the restaurant, tavern and bar owners, the Aspen Policies list HSS as First Named Insured.   The individual restaurant, tavern and bar owners are listed as additional named insureds under the Aspen Policies.

62.     HSS (A), (B) and (C) are primarily defined by their distinct lists of participants/additional named insureds, although there is also some variation in limits, amounts of self-insured retention and other endorsements that distinguish each of these Programs.

13

63.     With respect to the issuance and renewal of each of the Aspen Policies, Aspen relied upon, _inter alia_, insurance applications, loss runs and other information provided by HSS through McGriff, including but not limited to representations concerning the nature and claims history of the risks to be covered by Aspen.

*HSS (A)*

64.     On or around September 21, 2011, Aspen received a request from CRC Insurance Services ("CRC"), an insurance broker, to quote general and liquor liability insurance for HSS via electronic mail.

65.     In that email, Aspen was provided with an insurance application, loss runs and a schedule of prospective participants/additional named insureds and insured locations prepared by HSS, with a purported total of approximately 18 claims from October 1, 2006 until June 30, 2011 (the "Application Materials").

66.     In or around December 2011, and in reliance on the Application Materials, Aspen issued Commercial Liability Policy No. CRA8YY411 to HSS as First Named Insured, with effective dates of December 31, 2011 to December 31, 2012; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $5 million; and a SIR of $10,000.

14

67.     The policy period of CRA8YY411 was extended to June 30, 2013 by Endorsement No. 55 on June 18, 2012.

68.     Approximately one hundred and fifteen (115) restaurant, tavern and bar owners participated in and were additional named insureds on CRA8YY411.

69.     In or around June 2013, Aspen renewed Policy No. CRA8YY411 with the issuance of Policy No. CRA8YY413, with effective dates of June 30, 2013 to December 31, 2014, and the same limits and SIR as CRA8YY411.

70.     Aspen's decision to renew HSS (A) was due primarily to the number and severity level of claims reported to Aspen during the prior policy period (the "Claims Reporting") and in the renewal application and loss runs submitted by HSS (collectively with the above, the "Application Materials"), as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

71.     HSS prepared Application Materials received by Aspen via email during this period, including in particular a June 20, 2013 email transmission of an Inservco Loss Run (defined below) showing only two (2) losses under Policy CRA8YY411.

72.     In or around March 2014, Aspen issued Excess Liability Policy No. CXAE6MU14 to HSS with effective dates of March 25, 2014 to December 31, 2014, and excess liability limits of $15 million.

15

73.     In connection with that application, HSS prepared underwriting information (collectively with the above, the "Application Materials") received by Aspen via email on March 4, 2014.

74.     Aspen's decision to issue Excess Liability Policy No. CXAE6MU14 was based on the Claims Reporting and Application Materials submitted to date, and HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

75.     In or around December 2014, Aspen renewed CRA8YY413 with the issuance of Commercial Liability Policy No. CR0038P14, with effective dates of December 31, 2014 to June 30, 2016; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $10 million; and a SIR of $10,000 for all participants with thirty percent (30%) or more in liquor receipts and $2,500 for those with less than thirty percent (30%) in liquor receipts.

76.     HSS prepared underwriting materials, including materials submitted to Aspen via email on or around December 2, 2014, attaching Inservco Loss Runs (defined below) with a total of twenty six (26) claims as of November 30, 2014 (collectively with the above, the "Application Materials").

77. Aspen's decision to again renew HSS (A) was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy period and in the renewal Application Materials submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

78. In or around December 2014, Aspen renewed CXAE6MU14 with the issuance of Excess Liability Policy No. CX0038Q14A, with effective dates of December 31, 2014 to June 30, 2016, and excess liability limits of $2 million.

79. Aspen's decision to renew the excess coverage of HSS (A) was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy period and in the renewal Application Materials submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

80. In or around December 2014, Aspen also issued Excess Liability Policy No. CX0038U14, with effective dates of December 31, 2014 to June 30, 2016, with excess liability limits of $5 million above Policy Nos. CR0038P14, CX0038Q14A and an $8 million second-level excess liability policy issued by Zurich American Insurance Company.

81. Aspen's decision to issue Policy No. CX0038U14 was due primarily to the number and severity level of Claims Reporting to Aspen during the prior

policy period and in the insurance Application Materials submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

82.    Throughout the course of the HSS (A) Program, HSS was responsible for providing updated schedules to reflect the current participants/additional named insureds for HSS (A) and the applicable Aspen Policies.  HSS periodically added and/or deleted participants from HSS (A), often without Aspen's prior knowledge and/or authorization.

### HSS (B)

83.    In or around December 2012, Aspen issued Commercial Liability Policy No. CRAC26P12 to HSS as First Named Insured, with effective dates of December 31, 2012 to June 30, 2014; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $5 million; and a SIR of $10,000.

84.    HSS, on behalf of the HSS Program Enterprise, prepared a submission for HSS (B) for Aspen's consideration, which Aspen received via email on December 11, 2012 (collectively with the above, the "Application Materials").

85.    HSS subsequently prepared and submitted for Aspen's review additional Application Materials.

86.     Ultimately, HSS provided a distinct schedule of approximately two hundred and fifty-eight (258) participants/additional named insureds and insured locations for this first policy in HSS (B).

87.     Aspen's decision to issue Policy No. CRAC26P12 was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy period of HSS (A) and in the application and loss runs submitted by HSS for HSS (B) (collectively with the above, the "Application Materials"), as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

88.     In or around June 2014, Aspen renewed Policy No. CRAC26P12 with the issuance of Commercial Liability Policy No. CRAC26P13, with effective dates of June 30, 2014 to December 31, 2015; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $10 million; and a SIR of $10,000.

89.     The HSS Program Enterprise prepared a number of Application Materials for Aspen's review in connection with this renewal, including loss runs received by Aspen via email on June 17, 2014.

90.     Aspen's decision to renew HSS (B) was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy period and

in the Application Materials submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

91.     In or around March 2014, Aspen issued Excess Liability Policy No. CXAE6N114 to HSS as First Named Insured, with effective dates of March 25, 2014 to July 25, 2014, and excess liability limits of $15 million.

92.     In or around July 2014, Aspen renewed CXAE6N114 with the issuance of Excess Liability Policy No. CX0020Y14A, with effective dates of July 25, 2014 to December 31, 2015, and excess liability limits of $2 million above CRAC26P13.

93.     Aspen's decision to renew CXAE6N114 was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy period and in the Application Materials submitted by HSS, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

94.     In or around July 2014, Aspen also issued Excess Liability Policy No. CX0027W14 to HSS as First Named Insured, with effective dates of July 25, 2014 to December 31, 2015, and excess liability limits of $5 million above CRAC26P13, CX0020Y14A and an $8 million second-level excess policy issued by Zurich Insurance Company, Ltd.

20

95.     Throughout the course of the HSS (B) Program, HSS would provide updated schedules to reflect the current participants/additional named insureds of HSS (B).   HSS periodically added and/or deleted participants from HSS (B) without Aspen's prior knowledge and/or authorization.

*HSS (C)*

96.     In or around December 2013, Aspen issued Commercial Liability Policy No. CRADJ9K13 to HSS as First Named Insured, with effective dates of December 13, 2013 to June 13, 2015; general liability limits of $1 million per "occurrence" and $2 million in the aggregate; liquor liability limits of $1 million per common cause and in the aggregate; a combined total policy aggregate limit of $5 million; and a SIR of $2,500 for general liability claims.

97.     HSS prepared proposed underwriting guidelines for the to-be-formed HSS (C) program, which Aspen received via email on or around November 7, 2013.

98.     In connection with that email, HSS prepared, and Aspen received via email, a distinct schedule of approximately twenty-four (24) participants/additional named insureds and insured locations for this first policy in HSS (C) along with underwriting applications and loss runs (collectively with the above, the "Application Materials").

21

99.     Among the Application Materials prepared by HSS and received via email by Aspen included an Inservco Loss Run detailing a total of nine (9) claims as of December 12, 2013, submitted in response to Aspen's underwriting request for loss runs on the HSS (A) and (B) programs on October 29, 2013.

100.    By September 2014, the number of participants/additional named insureds in HSS (C) grew to approximately one hundred and seven (107) via email submissions.

101.    In or around April 2014, Aspen issued Excess Liability Policy No. CXAEH714 to HSS as First Named Insured, with effective dates of April 24, 2014 to June 13, 2015, and excess liability limits of $15 million.

102.    Aspen's decision to issue Excess Liability Policy No. CXAEH714 was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy period of HSS (A) and in the Applications Materials submitted by HSS for HSS (B), as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

103.    On June 11, 2015, Aspen was emailed an Inservco Loss Run along with a request that Aspen renew HSS (C) (collectively with the above, the "Application Materials"). The Inservco Loss Runs purportedly included losses

22

from HSS (A), (B) and (C). The Application Materials also included a schedule of participants/additional named insureds.

104. In or around June 2015, Aspen renewed Policy No. CRADJ9K13 with the issuance of Commercial Liability Policy No. CR003UL15, with effective dates of June 13, 2015 to December 13, 2016; general liability limits of $1 million per "occurrence" and $2 million in the aggregate, as well as a combined total aggregate limit cap of $10 million for general liability claims; liquor liability limits of $1 million per common cause and in the aggregate, as well as a $1 million liquor general aggregate limit; and a SIR of $2,500 for general liability claims.

105. Aspen's decision to renew HSS (C) was due primarily to the number and severity level of Claims Reporting to Aspen during the prior policy periods of HSS (A), (B) and (C) and in the Application Materials and loss runs submitted for HSS (C), as well as the continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

106. All Application Materials were prepared by or at the direction of Snow, O'Donnell, and Connelly.

107. All Claims Reporting was done by or at the direction of Snow, O'Donnell, and Connelly.

108. McGriff, as an agent of HSS, was involved in the underwriting and placement of all of the Aspen Policies.

109.   McGriff, as an agent of HSS, was provided with all Application Materials before submission to Aspen.

110.   McGriff, as an agent of HSS, was involved in the transmittal of Application Materials to Aspen.

111.   Throughout the course of the HSS Programs, Aspen received volumes of emails and letters from and on behalf of the HSS Program Enterprise regarding the HSS Programs placement and renewals, Claims Reporting, and Application Materials (collectively, with the above, the "Application Materials").

## Patriot's Acquisition of HSS

### Common Ownership of HSS, Selective Risk, Carman and Selective Law

112.   As noted, in addition to his ownership interest in HSS, as of April 1, 2015, Snow was one of two shareholders, principals and/or members of Selective Risk, the third-party claims administrator chosen by HSS to assist in the administration and/or servicing of the HSS Programs.

113.   As of April 1, 2015, the second shareholder, principal and/or member of Selective Risk was O'Donnell, who also serves as President and Chief Executive Officer of Selective Law -- HSS' chosen defense counsel for representing the participants/additional named insureds in the HSS Programs against third-party claims.

24

114.    Neither HSS, Snow, Selective Risk nor Selective Law disclosed to Aspen that the three entities were related parties by virtue of Snow's and O'Donnell's common ownership interests.

115.    Snow is also the President, Chief Executive Officer and Treasurer of Carman.

### *Patriot's Acquisition of HSS and Selective Risk Assets through Trigen*

116.    Patriot National is provider of technology and outsourcing services to members of the insurance industry, particularly within the workers' compensation, property and casualty, healthcare and employment sectors.

117.    In or around 2012, Patriot National formed Trigen Insurance, a multi-purpose property and casualty insurance agency, as a wholly-owned affiliate.

118.    On or around January 31, 2013, Patriot National spun-off Trigen Insurance through a sale of the latter to Trigen Insurance's then-CEO and -President.

119.    On or around March 31, 2015, Patriot National reacquired Trigen Insurance through a Stock Purchase Agreement between Trigen Holdings Group, Inc. ("Trigen Holdings"), its shareholders and Patriot Services, Inc. ("Patriot Services"), a wholly-owned Patriot National subsidiary (the "Trigen Stock Purchase Agreement").

120.   Upon consummation of the Trigen Stock Purchase Agreement or soon thereafter, Trigen Insurance merged with Trigen Holdings, with Trigen Insurance as the surviving entity.  Trigen Insurance, in turn, became a wholly-owned direct subsidiary of Patriot National.

121.   On or around April 1, 2015, Patriot acquired HSS and Selective Risk through a series of Asset Purchase Agreements.

122.   The first Asset Purchase Agreement was entered into by Trigen Insurance, HSS and Snow, as sole shareholder, principal and/or member of HSS (the "HSS Asset Purchase Agreement").

123.   Pursuant to the HSS Asset Purchase Agreement, HSS and Snow agreed to transfer to Trigen Insurance all of HSS' rights under certain contracts, as well as certain other assets and liabilities, specified in various schedules purportedly attached thereto but not made publicly available.

124.   In return, Trigen Insurance agreed to pay HSS and/or Snow $5.605 million upon closing, with up to an additional $4.045 million in future earn-out payments tied to HSS' estimated Earnings Before Interest, Taxes, Depreciation and Amortization ("EBITDA").

125.   On the same day, Trigen Insurance entered into an Asset Purchase Agreement with Selective Risk, as well as Snow and O'Donnell in their capacities

26

as sole shareholders, principals and/or members thereof (the "Selective Risk Asset Purchase Agreement").

126.   In exchange for the transfer of certain assets and liabilities of Selective Risk and Selective Risk's rights under certain contracts -- all delineated in schedules purportedly attached to the Selective Risk Asset Purchase Agreement but not made publicly available -- Trigen Insurance agreed to pay Selective Risk, Snow and/or O'Donnell $1.9225 million upon closing, with the potential for a maximum future earn-out payment of the same amount based upon Selective Risk's estimated EBITDA.

127.   Pursuant to the HSS and Selective Risk Asset Purchase Agreements, Trigen Insurance retained to the sole right to use the name "Hospitality Supportive Systems, LLC."

128.   However, the Agreements also endowed Trigen Insurance with the power to, inter alia, unilaterally transfer its rights thereunder "in whole or in part to any of its Affiliates or to any Person which becomes a successor in interest (by purchase of assets or stock, or by merger or otherwise) to [Trigen Insurance]."

129.   On or around April 8, 2015, Patriot National issued and filed with the SEC a Press Release announcing Patriot National's acquisition of HSS' assets "and the assets of its claims service affiliate Selective Risk" for a total purchase price of approximately $13.5 million.

130.   On or around May 14, 2015, Trigen Insurance, HSS, Selective Risk, Snow and O'Donnell executed Amendments to the respective Asset Purchase Agreements that provided for the immediate accelerated payment of all outstanding earn-out compensation available thereunder: $4.045 million under the HSS Asset Purchase Agreement and $1.9225 under the Selective Risk Asset Purchase Agreement.

131.   Thereafter, Patriot National and/or Trigen Insurance spun-off the HSS business and/or assets into a separate entity, Trigen Hospitality.  Trigen Hospitality is a wholly-owned subsidiary of Patriot Underwriters.  Patriot Underwriters, in turn, is a wholly-owned subsidiary of Patriot National.

132.   Following the execution of the HSS and Selective Risk Asset purchase agreements, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 submitted an application for coverage under Policy No. CR003UL15 in HSS (C) under the name "Hospitality Supportive Systems, Inc."

133.   HSS and Snow executed the HSS Asset Purchase Agreement without Aspen's prior knowledge and/or authorization.

134.   With respect to the Aspen Policies, no duly-authorized endorsements substituting any other entity for HSS as First Named Insured thereunder were ever issued by Aspen.

28

135.   To date, HSS remains the sole First Named Insured under the Aspen Policies.

**Numerous Known Claims Not Disclosed in Applying for Coverage with Aspen** *The HSS Program Conspiracy*

136.   The HSS Programs were designed by HSS, Selective Risk, Selective Law, Carman, Snow, O'Donnell and Connelly to operate as a joint enterprise between and among them, with each entity and person having a specific role in the enterprise.

137.   Generally, premium payments received from HSS Program member-insureds were used by the HSS Program Enterprise to fund the costs associated with adjusting, handling, and settling the claims in the HSS Programs without providing notice to Aspen.

138.   HSS, through Snow and Connelly, operated as a clearing house for a variety of different roles, including marketing, underwriting, member-insured communications, carrier communications, and accounts management.

139.   Carman, through Snow and Connelly, also operated as a clearing house for a variety of different roles, including marketing, underwriting, member-insured communications, carrier communications, and accounts management.

140.   Selective Risk, through Snow and O'Donnell, investigated claims as the SIR third party administrator, using the pool of money collected from premium

charges to attempt to adjust claims through denial or settlement in order to avoid reporting to Aspen.

141.   Selective Risk, through Snow and O'Donnell, evaluated claims for potential liability, including whether and how a Claim should be withheld from Aspen.

142.   Selective Law, through O'Donnell, also investigated claims and got involved in litigations as SIR counsel, using the pool of money collected from premium charges to attempt to settle and/or litigate those claims with the goal of obtaining a defense verdict.

143.   Selective Law, through Snow and O'Donnell, evaluated claims for potential liability, including whether and how a Claim should be withheld from Aspen.

144.   O'Donnell also utilized his position at Selective Risk and Selective Law within the context of the HSS Program Enterprise to manufacture false loss runs during the actual underwriting periods of the Aspen Policies.

145.   O'Donnell accomplished this through his employment relationship with Inservco, through which he had access to Inservco's services and letterhead.

146.   On July 5, 2012, O'Donnell emailed Staci Ulp of Inservco to explain the HSS Programs:

Subject: New Client – Hospitality Supportive Systems, LLC

5137659-3

Staci: Per our conversations please see below information you requested in order to contract w/this new client and to have loss runs produced. Note there are no claims/suits etc. … to date to report. The banking/payment of matters will be handled by the client directly, I will provide all personnel etc. … in order to service the client, we really only need Inservco to do the back room input of information that I will provide re: claims/suits, indemnification, expenses etc. … Let me know you hae received this infor. We can talk later today or tomorrow a.m. re: the same.

(1)    ACCOUNT NAME: Hospitality Supportive Services, LLC – 940 West Sproul Road, Suite 103, Springfield, PA 19064

(2)    CONTACT PERSON: John W. Connelly, Jr. Program Underwriter – same address as above. [redacted personal identifying information]

(3)    INVOICING method: Quarterly – the client can be billed quarterly at the above EM and hard mail address. The client has agreed to a minimum of $12,000.00 annually to be paid quarterly, this is reflective of the charge of $500.00 per reportable event to us and if the client has more than 2 reportable events per month, the quarterly invoice will reflect the same. We must also discuss crediting the client for unused payments, i.e. The client will have a check to Inservco for the first 3 quarters ( commencing 12/31/11 start date) so the I will have the client send a check to Inservco for $9000.00 and we are internally charging the client $500.00 per reportable event, so we need to credit the client for unused so to speak items.

(4)    EIN: [redacted]

(5)    SCHIP APPLICABLE ; let's discuss, I suggest yes as one never knows

That is the response we discussed you will need, if you can provide me w/a proposed contract I will review and let you know of any thoughts or questions I may have for potential editing purposes. This will be GL only no W/Cmop. However we may do that as the client progresses. Thanks. Charlie

147.   Contracts between HSS and Inservco for the above described services were executed.

148.   The HSS Program Enterprise paid Inservco throughout the existence of the HSS Programs for these services.

149.   A small number of hand-selected claims would be run through Inservco's system to create a "loss run" under Inservco cover which constituted the claims the HSS Program Enterprise agreed to present to Aspen (the "Inservco Loss Runs").

150.   O'Donnell and Connelly then reviewed and ensured that Inservco Loss Runs did not include any claims that the HSS Program Enterprise did not want reported to Aspen, and would instruct Inservco to remove certain claims on the Inservco Loss Runs.

151.   By way of example, on December 12, 2013, after reviewing a draft Inservco Loss Run for submission to Aspen, Connelly emailed Staci Ulp of Inservco stating "Ooooops! Yager is still on here! It's supposed to go!"

152.   At Connelly's direction, Inservco removed the Yager claim from that draft loss run on December 13, 2013.

153.   On information and belief, the Yager claim involved near fatal injuries allegedly suffered during an assault at Failte Steakhouse in Scranton on April 13, 2012.

154.   The Yager claim was never reported to Aspen.

32

155.   On information and belief, the Yager claim was settled by Selective Risk and Selective Law.

156.   Inservco Loss Runs were submitted to Aspen throughout the HSS Program as true and correct Application Materials.

157.   Throughout the existence of the HSS Programs, HSS, Selective Risk, Selective Law, Carman, and other employees and additional persons not employed by any of these entities conducted a weekly meeting to discuss underlying claims and suits in the HSS Programs (the "Weekly Meeting").

158.   Individual attendees of the Weekly Meeting included, inter alia, Defendants Snow, Connelly, and O'Donnell, along with employees of HSS, Carman, Selective Risk, and Selective Law and other non-employee third parties.

159.   The HSS Program Enterprise internally evaluated the liability risk presented by a claim to the premium money pool, and estimated how much money it would cost to attempt to handle the claim without reporting the claim to Aspen.

160.   The main goal, and the purpose of, the Weekly Meeting was to discuss the status of all claims in the HSS Programs, and in particular those being withheld from Aspen, in order determine whether a claim or suit should be reported to Aspen based on liability exposure to the pool of premium funds, and if so, when that report should be made.

161. The Weekly Meeting identified and addressed those claims which could otherwise be resolved and closed without Aspen's knowledge.

162. The decision to report a claim was largely based on the liability analysis of O'Donnell, Selective Risk, and Selective Law, who analyzed the likelihood of whether a settlement favorable to the premium pool could be reached, or whether a defense verdict was possible, so that the claim could be handled to completion without Aspen's knowledge or invovlement.

163. On information and belief, including the timing of eventual Claims Reporting to Aspen, decisions involving the timing of when to report a claim or suit - - if at all - - also included considerations of the renewal periods for the HSS Policies.

164. As such, to the extent possible, claims that were to be reported were timed to lag after a renewal was finalized, and so after the issuance of the policy and calculation of the premium rate.

165. Those few claims that the HSS Program Enterprise reported to Aspen were included on the Inservco Loss Runs in the Application Materials, however, hundreds of claims were never reported to Aspen - - including many which the HSS Program Enterprise adjusted, settled, and/or litigated to verdict without Aspen's knowledge or consent.

166.   The Inservco Loss Runs were clearly an attempt to legitimize the claims reporting through a known insurance industry vendor.

167.   This resulted in - - and achieved the HSS Program Enterprise's goal of - - Aspen being deceived into issuing and continuing to issue the HSS Program policies, and doing so at artificially deflated premium rates based on risk and loss history.

168.   Hundreds of claims were settled and ultimately not reported to Aspen as a result of the Weekly Meeting.

169.   Hundreds of individual claims and suits from a number of different states were deliberately withheld from reporting to Aspen during the underwriting and renewal periods for the HSS Policies as a result of the Weekly Meeting.

170.   Hundreds of individual claims and suits from a number of different states were deliberately withheld from reporting to Aspen upon receipt of the first notice of claim and/or suit as a result of the Weekly Meeting.

171.   Most - - if not all - - of the claims eventually reported to Aspen were first reviewed at the Weekly Meeting to determine if there was an approach to otherwise resolve the claim without Aspen's involvement or knowledge.

172.   Most - - if not all - - of the claims eventually reported to Aspen were done months to years after the first notice of claim or suit was received by the HSS Program Enterprise.

173.   The only claims that were reported to Aspen from the inception of the HSS Programs until about mid-2015 were those intentionally selected by the HSS Program Enterprise for reporting.

174.   Through the Weekly Meeting, the HSS Program Enterprise concealed claims for as long as possible, until the potential liability presented by a claim was too great for their own premium reinvestment pool to handle.

175.   Eventually, the HSS Program Enterprise was forced to report the first claim that presented a significant problem for the HSS Program scheme.

### *The Crowley Claim*

176.   On or around April 26, 2013, Liam Crowley suffered fatal injuries as a result of a motor vehicle accident when his motorcycle was struck by a vehicle operated by a patron of the tavern known as Timothy's of West Chester ("Timothy's").   On or around May 20, 2014, the Estate of Crowley filed an amended complaint in a wrongful death action styled <u>Crowley v. Timothy's West Chester LLC, et al.</u>, Docket No. 13-05394, in Chester County Court of the Commonwealth of Pennsylvania (the "Crowley Claim").

177.   Timothy's, a participant/additional named insured in HSS (A), was served with the amended complaint on May 23, 2014.

178.   The HSS Program Enterprise was aware of the Crowley Claim at least as early as September 16, 2013, and through HSS engaged the services of Selective

36

Risk to investigate and adjust the Crowley Claim. HSS also retained Selective Law to represent Timothy's. Selective Law entered an appearance on behalf of Timothy's on June 20, 2014.

179.   Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

180.   Aspen was first notified of the Crowley Claim on January 6, 2015, approximately twenty-one (21) months after the fatality/occurrence, approximately fifteen (15) to twenty-one (21) months after the HSS Program Enterprise was aware of the claim; seven (7) months after suit, and two (2) months before the scheduled trial date of March 12, 2015.

181.   Aspen defended Timothy's pursuant to a reservation of rights and ultimately settled the Crowley Claim on Timothy's behalf under Policy No. CRA8YY411 in HSS (A).

182.   Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the Crowley Claim in the Application Materials for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CR0038P14, CX0038Q14A,

CX0038U14,   CRA8YY413,   CXAE6MU14,   CRAC26P13,   CX0020Y14A,
CX0027W14 and CRADJ9K13.

183.   The Application Materials for the above noted policies did not include
the Crowley Claim.

### The HSS Program Enterprise's Previously Hidden Claims

184.   In the wake of the Crowley Claim, on May 13, 2015, Connelly sent a
letter to McGriff (c/o Morgan McMillan) and CRC (c/o Peter Curtin), stating "We
acknowledge there are claims/suits that HSS has not reported to Aspen."

185.   The letter goes on to state, "be assured that HSS will have its
reporting updated immediately and I will personally oversee same. In fact, I have
our team working on it now!"

186.   In June 2015, during the renewal process for HSS (C), specifically
Policy No. CR003UL15, Aspen inquired with HSS, Snow, and Connelly about the
material failures to report the Crowley Claim.

187.   HSS, Snow, and Connelly made an affirmative representation to
Aspen that there were no other claims pending in the HSS Programs of which
Aspen had not been notified.

188.   In particular, on June 15, 2015, at 3:49 P.M., Defendant Connelly
emailed Aspen, presciently stating "I am hopeful you have seen a marked

improvement to claims reporting as each and every claim is being sent to you. Hopefully we will not see too much frequency but time will tell."

189.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program (as discussed at the eponymous Weekly Meeting), and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the now-reported Crowley claim.

190.   The purpose of withholding claims was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

191.   As noted, throughout the history of the HSS Programs up until late 2015, the reported loss experience under the Aspen Policies was - - by design - - minor, with a comparatively-small number of reported claims and few, if any, of significant value.

192.   In the meantime, the HSS Program Enterprise began marketing the HSS Program to other insurers, including but not limited to Endurance American Specialty Insurance Company ("Endurance").

193.   On information and belief, from November 2014 through February 2015, the HSS Program Enterprise, through HSS, provided Endurance with "loss

runs" which showed a total of 62 reported claims and a total incurred of $504,514 across the HSS Programs since December 31, 2011.

194.   On information and belief, based thereon, Endurance issued a policy to the HSS Program Enterprise incepting on April 17, 2015 (the "Endurance Policy").

195.   Following Aspen's issuance of Notices of Nonrenewal for Policy Nos. CR0038P14, CRAC26P13 and CR003UL15 in September 2015, and after the Endurance Policy incepted and the underwriting period was over, HSS began notifying Aspen of a significantly-increased number of claims against various additional named insureds under the Aspen Policies.

196.   Since Aspen was non-renewing the HSS Programs, and with Endurance taking over the risk based on the previously supplied "loss runs," there was no more incentive for the HSS Program Enterprise to keep the true nature of the risk hidden from Aspen any longer and attempt to handle and/or litigate claims in secret and at risk to the premium reinvestment pool of money.

197.   The late stage of many of the recently-reported underlying proceedings spurred Aspen to investigate their history, as well as HSS' knowledge thereof.

198.   Aspen's initial investigation revealed that HSS was aware of a significant number of underlying claims that were not disclosed to Aspen in the

40

applications for coverage under certain of the Aspen Policies.

199.   Endurance filed a parallel rescission action against HSS seeking a declaration that the Endurance policy is void *ab initio* based on the underwriting misrepresentations made by HSS during the underwriting of the Endurance Policy. See Endurance American Specialty Insurance Company v. Hospitality Supportive Systems, LLC, docket no. 17-3983 (Eastern District of Pennsylvania).

### *The Glynn Claim*

200.   On or around December 9, 2012, Brendan Glynn suffered severe bodily injury as result of being struck by a motor vehicle.  Immediately before the accident, Brendan Glynn was a patron at Cavanaugh's Restaurant and Bar (owned by and hereinafter referred to as "39th and Sansom Street Corp.").  On or around May 30, 2014, Brendan Glynn filed a civil action captioned Brendan D. Glynn v. Cavanaugh's Restaurant and Bar, et al., filed in the Court of Common Pleas, Philadelphia County, Case ID 1405004081 (the "Glynn Claim").

201.   39th and Sansom Street Corp., a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Glynn Claim on or before June 12, 2014.

202.   The HSS Program Enterprise was aware of the Glynn Claim at least as early as May 21, 2014, and through HSS engaged the services of Selective Risk to

investigate and adjust the Glynn Claim. HSS also retained Selective Law to defend 39th and Sansom Street Corp., and an appearance was entered by Selective Law on June 12, 2014.

203.   Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

204.   Aspen was first notified of the Glynn Claim on January 19, 2016, over four (4) years after the injury/"occurrence"; and twenty (20) months after the HSS Program Enterprise was aware of the claim and suit was filed.

205.   Aspen defended 39th and Sansom Street Corp. pursuant to a reservation of rights and ultimately contributed towards the settlement of the Glynn Claim under Policy No. CRA8YY411 in HSS (A).

206.   Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies.

207.   Moreover, the HSS Program Enterprise failed to notify Aspen of the Glynn Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CR0038P14, CX0038Q14A, CX0038U14, CRA8YY413, CXAE6MU14, CRAC26P13, CX0020Y14A, CX0027W14 and CRADJ9K13.   Similarly, Trigen

42

Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Glynn Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

208.   The Application Materials for the above noted policies did not include the Glynn Claim.

209.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program, and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the Glynn claim.

210.   The purpose of withholding this claim was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

### The Egan Claims

211.   On or around June 22, 2013, Neil and Scott Egan suffered severe bodily injury resulting from a physical altercation with other patrons of Drinker's Tavern (owned by and hereinafter referred to as "Alaska Waffle House, LLC"). On June 24, 2013, counsel for the Egans sent a letter to Drinker's Tavern with a first notice of claim.

212.   The HSS Program Enterprise was notified of the Egans claim at least as early as November 13, 2013.

213.   On or around June 19, 2014, the Egans filed civil complaints captioned <u>Neal Egan v. Drinkers Tavern, et al.</u>, and <u>Scott Egan v. Drinkers Tavern, et al.,</u> filed in the Court of Common Pleas, Philadelphia County, Case ID 140602738 and 140602739, respectively (the "Egan Claims").

214.   Alaska Waffle House, LLC, a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Egan Claims on or around June 19, 2014.

215.   The HSS Program Enterprise was aware of the Egan Claims in June of 2013, and through HSS engaged the services of Selective Risk to investigate and adjust the Egan Claims. HSS also retained Selective Law to defend Alaska Waffle House, LLC, and an appearance was entered by Selective Law on July 17, 2014.

216.   Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

217.   Aspen was first notified of the Egan Claims on January 19, 2016, thirty (30) months after the injury/"occurrence"; twenty six (26) months after the HSS Program Enterprise was aware of the claim; eighteen (18) months after suit was filed and three (3) weeks before the scheduled trial date.

218.   Aspen has disclaimed coverage for the Egan Claims based upon HSS's breach of the terms, conditions and duties contained within the Aspen Policies, including but not limited to the notice conditions.

219.   Despite the knowledge of these significant claims, the HSS Program Enterprise failed to immediately notify Aspen of the injuries, "occurrence" and "suits" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the Egan Claims during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CR0038P14, CX0038Q14A, CX0038U14, CRA8YY413, CXAE6MU14, CRAC26P13, CX0020Y14A, CX0027W14, CRADJ9K13 and CXAEH714.   Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Egan Claims to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

220.   The Application Materials for the above noted policies did not include the Egan Claims.

221.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program, and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the Egan claims.

45

222.   The purpose of withholding this claim was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

### *The Possinger Claim*

223.   On or around July 11, 2013, Kyla Possinger was caused to suffer severe bodily injuries as a result of a motor vehicle accident when her motorcycle was struck by a vehicle operated by a patron of the tavern known as R.P. McMurphy's (owned by and subsequently referred to as "Brother Williams, Inc."). On or around October 22, 2014, Kyla Possinger filed a civil action styled Possinger v. R.P. McMurphy's, et al., in the Court of Common Pleas, Philadelphia County, Case ID 141002590 (the "Possinger Claim").

224.   The patron of Brother Williams, Inc., who allegedly caused the motor vehicle accident, was apprehended by the Police inside Brother Williams, Inc., shortly after the accident.

225.   Brother Williams, Inc., a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Possinger Claim on or around October 22, 2014.

226.   The HSS Program Enterprise was aware of the Possinger Claim at least as early as October 28, 2013, and through HSS engaged the services of Selective Risk to investigate and adjust the Possinger Claim. HSS also retained

46

Selective Law to defend Brother Williams, Inc., and an appearance was entered by Selective Law on January 13, 2015.

227.   Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

228.   Aspen was first notified of the Possinger Claim on January 20, 2016, thirty (30) months after the injury/"occurrence"; twenty seven (27) months after the HSS Program Enterprise was aware of the claim; and fifteen (15) months after suit was filed.

229.   Aspen defended Brother Williams, Inc., pursuant to a reservation of rights and ultimately settled the Possinger Claim on Brother Williams, Inc.'s behalf under Policy No. CRA8YY413 in the HSS (A) Program.

230.   Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injuries, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the Possinger Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CR0038P14, CX0038Q14A, CX0038U14, CX0020Y14A, CX0027W14, CRADJ9K13 and CXAEH714.  Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters

47

and/or ABC Corporations 1-25 failed to disclose the Possinger Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

231.   The Application Materials for the above noted policies did not include the Possinger Claim.

232.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program, and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the Possinger claims.

233.   The purpose of withholding this claim was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

### The Kocher Claim

234.   On or around March 21, 2014, Shawn Kocher was caused to suffer severe bodily injuries, including traumatic brain injury, as a result of a motor vehicle accident while he was a passenger in a vehicle operated by a patron of the tavern known as Roosevelt's 21 (owned by and subsequently referred to as "Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc."). On or around July 14, 2014, Shawn Kocher filed a civil action styled <u>Kocher v. Backjama G.</u>

<u>Enterprises Inc., et al.</u>, in the Court of Common Pleas, Northampton County, Docket No. 2014-6545 (the "Kocher Claim").

235.   Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc., participants/additional named insureds in the HSS (B) Program, were served with the complaint in the Kocher Claim shortly after it was filed on July 14, 2014.

236.   The HSS Program Enterprise was aware of the Kocher Claim at least as early as May 8, 2014, and through HSS engaged the services of Selective Risk to investigate and adjust the Kocher Claim. HSS also retained Selective Law to defend Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc., in connection with the Kocher Claim.

237.   Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

238.   Aspen was first notified of the Kocher Claim on January 20, 2016, two (2) years after the injury/"occurrence,"; twenty (20) months after the HSS Program Enterprise was aware of the claim; eighteen (18) months after suit was filed and two (2) months before the scheduled trial date.

239.   Aspen defended Backjama G. Enterprises, Inc., and Majack Bag Ventures, Inc., pursuant to a reservation of rights and ultimately contributed

towards the settlement of the Kocher Claim under Policy No. CRAC26P12 in the HSS (B) Program.

240.   Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the Kocher Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CR0038P14, CX0038Q14A, CX0038U14, CX0020Y14A, CX0027W14 and CXAEH714. Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Kocher Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

241.   The Application Materials for the above noted policies did not include the Kocher Claim.

242.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program, and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the Kocher claims.

243.   The purpose of withholding this claim was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

### *The Howard Claim*

244.   On or around January 24, 2013, Charalynn Howard was caused to suffer severe bodily injuries as a result of being struck by patron who was extricated from the tavern known as Kildare's of Manayunk (owned by and subsequently referred to as "Kildare's Manayunk, Inc.") by an employee (bouncer).  On or around October 15, 2014, Charalynn Howard filed a civil action styled Howard v. Kildare's Inc., et al., in the Court of Common Pleas, Philadelphia County, Case ID 141001658 (the "Howard Claim").

245.   Kildare's Manayunk, Inc., a participant/additional named insured in the HSS (A) Program, was served with the complaint in the Howard Claim shortly after it was filed on October 15, 2014.

246.   The HSS Program Enterprise was aware of the Howard Claim at least as early as February 27, 2013, and through HSS engaged the services of Selective Risk to investigate and adjust the Howard Claim. HSS also retained Selective Law to defend Kildare's Manayunk, Inc., in connection with the Howard Claim. Selective Law entered its appearance on December 5, 2014.

247.  Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

248.  Aspen was first notified of the Howard Claim on January 19, 2016, three (3) years after the injury/"occurrence"; thirty four (34) months after the HSS Program Enterprise was aware of the claim; and fifteen (15) months after suit was filed.

249.  The Howard Claim was settled with contributions from both Aspen and HSS.

250.  Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the Howard Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CRA8YY413, CXAE6MU14, CR0038P14, CX0038Q14A, CX0038U14, CRAC26P13, CX0020Y14A, CX0027W14, CRADJ9K13 and CXAEH714. Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Howard Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

251.   The Application Materials for the above noted policies did not include the Howard Claim.

252.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program, and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the Howard claim.

253.   The purpose of withholding this claim was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

### *The McQueen Claim*

254.   On or about March 8, 2014, Andrea McQueen was injured in a motor vehicle accident. Her injuries included the loss of her unborn child. The driver of the vehicle that struck her was drinking at Kildare's Irish Pub (owned by and subsequently referred to as "Kildare's West Chester, LLC").  On or about March 4, 2016, Andrea McQueen filed an action styled McQueen et al. v. Simmons et al., in the Court of Common Pleas, Philadelphia County, Case ID 160300008 (the "McQueen Claim").

255.   Kildare's West Chester, LLC, a  participant/additional named insured in the HSS (B) Program, was sent a letter of representation on March 13, 2014

regarding the McQueen Claim, and HSS received that letter at least as early as January 15, 2015.

256.   The HSS Program Enterprise was aware of the McQueen Claim, and through HSS engaged the services of Selective Risk to investigate and adjust the McQueen Claim. HSS also retained Selective Law to defend Kildare's of West Chester, LLC. Selective Law entered its appearance on March 18, 2016.

257. Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

258.   Aspen was first notified of the McQueen Claim on December 18, 2015, nearly eleven (11) months after the HSS Program Enterprise was notified of the claim and nineteen (19) months after the date of loss and letter of representation.

259.   Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the McQueen Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CRA8YY413,    CXAE6MU14,    CR0038P14,    CX0038Q14A,    CX0038U14,

CRAC26P13,   CX0020Y14A,   CX0027W14,   CRADJ9K13   and   CXAEH714.

Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC

Corporations 1-25 failed to disclose the McQueen Claim to Aspen when applying

for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

260.   The Application Materials for the above noted policies did not include

the McQueen Claim.

261.   Despite these representations to the contrary, the HSS Program

Enterprise was aware that there were actually hundreds of claims and suits pending

or previously settled in the HSS Program, and that the vast majority of those claims

and suits were being intentionally withheld from Aspen, including the McQueen

claim.

262.   The purpose of withholding this claim was to induce Aspen into

continuing to issue the HSS Policies incepting after this occurrence, and to do so

an artificially deflated premium rate, if at all.

### *The Lukk Claim*

263.   On or about November 15, 2013, Cotty Lukk was paralyzed as a result

of a drunk driving accident. Cotty Lukk was drinking at, among other bars,

Kildare's of West Chester, LLC.

264.   The HSS Program Enterprise was aware of the Lukk incident at least

as early as November 7, 2014.

55

265.   At least as early as March 27, 2015, the HSS Program Enterprise received notice of the suit captioned Lukk v. Kildare's, Inc., et al., filed in the Court of Common Pleas, Philadelphia County, Case ID 150300843 on March 4, 2015 (the "Lukk Claim").

266.   The HSS Program Enterprise through HSS engaged the services of Selective Risk to investigate and adjust the Lukk Claim. HSS also retained Selective Law to defend Kildare's of West Chester, LLC. Selective Law entered its appearance on April 1, 2015.

267.   Snow, O'Donnell, Connelly, HSS, Carman, Selective Law and Selective Risk all attempted to resolve the claim and eventual lawsuit without giving any notice to Aspen.

268.   The Lukk Claim was reported to Aspen on January 22, 2016, over two (2) years after the initial date of loss and almost nearly fifteen (15) months after the HSS Program Enterprise was first notified of the Lukk Claim.

269.   Despite the knowledge of this significant claim, the HSS Program Enterprise failed to immediately notify Aspen of the injury, "occurrence" and "suit" in breach of the express terms and conditions of the Aspen Policies. Moreover, the HSS Program Enterprise failed to notify Aspen of the Lukk Claim during the application and renewal application for multiple Aspen Policies issued to the HSS Programs, including but not limited to Policy Nos. CRA8YY413,

CXAE6MU14,   CR0038P14,   CX0038Q14A,   CX0038U14,   CRAC26P13, CX0020Y14A, CX0027W14, CRADJ9K13 and CXAEH714.   Similarly, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 failed to disclose the Lukk Claim to Aspen when applying for Policy No. CR003UL15 under the name "Hospitality Supportive Systems, Inc."

270.   The Application Materials for the above noted policies did not include the Lukk Claim.

271.   Despite these representations to the contrary, the HSS Program Enterprise was aware that there were actually hundreds of claims and suits pending or previously settled in the HSS Program, and that the vast majority of those claims and suits were being intentionally withheld from Aspen, including the Lukk claim.

272.   The purpose of withholding this claim was to induce Aspen into continuing to issue the HSS Policies incepting after this occurrence, and to do so an artificially deflated premium rate, if at all.

### *Aspen's Discovery of Additional Undisclosed Known Claims*

273.   Since November 2015, Aspen has been put on notice of approximately two hundred and thirty-six (236) additional claims made in the HSS Programs.  Approximately forty percent (40%) of these claims occurred from 2012 to 2014.

274.   For comparison, Aspen received approximately 7-10 claims per year from the HSS Programs during each of the prior 5 years.

275.   The HSS Program Enterprise, and/or the participants/additional named insureds in the HSS Programs were aware of these injuries, "occurrences" or "suits" when applying for, and renewing one or more of the Aspen Policies. With respect to the application for coverage under Policy No. CR003UL15 in HSS (C), Trigen Insurance, Trigen Hospitality, Patriot Underwriters, ABC Corporations 1-25 and/or the participants/additional named insureds thereunder were aware of these injuries, occurrences or "suits" when applying for renewal coverage.

276.   On or around February 29, 2016, Aspen notified HSS that Aspen was cancelling Aspen Policies CR003UL15, CX0038Q14A, CX0038U14 and CR0038P14 as of March 30, 2016.

277.   Aspen returned the unearned premium under said policies to HSS, yet HSS kept said funds for itself and never returned the unearned premium to the additional names insureds or their agents.

278.   Aspen's investigation of the material misrepresentations and/or omissions made by the various Defendants in connection with the applications for coverage under the Aspen Policies is ongoing.

279.   Since the filing of the instant litigation in March 2016, Aspen has uncovered no less than ninety-five (95) additional claims asserted against

58

participants/additional named insureds in HSS (A) <u>within Philadelphia County, Pennsylvania, alone</u> that were not disclosed to Aspen in conjunction with the initial application for coverage under Policy No. CRA8YY411 in HSS (A).

280.   The HSS Program Enterprise also failed to report or late reported hundreds of claims to Aspen which that did not reach a litigation stage.

281.   Likewise, the HSS Program Enterprise failed to report or late reported hundreds of claims which HSS believed could be settled without Aspen's involvement.

282.   From the start of the HSS Programs on December 31, 2011 through September of 2015, only about 40 claims were reported to Aspen. After Aspen's non-renewal, from October of 2015 through mid-December of 2015, the rate of reporting picked up significantly, with over fifty (50) additional claims being reported. Then, from December 17, 2015 until the end of January 2016 (approximately one and a half months) more than 70 additional claims were reported to Aspen. Since January 2016, Aspen has been notified of over three hundred (300) additional claims in the HSS Programs.

283.   In connection with this litigation, Aspen has identified approximately three hundred (300) additional claims in the HSS Programs that were never previously reported to Aspen.

### *Additional Underwriting Misrepresentations Committed by HSS: Palmer Social Club, Inc., d/b/a Trilogy Nightclub & Hookah Lounge*

284.   In addition to claims handling misrepresentations, the HSS Program Enterprise also undertook a broad underwriting misrepresentation campaign in order to fit Additional Named Insureds into the HSS Programs who otherwise fell outside of the HSS Underwriting Guidelines.

285.   By way of example, Aspen received via email an underwriting Acord form, dated October 30, 2014, prepared by the HSS Program Enterprise and submitted on behalf of Palmer Social Club, Inc., d/b/a Trilogy Nightclub & Hookah Lounge ("Palmer").

286.   The application was prepared by "KPATTERSON," believed to be HSS employee Kristina Patterson.

287.   That underwriting application states that Palmer's grossed $219,000 in liquor sales, $511,000 in food sales, and $730,000 in total sales.

288.   In addition, Palmer's underwriting submission includes a "menu" which does not contain any identifying marks or logos and lists only simple sandwiches (BLT $4.50, ham and cheese $3.50, etc.) and hamburgers ($4.00, with cheese $4.50; lettuce, tomato, or onion are 50 cents extra). [1]

289.   Although this modest menu of grilled cheese sandwiches ($2.00) and hot dogs ($2.00) does not currently appear on Palmer's website (nor does any food menu, for that matter), Palmer's does advertise the following Bottle Service

[1] https://www.phillytrilogy.org/packages

Packages (which were not included in the underwriting materials submitted):
"Silver - $600: Free Admission for 8 Guests, VIP Seating, One Hookah, One
Bottle of House Champagne, Two Premium Bottles"; "Gold - $1,000: Free
Admission for 12 Guests, VIP Seating, 2 Hookahs, One Bottle of House
Champagne, Three Premium Bottles"; "Platinum - $1,500: Free Admission for 16
Guests, VIP Seating, Three Hookahs, Two Bottles of House Champagne, and
Three Premium Bottles."

290.   The bottle service packages were omitted from underwriting materials
- as they are clearly indicative of a "night club" - which was prohibited by the
Underwriting Guidelines.

291.   In order to keep up the food to liquor sales ratio submitted by HSS
during underwriting (roughly $5 food to $2 alcohol), Palmer's would have to sell
approximately $1,500 worth of food for every Silver Package sold (e.g., 300
cheeseburgers with lettuce, tomato, and onion), and $3,750 worth for every Gold
Package sold (e.g., 750 cheeseburgers with lettuce tomato and onion).

292.   The menu submitted during underwriting also states that "THIS
ESTABLISHMENT IS SMOKE FREE THANK YOU FOR NOT SMOKING," a
bizarre warning considering that patrons pay up to $1,500 for a table service which
includes three hookahs (purportedly to accompany Palmer's chicken strips
($1.25/each) and house salad ($2.50 with French, Italian, Ranch or Blue Cheese)).

61

293.   The Acord form, dated October 30, 2014, also asks the following information from Palmer: "Question 7: During the last five years[,] has any applicant been indicted for or convicted of any degree of the crime of fraud[?]" Palmer responded "NO" to this question. However, on June 30, 2010, as reported by Philly.com, "The Palmer Social Club, a Philly hip-hop nightspot, entered a guilty plea yesterday in federal district court to filing false tax returns and its former manager, Michael Weiss, copped a plea corruptly obstructing the administration of federal tax laws."

294.   Pursuant to the HSS Underwriting Guidelines, nightclubs are not permitted and do not qualify for the HSS Program.

295.   The Acord form submitted on behalf of Palmer merely lists the name "Palmer Social Club," omitting "d/b/a Trilogy Nightclub & Hookah Lounge."

### *Additional Underwriting Misrepresentations Committed by HSS: Rack's Bar & Grille, Inc. & Rack's Real Estate LLC t/a Rack's Bar & Grill*

296.   Aspen received via email an Acord underwriting application dated May 16, 2012, by "KPATTERSON" (believed to be Kristina Patterson, as employee of the Carman Corporation) and submitted on behalf of Rack's Bar & Grille, Inc. & Rack's Real Estate LLC t/a Rack's Bar & Grill ("Rack's").

297.   Question 10 of that application asks "Has applicant had a judgment or lien during the last five (5) years?"

298.   Question 10 was answered "NO."

62

299.   On May 19, 2010, two years prior, Rack's suffered a judgment of approximately $14,207,563.50[2] in the matter <u>Elenbark v. Evans and Rack's Bar and Grill, et al.</u>, Camden County Superior Court, State of New Jersey, index number CAM-L-2460-07; CAM-L-854-08.

***Additional Underwriting Misrepresentations Committed by HSS: Soilent Francines, LLC t/a Dirty Frank's Bar***

300.   Aspen received via email an Acord underwriting application dated December 11, 2013, filled out by "RSHARRAR" (believed to be Ron Sharrar of HSS and/or Carman) and submitted on behalf of Soilent Francines, LLC t/a Dirty Franks ("Dirty Franks").

301.   That application claims that out of a total of $385,000 in sales, approximately $250,000 accounts for food.

302.   Much like the submission for Palmer's, a generic take-out menu, without a restaurant name or phone number, was submitted with the application.

303.   That menu purports to serve wraps, club sandwiches, buffalo wings, hot sandwiches, and claims the following specialties: Steak Royal, Pizza Steak, Pizza Meatball, Steak Delight, Pepperoni Pizza Steak, Gourmet Burger, Pizza Sausage, Chicken Gyro, Gyro, Eggplant Parmigiana, Chicken Parmigiana, Veal Parmigiana, and Vegetarian Gyro, along with hot platters included fried chicken, shrimp, scallops, and flounder.

---

[2] https://alarmexpert.com/george-elenbar-v-steven-evans-rack-bar-and-grill/ (Last accessed on August 21, 2019).

304.   Dirty Frank's does not advertise any food menu online.

305.   An October 18, 2017 article from Food and Wine Magazine by Markham Heid claims that "if one spot on this list exemplifies the come-as-you-are, nice-but-not-fake-nice spirit of Philadelphia, Dirty Frank's is it. *They don't even care if you bring in your own food since they don't serve any.*" (emphasis added).[3]

306.   The email submissions on behalf of Palmer's, Rack's, and Dirty Frank's are only a few examples of the widespread underwriting deception committed by the HSS Program Enterprise at the direction of Snow, Connelly, and O'Donnell (the "Underwriting Misrepresentations," and collectively with the above, the "Application Materials").

307.   Dozens, if not hundreds, of Underwriting Misrepresentations by the HSS Program Enterprise were designed to fit otherwise non-conforming applicants into the HSS Underwriting Guidelines.

**The HSS Program Enterprise Market False Insurance Programs After the Filing of the Instant Litigation**

308.   Even after this litigation was filed, the HSS Program Enterprise continued and expanded their scheme.

309.   This litigation was filed on March 10, 2016 (the "Rescission Action").

---

[3] https://www.foodandwine.com/travel/bars/where-drink-local-in-philadelphia (Last accessed August 21, 2019).

310.   The last effective policies in the HSS Programs ended on March 30, 2016.

311.   Aspen did not issue any new or renewed policies to HSS after the HSS Programs expired on March 30, 2016.

312.   Aspen has not had any discussions with HSS to extend, renew, or grant new coverage to HSS or the HSS Programs since the HSS Programs expired on March 30, 2016.

313.   Despite this, the HSS Program Enterprise, through HSS and Snow, has continued to misrepresent and falsely advertise the existence of a continuing business relationship with Aspen after these events.

314.   For example, Adelphia Restaurant ("Adelphia") recently alleged in a January 14, 2019 complaint  that it was named as an additional named insured on an "Aspen Specialty Insurance Company" policy effective from (1) March 29, 2016 through May 10, 2017, and (2) December 13, 2016 through February 11, 2017.

315. As proof of these claims, Adelphia attaches "Certificates of Insurance" under HSS header and signature. These "Certificates of Insurance" not only identify Aspen as purportedly providing insurance coverage to Adelphia, but identify as fully in force a policy which has been cancelled and is part of this Rescission Action.

316.   No such policy exists.

317.   Adelphia further alleges the following behavior on behalf of HSS:  (1) On October 13, 2016, HSS advised Adelphia that it secured an extension of coverage from Aspen for the period March 29, 2016 through December 13, 2016; on December 9, 2016, HSS advised Adelphia that it secured a second extension of coverage from Aspen for the period December 13, 2016 through February 11, 2017; and on March 28, 2017, HSS advised Adelphia that it secured a third extension of coverage from Aspen for the period March 29, 2016 through May 10, 2017.

318.   Adelphia was provided with numerous documents counterfeiting Aspen's mark and trade name in order to deceive Adelphia into thinking Aspen issued coverage to Adelphia.

319.   None of these events ever took place.

320.   Adelphia paid HSS for the purported "coverage" from Aspen, and upon information and belief, scores of other small businesses paid HSS for non-existent insurance coverage as well.

321.   On February 7, 2019, Aspen sent a letter to Snow and HSS demanding an immediate stop of the false marketing of a business relationship between Snow, HSS and Aspen. Aspen notified Snow and HSS that this behavior violates the

Lanham Act (15 U.S.C. § 1114, et seq.) and other laws, and constitutes an improper and unauthorized use of Aspen's trademarks and intellectual property.

322.   The Aspen trade name is a trade mark of Aspen Insurance Holdings Limited.

323.   Only Aspen possess the exclusive right to utilize trademarks, service marks, trade names, likeness and logos of Aspen.

324.   Purchasers of Aspen products rightly expect that they are purchasing insurance coverage through an insurance company that is highly rated.

325.   Aspen demanded the names and contact information for all additional entities whom Snow and HSS misrepresented and/or falsely advertised the existence of coverage periods after March 30, 2016 through Aspen, along with copies of the communications Snow and HSS had with these entities.

326.   On February 14, 2019, counsel for Snow and HSS refused to provide this information, instead responding to Aspen's February 7, 2019 letter by simply stating, inter alia, that "[t]hey long ago ceased issuing any certificates with respect to Aspen insurance coverage."

## COUNT I - EQUITABLE RESCISSION
### (as to HSS)

327.   Aspen realleges each allegation set forth in the paragraphs above.

328.   Notwithstanding the various asset and purchases set forth above, HSS was and remains the sole First Named Insured under the Aspen Policies.

67

329. The applications and renewal applications for the Aspen Policies contain the following provisions:

*ANY PERSON WHO KNOWINGLY AND WITH INTENT TO DEFRAUD ANY INSURANCE COMPANY OR OTHER PERSON FILES AN APPLICATION FOR INSURANCE OR STATEMENT OF CLAIM CONTAINING ANY MATERIALLY FALSE INFORMATION, OR CONCEALS FOR THE PURPOSE OF MISLEADING, INFORMATION CONCERNING ANY FACT MATERIALS THERETO, COMMITS A FRAUDULENT INSURANCE ACT, WHICH IS A CRIME AND SUBJECTS THE PERSON TO CRIMINAL AND CIVIL PENALTIES, INSURANCE BENEFITS MAY ALSO BE DENIED.*

*THE UNDERSIGNED IS AN AUTHORIZED REPRESENTATIVE OF THE APPLICANT AND REPRESENTS THAT REASONABLE ENQUIRY HAS BEEN MADE TO OBTAIN THE ANSWERS TO QUESTIONS ON THIS APPLICATION. HE/SHE REPRESENTS THAT THE ANSWERS ARE TRUE, CORRECT AND COMPLETE TO THE BEST OF HIS/HER KNOWLEDGE.*

330. In the Application Materials for the issuance and renewal of the Aspen Policies and thereafter, HSS, on behalf of the HSS Program Enterprise, misrepresented, misstated, omitted and/or concealed material Claims Reporting information regarding the injuries, losses, claims and/or "suits" that had occurred in the HSS Programs. Such misrepresentations include but are not limited to the the Crowley Claim, the Glynn Claim, the Egan Claim, the Howard Claim, the Kocher Claim, the Possinger Claim, the Lukk Claim, and the McQueen Claim.

331. If HSS had disclosed such information, Aspen would not have issued the Aspen Policies as written, if at all.

332. The acts and omissions of HSS, along with the HSS Program Enterprise, constitute misrepresentations, misstatements, omissions and/or

concealments of facts to Aspen in the application for and/or negotiation of the Aspen Policies.

333. The misrepresentations, misstatements, omissions and/or concealments of facts regarding prior and pending claims under the HSS Programs and loss experience were material to the acceptance of the risk and material to the hazards accepted by Aspen.

334. The number and severity of the injuries, "occurrences," claims and "suits" was material to the acceptance of the risk by Aspen.

335. HSS, together with the HSS Program Enterprise, was aware of the materiality and falsity of the misrepresented, omitted and/or concealed information that was not submitted and was aware that Aspen would either not have issued and renewed the Aspen Policies or would have issued and/or amended the Aspen Policies under different terms and conditions -- including but not limited to a different premium rate -- if Aspen had known the misrepresented, omitted, false and/or concealed information.

336. Indeed, it was discovered by Aspen after the issuance of all the Aspen Policies, contrary to what was represented to it at the time of the quoting and issuance of the Aspen Policies, that HSS, together with HSS Program Enterprise, was aware of and concealing dozens of injuries, "occurrences," claims and "suits" within the HSS Program in order to procure the Aspen Policies.

69

337.   Aspen relied on HSS' material misrepresentations to its detriment.

338.   The last premium payment for the Aspen Policies was received by Aspen on August 13, 2015, in the amount of $1,016,400.

339.   During the course of the investigation of the aforementioned claims, Aspen discovered HSS' material misrepresentations, together with HSS Program Enterprise.  Aspen accepted no further premium payments thereafter.

340.   As a result of the misrepresentations, misstatements, omissions and/or concealments of facts set forth above, the Aspen Policies should be rescinded ab initio, including but not limited as to any and all purported insureds, named insureds and additional insureds.

341.   Aspen has provided and/or is currently providing defense and/or indemnity insurance coverage for various past and pending liability claims and lawsuits under the HSS Programs (the "Underlying Claims").

342.   Upon rescission of the Aspen Policies, Aspen is entitled to retain some or all of the premium paid for the Aspen Policies as an off-set to the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

343.   Upon rescission of the Aspen Policies, Aspen is entitled to restitution of the costs and expenses Aspen has incurred as a result of the issuance of the

70

Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

## COUNT II - RESCISSION BASED ON FRAUD
### (as to HSS)

344.   Aspen realleges each allegation set forth in the paragraphs above.

345.   HSS, together with HSS Program Enterprise, knowingly made false representations and concealed material information with the intention of inducing Aspen to issue the Aspen Policies.  Specifically, HSS, together with HSS Program Enterprise, failed to notify Aspen of injuries, "occurrences," claims and "suits" within the HSS Programs including but not limited to the the Crowley Claim, the Glynn Claim, the Egan Claim, the Howard Claim, the Kocher Claim, the Possinger Claim, the Lukk Claim, and the McQueen Claim on the applications for certain Aspen Policies.

346.   HSS, together with HSS Program Enterprise, knew that the information regarding the pending injuries, "occurrences," claims and "suits" within the HSS Programs was material to Aspen's underwriting process and assessment of the risk.

347.   HSS, together with HSS Program Enterprise, intended for Aspen to rely on the false and concealed information in its procurement of the Aspen Policies.

71

348.   The misrepresentations, concealment of facts, omissions and incorrect statements provided to Aspen by HSS, together with HSS Program Enterprise, were fraudulent.

349.   Aspen did in fact rely upon the false information provided by HSS, together with HSS Program Enterprise, to its detriment, in issuing and maintaining the Aspen Policies

350.   As a result of the foregoing, Aspen has suffered and will continue to suffer damages if the Aspen Policies are not rescinded, in an amount that exceeds the jurisdictional limits of this Court.

351.   Since the misrepresentations, misstatements, omissions and/or concealments of facts recited above, individually and together, were fraudulent, the Aspen Policies should be rescinded ab initio, including but not limited as to any and all purported insureds, named insureds and additional insureds.

352.   Aspen has provided and/or is currently providing defense and/or indemnity insurance coverage for various Underlying Claims.

353.   Upon rescission of the Aspen Policies, Aspen is entitled to retain some or all of the premium paid for the Aspen Policies as an off-set to, and/or for restitution of, the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

72

354.   Upon rescission of the Aspen Policies, Aspen is entitled to restitution of the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

## COUNT III - DECLARATORY RELIEF
### (as to HSS)

355.   Aspen realleges each allegation set forth in the paragraphs above.

356.   Pleading alternatively, if the Aspen Policies are not rescinded, there is an actual and justiciable controversy and Aspen is uncertain as to its rights.  Aspen states that the misrepresentations, misstatements, omissions and/or concealments of facts -- because they were fraudulent, material to the acceptance of the risk and/or material to the hazard assumed -- and further because Aspen in good faith would not have issued the Aspen Policies had the true information been known, renders the Aspen Policies inapplicable to various pending Underlying Claims, and any claim brought or to be brought as a result thereof or to be made under the Aspen Policies.

357.   In the event that this Court does not exercise its equitable powers and completely rescind the Aspen Policies, Aspen seeks a declaration that there is no coverage under the Aspen Policies for various pending Underlying Claims, and any claim brought or to be brought as a result thereof or to be made under the Aspen Policies.

358.   Aspen seeks a judicial determination from this Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., declaring whether and to what extent Aspen has a coverage obligation to HSS and/or any additional named insureds under the Aspen Policies.

## COUNT IV - DECLARATORY RELIEF - FRAUD
### (as to HSS)

359.   Aspen realleges each allegation set forth in the paragraphs above.

360.   Pleading alternatively, HSS, together with The HSS Program Enterprise, knowingly made misrepresentations, misstatements, omissions and/or concealments of facts with the intent of deceiving and inducing Aspen to issue the Aspen Policies.

361.   These misrepresentations, misstatements, omissions and/or concealments of facts include, but are not limited to, failing to disclose known injuries, "occurrences," claims and "suits" within the HSS Programs , including but not limited to the the Crowley Claim, the Glynn Claim, the Egan Claim, the Howard Claim, the Kocher Claim, the Possinger Claim, the Lukk Claim, and the McQueen Claim.

362.   These misrepresentations, misstatements, omissions and/or concealments of facts were made by HSS, together with The HSS Program Enterprise, with the intention of deceiving and inducing Aspen to issue policies that it would otherwise not issue.

74

363.   Aspen relied upon the misrepresentations, misstatements, omissions and/or concealments of facts in issuing the Aspen Policies.

364.   Aspen has suffered and will continue to suffer damages as a result of this fraud.

365.   As a result, if the Aspen Policies are not rescinded, an actual and justiciable controversy exists, Aspen is uncertain of its rights, and Aspen seeks a declaration, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., that there is no coverage under the Aspen Policies for various pending Underlying Claims, and any claim brought or to be brought as a result thereof or to be made under the Aspen Policies.

## COUNT V - DECLARATORY RELIEF - NO COVERAGE
### (as to HSS)

366.   Aspen realleges each allegation set forth in the paragraphs above.

367.   HSS has requested insurance coverage under one or more Aspen Policies for various Underlying Claims in several jurisdictions around the country.

368.   These coverage claims made by HSS have given rise, and likely will continue to give rise, to disputes between and among Aspen and HSS, including without limitation disputes concerning the proper interpretation of various policy terms and the existence, scope and extent of coverage, if any, with respect to the Underlying Claims under the Aspen Policies.

369.   The Aspen Policies contain various terms, conditions, provisions and exclusions which must be satisfied or found not to apply for coverage to exist with respect to the Underlying Claims, which may include but are not limited to:

a.        Coverage is or may be barred to the extent that an insured has failed to notify Aspen as soon as practicable of an injury, "occurrence" or an offense, regardless of the amount, which may result in a claim and/or to provide written notice of a claim or suit as soon as practicable in connection with the Underlying Claims as required pursuant to the Aspen Policies;

a.        Coverage is or may be barred to the extent that the Underlying Claims involve damages or injuries for which an insured has voluntarily made payment, assumed an obligation or incurred an expense without Aspen's consent;

b.        Coverage is or may be barred to the extent that an insured has failed to satisfy all duties and conditions precedent in connection with the Underlying Claims, including without limitation compliance with the assistance and cooperation provisions set forth in the Aspen Policies;

c.        Coverage is or may be barred to the extent that an insured has failed to provide quarterly written summaries (loss runs) of all "occurrences," claims, "suits", or offenses which have or may result in payments within the Retained Limit of the Aspen Policies;

76

d. Coverage is or may be barred to the extent that any person or entity seeking coverage in connection with the Underlying Claims does not qualify as a named insured or insured under the Aspen Policies.

370. Aspen seeks a judicial determination from this Court, pursuant to the Declaratory Judgment Act, 28 U.S.C. § 2201, et seq., declaring whether and to what extent Aspen has a coverage obligation, under the Aspen Policies, to HSS and/or other insureds in connection with the Underlying Claims.

## COUNT VI - RESERVATION TO ASSERT ADDITIONAL GROUNDS FOR RESCISSION OR DECLARATORY JUDGMENT
### (as to HSS)

371. Aspen realleges each allegation set forth in the paragraphs above.

372. Aspen's investigation with respect to potential coverage under the Aspen Policies is ongoing.

373. Aspen brings this action for, inter alia, rescission and a declaration of its rights and obligations under the Aspen Policies in order to promptly address the issues set forth herein.

374. Additional independent grounds may be available to support rescission or a declaration that coverage is limited and/or not available with respect to the HSS Programs.

375.   By not specifically raising any such limitations or exclusions at this time, Aspen expressly does not waive any of its rights under the Aspen Policies, in equity and/or at law.

376.   To the contrary, Aspen's investigation is ongoing, and it continues to fully reserve all of its rights under the Aspen Policies and/or at law, and specifically reserves all of its rights to amend this Complaint to assert additional grounds to support rescission and/or a declaration that coverage is limited and/or not available with respect to the HSS Programs.

## COUNT VII - FRAUD
### (as to the HSS Program Enterprise, McGriff, and Inservco)

377.   Aspen realleges each allegation set forth in the paragraphs above.

378.   Pleading alternatively and as set forth more fully above, HSS, together with the HSS Program Enterprise, its agent McGriff, and Inservco, committed numerous instances of knowing misrepresentation, misstatement, omission and/or concealment of facts in connection with the applications for coverage under certain of the Aspen Policies.

379.   These misrepresentations involved, inter alia, the Application Materials and Inservco Loss Runs prepared by the HSS Program Enterprise, McGriff and Inservco, submitted to Aspen on behalf of the HSS Program Enterprise, and which omitted Claims Reporting information concerning known losses and/or claims asserted against participants/additional named insureds under

78

the HSS Programs, which were material to the risk assumed by Aspen in issuing the Aspen Policies.

380.   Specific examples of the Application Materials and Inservco Loss Runs misrepresenting Claims Reporting include, but are not limited to, deliberate omissions of: the Crowley Claim, the Glynn Claim, the Egan Claim, the Howard Claim, the Kocher Claim, the Possinger Claim, the Lukk Claim, and the McQueen Claim.

381.   The purpose of these knowing material misrepresentations and/or misstatements by and on behalf of the HSS Program Enterprise was to procure the Aspen Policies and/or more favorable terms of coverage for the HSS Programs.

382.   Aspen relied upon the material misrepresentations and/or misstatements made by HSS and McGriff as its agent, Inservco, and the HSS Program Enterprise, in electing to issue the Aspen Policies and setting the terms of coverage thereunder.

383.   As a result of the above-noted misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages, in that Aspen has incurred and will continue to incur substantial costs under the Aspen Policies for the defense and indemnification of various participants/additional named insureds in connection with Underlying Claims.

These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## COUNT VIII - FRAUD
### (as to the HSS Program Enterprise and McGriff)

384.   Aspen realleges each allegation set forth in the paragraphs above.

385.   Pleading alternatively and as set forth more fully above, the HSS Program Enterprise, through HSS and McGriff as its agent, repeatedly represented that it would ensure compliance with the HSS Underwriting Guidelines by any proposed participants/additional named insureds for the HSS Programs.

386.   These representations by the HSS Program Enterprise, through HSS and McGriff as its agent, involved, inter alia, strict enforcement of the HSS Underwriting Guidelines' and limitations on acceptable loss history for proposed participants/additional named insureds for the HSS Programs.

387.   The purpose of these Underwriting Misrepresentations was to procure the Aspen Policies and/or more favorable terms of coverage for the HSS Programs.

388.   Aspen relied upon the Underwriting Misrepresentations by the HSS Program Enterprise, through HSS and McGriff as its agent in electing to issue the Aspen Policies and setting the terms of coverage thereunder.

389.   Contrary to its repeated representations, the HSS Program Enterprise, through HSS and McGriff as its agent, did not ensure that proposed participants/additional named insureds qualified pursuant to the HSS Underwriting

Guidelines, particularly but not limited to those specifications concerning acceptable loss history.

390.   Additional specific examples of Underwriting Misrepresentation include the submission to Aspen of applications for: Palmer's, Rack's, and Dirty Frank's.

391.   As a result of the above-noted Underwriting Misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages, in that Aspen has incurred and will continue to incur substantial costs under the Aspen Policies for the defense and indemnification of various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## <u>COUNT IX - NEGLIGENCE</u>
### (as to HSS, McGriff)

392.   Aspen realleges each allegation set forth in the paragraphs above.

393.   Pleading alternatively, HSS and its agent, McGriff, owed Aspen an independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines by committing numerous instances of misrepresentation, misstatement, omission and/or concealment of facts in connection with the Application Materials for coverage under certain of the Aspen Policies, and by failing to ensure that proposed

participants/additional named insureds qualified pursuant to the HSS Underwriting Guidelines.

394.   HSS and its agent McGriff breached the aforesaid duty as set forth in this pleading.

395.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT X – NEGLIGENCE
### (as to Selective Risk)

396.   Aspen realleges each allegation set forth in the paragraphs above.

397.   Selective Risk, as third party administrator for the HSS Program within the SIR, owed Aspen an independent duty of care in connection with administration of the HSS Programs with regards to handling claims in the context of the SIR of the HSS Program.

398.   Selective Risk breached the aforesaid duty.

399.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XI – NEGLIGENCE
### (as to Selective Law)

400.   Aspen realleges each allegation set forth in the paragraphs above.

401.   Selective Law, as self-insured retention counsel for the HSS Program, owed Aspen an independent duty of care in connection with the administration of

the HSS Programs with regards to claims in the context of the SIR of the HSS Program.

402.   Selective Law breached the aforesaid duty.

403.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XII - RICO § 1962(c)
## (as to the HSS Program Enterprise)

404.   Aspen realleges each allegation set forth in the paragraphs above.

405.   This Count is against the HSS Program Enterprise: HSS, Carman, Snow, Connelly, Selective Risk, Selective Law, and O'Donnell.

406.   Each defendant in the HSS Program Enterprise is a "person" capable of holding legal or beneficial interest in property within the meaning of U.S.C. § 1961(3).

407.   Each defendant in the HSS Program Enterprise violated 18 U.S.C. § 1962(c) by the acts described in the prior paragraphs and as further described below.

408.   The Enterprise. The HSS Program Enterprise is an association-in-fact enterprise for the common and continuing purpose described herein and constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and whose racketeering activities affect interstate commerce. The members of the enterprise functioned as a continuing unit with an ascertainable structure separate and distinct

83

from that of the conduct of racketeering activity. Snow, Connelly, and O'Donnell are employed by or associated with the enterprise.

409.   Alternatively, HSS, Carman, Snow and Connelly constitute a separate enterprise from the enterprise of Selective Law, Selective Risk, Snow and O'Donnell within the meaning of 18 U.S.C. § 1961(4).

410.   <u>Pattern of Racketeering Activity.</u> The HSS Program Enterprise agreed to and did conduct and participate in the conduct of the enterprise's affairs through a pattern of racketeering activity for the unlawful purpose of intentionally defrauding, among others, Aspen, within the meaning of 18 U.S.C. § 1961(1), 1961(5), and 1962(c). The racketeering activity was made possible by the HSS Program Enterprise's regular and repeated use of the facilities and services of the enterprise. The HSS Program Enterprise had the specific intent to engage in the substantive RICO violations alleged herein.

411.   Predicate acts of racketeering activity are acts which are indictable under provisions of the U.S. Code enumerated in 18 U.S.C. § 1961(1)(B). The HSS Program Enterprise committed hundreds of instances of such acts or else aided and abetted such acts through the fraudulent concealment and/or deliberately late reporting of claims by mail and wire and fraud, as detailed above. Hundreds of new claims that were never previously disclosed have only been recently revealed through discovery in this matter.

412.   The acts of racketeering were not isolated, but rather, the acts of the HSS Program Enterprise were related in that they had the same or similar purpose and result, participants, victims and method of commission. Further, the acts of racketeering by the HSS Program Enterprise have been continuous. There was repeated conduct during a time period beginning at least as early as approximately 2011 and continuing to the present, and there is a continued threat of repetition of such conduct.

413.   The association-in-fact enterprise and the alternative enterprises, as alleged herein, were not limited to the predicate acts and extended beyond the racketeering activity. Rather, they existed separate and apart from the racketeering activity for the legitimate business purposes of insurance brokering, third party claims administration, and operation as a law firm. The members of the HSS Program Enterprise have had, and do have, upon information and belief, legitimate business plans outside of racketeering activity.

414.   Aspen specifically alleges that the HSS Program Enterprise participated in the management of the association-in-fact enterprise and the alternative enterprises by overseeing and coordinating the commission of multiple acts of racketeering described below.

415.   <u>Predicate Acts: Use of Mails and Wires to defraud Aspen in Violation of 18 U.S.C. §§ 1341 and 1342 and Trafficking in Counterfeit Good or Services in</u>

Violation of 18 U.S.C. § 2320. Pursuant to and in furtherance of their fraudulent scheme, the HSS Program Enterprise committed multiple related acts of mail and wire fraud during the underwriting periods of each Aspen Policy and throughout the Claims Reporting process.

416.   The HSS Program Enterprise committed acts constituting indictable offenses under 18 U.S.C. §§ 1341 and 1342 in that they devised or intended to devise a scheme or artifice to defraud Aspen into issuing, and continuing to issue, a pooled risk program for a materially misrepresented pooled risk by means of false pretenses, representations or promises. For the purpose of executing their scheme or artifice, the HSS Program Enterprise caused delivery of volumes of documents and information, including Application Materials, by U.S. mails or by private or commercial interstate carriers, or received such therefrom. The HSS Program Enterprise also transmitted or caused to be transmitted by means of wire communications in interstate commerce various writings, signs and signals, including Application Materials. The acts of the HSS Program Enterprise set forth above were done with the knowledge that the use of the mail or wires would follow in the ordinary course of business, or that such use could have been foreseen, even if not actually intended. These acts were done intentionally and knowingly with the specific intent to advance the HSS Program Enterprise scheme or artifice.

417.   The HSS Program Enterprise carried out their scheme in different states and could not have done so unless they used the U.S. mails or private or commercial interstate carriers or interstate wires. In furtherance of their scheme alleged herein, HSS, Carman, Selective Law, Selective Risk, Snow, Connelly and O'Donnell communicated among themselves and with Aspen in furtherance of their scheme to defraud Aspen. These communications were typically transmitted by wire (i.e., electronically) and/or through the United States mails or private or commercial carriers. As set forth above, the HSS Program Enterprise also transmitted or caused the Application Materials and Claims Reporting information to be transmitted at various times from September 21, 2011 until as recently as January 4, 2019, whereby approximately 300 previously fraudulently concealed claims were identified.

418.   Specifically, HSS, Carman, Selective Law, Selective Risk, Snow, Connelly and O'Donnell used wire and/or U.S. mails or private or commercial carriers to induce Aspen into issuing, and continuing to issue at artificially deflated premium rates, if at all, the HSS Programs by providing Aspen with material misrepresentations, falsehoods, and fraudulent concealments of the true nature of the insured risk in the HSS Programs throughout the Application Materials and Claims Reporting.

419.   Separate predicate acts exist for each hidden claim and Underwriting Misrepresentation. On information and belief, hundreds of predicate acts exist.

420.   The HSS Program Enterprise prepared fraudulent Application Materials submitted via email to Aspen throughout the existence of the HSS Programs, including but not limited to, by way of example, applications on behalf of: Palmer's, dated October 30, 2014; Rack's, dated May 16, 2012; and Dirty Frank's, dated December 11, 2013.

421.   The HSS Program Enterprise prepared and submitted via email for Aspen's consideration countless fraudulent Application Materials during each underwriting period for every HSS Program policy, including through the deliberate omission of hundreds of relevant loss history claims, such as but not limited to: the Crowley Claim, the Glynn Claim, the Egan Claim, the Howard Claim, the Kocher Claim, the Possinger Claim, the Lukk Claim, and the McQueen Claim.

422.   As detailed above, the email submission of these Application Materials to Aspen for consideration during the underwriting of each HSS Program policy as well as the Claims Reporting during the HSS Programs was designed by the HSS Program Enterprise to induce Aspen into issuing and continuing to issue the HSS Program policies.

423.   Aspen's decision to issue and renew policies in the HSS Program was due primarily to the number and severity level of Claims Reporting to Aspen and in the collective Application Materials submitted, as well as HSS' continuing representations that it was actively vetting participants' compliance with the HSS Underwriting Guidelines.

424.   Even after this action was filed and the last effective HSS Program policies were cancelled by Aspen, the HSS Program Enterprise continued to fraudulently market and collect premiums from member-insureds for purported coverage through Aspen which did not exist, was never requested from Aspen, and was never negotiated with Aspen, through mail and wires.

425.   By way of example, on October 13, 2016, HSS mailed Adelphia that it secured an extension of coverage from Aspen for the period March 29, 2016 through December 13, 2016; on December 9, 2016, HSS mailed Adelphia that it secured a second extension of coverage from Aspen for the period December 13, 2016 through February 11, 2017; and on March 28, 2017, HSS mailed Adelphia that it secured a third extension of coverage from Aspen for the period March 29, 2016 through May 10, 2017.

426.   Throughout these mailings, and in violation of 18 U.S.C. § 2320, HSS counterfeited Aspen's marks in order to induce Adelphia and others into paying significant amounts of "premium" for coverage post-dating March 30, 2016.

427.   These acts of mail and wire fraud regarding the underwriting for each of the policies and the counterfeit use of Aspen's trade name set forth above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5).

428.   As laid out in detail above, each member of the HSS Program Enterprise have directly and indirectly conducted and participated in the conduct of the HSS Program Enterprises affairs through the pattern of racketeering and activity described above, in violation of U.S.C. § 1962(c).

429.   As a direct and proximate result of the HSS Program Enterprise's racketeering activities and violations of 18 U.S.C. § 1962(c), Aspen has been injured in their business and property by wiring tens of millions of dollars in defense and indemnity payments that would have never been made had the true insured risk of the HSS Programs been presented to Aspen during the underwriting of the HSS Programs. Aspen also faces lawsuits from member-insureds who were fraudulently promised coverage through Aspen after March 30, 2016, and the costs associated with defending those actions and the damage to Aspen's business reputation.

430.   The HSS Program Enterprises shared objective was to induce Aspen into issuing and continuing to issue the HSS Program Policies so that the HSS Program Enterprise could profit off those policies.

90

431.    Aspen reasonably and justifiably relied on the HSS Program Enterprises' false representations, false pretenses and deceptive communications, and Aspen has been damaged as a direct and proximate cause of the HSS Program Enterprise's members participation in such enterprise, as alleged herein.

432.    <u>Predicate Act: Transport and Receipt of Stolen Money in Violation of 18 U.S.C. 2314 and 2315.</u> The HSS Program Enterprise committed acts constituting indictable offenses under 18 U.S.C. 2314 in that, having devised or intended to devise a scheme or artifice to defraud Aspen or to obtain money from Aspen by means of false or fraudulent pretenses, representations or promises, the HSS Program Enterprise transported or caused to be transported in interstate commerce money having a value of $5000 or more, which was stolen, converted or taken by fraud. The HSS Program Enterprise also committed acts constituting indictable offenses under 18 U.S.C. 2315 in that they received money in excess of $5000, which crossed a State boundary after being stolen, unlawfully converted or taken. The acts of the HSS Program Enterprise set forth above were done willfully and with knowledge that the money was stolen, converted or taken by fraud. These acts were done intentionally and knowingly with the specific intent to advance the HSS Program Enterprises' scheme or artifice.

433.   In particular, the HSS Enterprise through SLG, SRM, O'Donnell and Snow, stole, converted, and took by fraud defense costs from Aspen for underlying claims in the HSS Programs.

434.   Had the HSS Program Enterprise properly presented the actual insured risk of the HSS Programs, Aspen never would have issued the policies in the first instance.

435.   Knowing this, the HSS Enterprise benefited via their third party administrator and law firm, SLG and SRM, with Snow and O'Donnell as their principals, by charging Aspen for costs associated with handling claims and receiving said monies.

436.   <u>Continuity of Conduct</u>. The HSS Program Enterprises' violations as set forth herein, each of which directly and proximately injured Aspen and others, constituted a continuous course of conduct from at least September 21, 2011 to present, which was intended to obtain money through false representations, fraud, deceit and other improper and unlawful means. These violations were part of racketeering activity.

437.   The HSS Program Enterprise has conducted and/or participated, directly and/or indirectly, in the conduct of the affairs of the alleged enterprises through a pattern of racketeering activity as defined herein in violation of 18. U.S.C. § 1962(c).

438.   Aspen has been damaged by the actions of the HSS Program Enterprise alleged herein. Aspen seeks an award of damages     in     compensation for, among other things, the tens of millions of dollars of defense and indemnity payments expended by Aspen through the HSS Programs.

439.   Aspen seeks an award of three times the damages it sustained and the recovery of reasonable attorneys' fees and costs of investigation and litigation as well as any other relief authorized by statute.

## COUNT XIII - RICO § 1962(d)
### (as to the HSS Program Enterprise)

440.   Aspen realleges each allegation set forth in the paragraphs above.

441.   In violation of 18 U.S.C. §§ 1962(d), the HSS Program Enterprise knowingly, willfully, and unlawfully conspired to facilitate a scheme which included the operation or management of a RICO enterprise through a pattern of racketeering activity as set forth in Count XII and the paragraphs above.

442.   The conspiracy commenced at least as early as September of 2011 and is ongoing.

443.   Specifically, the HSS Program Enterprise conspired to conceal the true nature of the insured risk of the HSS Programs via mail and wire fraud, and each committed overt acts through the Application Materials and Claims Reporting by using their ill-gotten gains to handle, investigate, adjust, settle, and litigate

93

claims with the intention of never reporting those claims to Aspen or deliberately late reporting specific claims.

444.   In addition, the HSS Program Enterprise conspired to commit, and committed overt acts towards, mail and wire fraud against Aspen as an enterprise by misrepresenting the actual insured risk of the HSS Programs by submitting fraudulent Application Materials in order to fraudulently induce Aspen into continuing to issue the Aspen Policies to the HSS Programs and do so an artificially deflated premium rate.

445.   The HSS Program Enterprise knew that their mail and wire fraud was part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

446.   The HSS Program Enterprise also conspired to traffick in counterfeit goods or services, and each committed overt acts by misrepresenting the placement of coverage through Aspen to Adelphia and countless other insureds who were fraudulently promised coverage through Aspen after March 30, 2016.

447.   The HSS Program Enterprise knew that their trafficking in counterfeit goods or services was part of racketeering activity and agreed to the commission of those acts to further the schemes described above.

448.   The HSS Program Enterprise also conspired to transport and receive stolen money as set forth in the paragraphs above, and committed overt acts

towards this end, including by submitting invoices from Selective Risk and Selective Law for costs associated with handling claims and receiving said monies, knowing that Aspen would not have issued the HSS Programs had the HSS Program Enterprise properly disclosed the actual insured risk contained therein.

449.   The HSS Program Enterprise knew that their conspiracy to transport and receive stolen money was part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above.

450.   That conduct constitutes conspiracy to violate 18 U.S.C. § 1962 (c) in violation of 18 U.S.C. § 1962(d).

451.   As a direct and proximate result of the HSS Program Enterprise's conspiracy, the overt acts taken in furtherance of that conspiracy, and violations of 18 U.S.C. § 1962(d), Aspen has been injured in their business and property by expending tens of millions of dollars in defense and indemnity payments that would have never been made had the true insured risk of the HSS Programs been presented to Aspen during the underwriting of the HSS Programs. Aspen also faces lawsuits from member-insureds who were fraudulently promised coverage through Aspen after March 30, 2016, and the costs associated with defending those actions and the damage to Aspen's business reputation.

## COUNT XIV - ALTER-EGO LIABILITY
### (as to Snow and Carman)

452.    Aspen realleges each allegation set forth in the paragraphs above.

453.    Pleading alternatively and as set forth above, Snow was at all relevant times and/or remains sole shareholder, principal and/or member of HSS.

454.    Additionally, Snow was at all relevant times and/or remains President, CEO, and Treasurer -- as well as shareholder, principal and/or member -- of Carman.

455.    HSS and Carman share a common office location.

456.    HSS and Carman share common officers and personnel with respect but not limited to the HSS Programs and the Aspen Policies, including but not limited to Snow.

457.    Snow completely dominates both HSS and Carman, such that effectively no other officers thereof function.

458.    HSS and Carman do business and/or operate in some capacity as if they were one entity, including but not limited to:

a.          The listing of Carman as applicant on certain application forms for coverage under the Aspen Policies issued to HSS as First Named Insured;

b.          The listing of shared HSS/Carman personnel's contact information in their capacity as Carman employee(s) on a complaint filed on behalf of HSS with the Pennsylvania Department of Insurance concerning the Aspen Policies; and

96

c.        Correspondence sent from shared HSS/Carman personnel in their capacity as Carman employee(s) to Aspen with respect to claims arising under the Aspen Policies issued to HSS as First Named Insured.

459.   HSS, Snow and/or Carman failed to observe the corporate formalities and/or keep adequate corporate records.

460.   HSS, Snow and/or Carman failed to maintain segregated bank accounts and accounting records, and commingled accounts and funds, such that the corporate formalities and separateness of each should be disregarded.

461.   Following the execution of the HSS Asset Purchase Agreement, HSS is merely an empty-shell entity devoid of any substantial assets.

462.   Snow and/or Carman used HSS to defraud Aspen through repeated misrepresentations, misstatements, omissions and/or concealment of facts in connection with the applications for coverage under the Aspen Policies.

463.   As set forth above, Snow and/or Carman have used HSS as their alter ego.

464.   Fundamental injustice will result if Aspen is not permitted to recover from Snow and/or Carman because Aspen's damages will exceed any premium paid for the Aspen Policies and HSS is without substantial assets.

465. Accordingly, Aspen is entitled to disregard the corporate formalities and separateness of HSS, Snow and/or Carman, such that liability against one constitutes liability against all.

## COUNT XV - NEGLIGENCE
### (as to Snow and Carman)

466. Aspen realleges each allegation set forth in the paragraphs above.

467. Pleading alternatively, Snow and/or Carman owed Aspen an independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines.

468. Snow and/or Carman breached the aforesaid duty.

469. As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XVI – CONSPIRACY
### (as to the HSS Program Enterprise)

470. Aspen realleges each allegation set forth in the paragraphs above.

471. The HSS Program Enterprise shared the common objective of deceiving and/or defrauding Aspen regarding the extent of the loss history and claims made in the HSS Program.

472. In order to accomplish this goal, the HSS Program Enterprise jointly decided whether or not certain claims should be reported to Aspen, and if so, when those claims would be reported with respect to the policy renewal periods.

98

473.   As a result of these overt acts, the HSS Program Enterprise ensured that claims were not timely reported to Aspen, or never reported at all.

474.   As a direct, proximate and foreseeable result of these actions, Aspen has been, and continues to be, damaged, as set forth in detail above.

475.   If Aspen was presented the actual insured risk presented by the HSS Programs, Aspen would have never issued or continued to issue the Aspen Policies to the HSS Program.

## COUNT XVII - PARTICIPATION LIABILITY
### (as to Snow, Connelly and O'Donnell)

476.   Aspen realleges each allegation set forth in the paragraphs above.

477.   Prior to and from the inception of the HSS Programs, Snow, Connelly and O'Donnell participated directly in the negotiation and procurement of the Aspen Policies, as well as the various representations made to Aspen concerning the proposed participants'/additional named insureds' loss history and compliance with the HSS Underwriting Guidelines.

478.   Furthermore, Snow, Connelly, and O'Donnell participated directly in the numerous material misrepresentations and/or misstatements made by HSS regarding known losses and/or claims asserted against participants/additional named insureds, as well as the failure to ensure compliance with the HSS Underwriting Guidelines.

479.    Accordingly, Snow, Connelly, and O'Donnell are liable as individual participants in the above-enumerated acts of fraud committed by the HSS Program Enterprise with respect to the HSS Programs and/or Aspen Policies.

480.    To the extent that the Court finds liability as to HSS, Carman, Selective Risk and Selective Law, then Snow, Connelly, and O'Donnell are and should be held personally liable for any damage caused to Aspen in connection with same.

### COUNT XVIII - SUCCESSOR LIABILITY
**(as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)**

481.    Aspen realleges each allegation set forth in the paragraphs above.

482.    Pleading alternatively and as set forth above, by way of the HSS Asset Purchase Agreement, Trigen Insurance acquired substantially all of HSS' assets, as well as those liabilities necessary to carry on HSS' general business operations.

483.    Pursuant to the terms of the HSS Asset Purchase Agreement, Trigen Insurance retained to the sole right to use the name "Hospitality Supportive Systems, LLC," from the effective date thereof onward.

484.    Thereafter, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 continued the general business operations of HSS as they had previously existed.

100

5137659-3

485.  Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 utilized the same personnel in the continuance of HSS' general business operations as previously used by HSS prior to the sale of its assets.

486.  Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 continued to utilize the same management in the continuance of HSS' general business operations, including but not limited to Snow.

487.  By way of a February 2016 issuance and/or transfer of Patriot National Common Stock from Patriot National to Snow -- which resulted in Snow becoming the third-largest shareholder of Patriot National with approximately 5.6% of all issued and outstanding shares -- Snow became a constituent part of Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, and continued as an owner and/or shareholder of the HSS general business operations and assets.

488.  In light of the provision in the HSS and Selective Risk Asset Purchase Agreements endowing Trigen Insurance with the sole right to use the name "Hospitality Supportive Systems, LLC," from the effective date thereof onward, as well HSS' consequential lack of any substantial assets, HSS as it previously existed ceased to operate.

489.   As set forth above, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 assumed the liabilities of HSS by way of the HSS Asset Purchase Agreement.

490.   Accordingly, to the extent the Court finds liability on the part of HSS, Aspen should be able to recover any damages caused thereby from Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in their capacity as liable successors.

## COUNT XIX - FRAUD
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

491.   Aspen realleges each allegation set forth in the paragraphs above.

492.   Pleading alternatively and as set forth more fully above, by way of the HSS Asset Purchase Agreement dated April 1, 2015, Trigen Insurance acquired substantially all of HSS' assets and rights pursuant to certain contracts delineated in schedules purportedly attached thereto but not made publicly available.

493.   Additionally, pursuant to the terms of the HSS and Selective Risk Asset Purchase Agreements, Trigen Insurance retained the sole right to use the name "Hospitality Supportive Systems, Inc." from the effective date thereof onward.

102

494.   The respective Asset Purchase Agreements also gave Trigen Insurance the unrestricted authority to transfer any and all of its rights thereunder to any of its affiliates.

495.   Thereafter, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 submitted an application for renewal coverage under Policy No. CR003UL15 in HSS (C), under the name "Hospitality Supportive Systems, LLC."

496.   The application for Policy No. CR003UL15 submitted by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 contained several instances of knowing misrepresentation, misstatement, omission and/or concealment of facts.

497.   These misrepresentations by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 involved, inter alia, information concerning known losses and/or claims asserted against participants/additional named insureds under the HSS Programs, which were material to the risk assumed by Aspen in issuing Policy No. CR003UL15.

498.   The purpose of these knowing material misrepresentations and/or misstatements was to procure Policy No. CR003UL15 and/or more favorable terms of coverage for the HSS Programs.

499.   Aspen   relied   upon   the   material   misrepresentations   and/or misstatements made by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in electing to issue Policy No. CR003UL15 and setting the terms of coverage thereunder.

500.   As  a  result  of  the  above-noted  misrepresentations  and  Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages, in that Aspen has incurred and will continue to incur substantial costs under the Aspen   Policies   for   the   defense   and   indemnification   of   various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

## <u>COUNT XX - FRAUD</u>
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

501.   Aspen realleges each allegation set forth in the paragraphs above.

502.   Pleading alternatively and as set forth more fully above, following the execution of the HSS and Selective Risk Asset Purchase Agreements dated April 1, 2015, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 submitted an application for renewal coverage under Policy No. CR003UL15 in HSS (C), under the name "Hospitality Supportive Systems, LLC."

503. In conjunction with the CR003UL15 application, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 -- using the name "Hospitality Supportive Systems, LLC" -- represented to Aspen that they would ensure compliance with the HSS Underwriting Guidelines.

504. These representations by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 involved, inter alia, strict enforcement of the HSS Underwriting Guidelines' limitations on acceptable loss history for proposed participants/additional named insureds for the HSS Programs.

505. The purpose of these representations was to procure Policy No. CR003UL15 and/or more favorable terms of coverage for the HSS Programs.

506. Aspen relied upon the representations by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in electing to issue Policy No. CR003UL15 and setting the terms of coverage thereunder.

507. Contrary to their repeated representations, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 did not ensure that proposed participants/additional named insureds qualified pursuant to the HSS Underwriting Guidelines, particularly but not limited to those specifications concerning acceptable loss history.

508. As a result of the above-noted misrepresentations and Aspen's reliance thereon, Aspen has been and will continue to be caused to suffer damages,

in that Aspen has incurred and will continue to incur substantial costs under the Aspen Policies for the defense and indemnification of various participants/additional named insureds in connection with Underlying Claims. These damages will exceed any amount of premium received by Aspen with respect to the Aspen Policies.

**COUNT XXI - UNJUST ENRICHMENT**
**(as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)**

509.   Aspen realleges each allegation set forth in the paragraphs above.

510.   Pleading alternatively and as noted above, prior and up to April 1, 2015, in its capacity as First Named Insured and intermediary between the HSS Programs' participants/additional named insureds and Aspen, HSS charged each participant/additional named insured a distinct and augmented premium with respect to the Aspen Policies as a fee for its services.

511.   Following the HSS and Selective Risk Asset Purchase Agreements dated April 1, 2015, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 retained these independently charged augmented premiums paid by participants/additional named insureds in the HSS Programs.

512.   This significant pecuniary benefit was conferred upon Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25

106

by Aspen through the issuance of Policy No. CR003UL15 to HSS as First Named Insured.

513.   Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 accepted and continue to retain any premium-related fees collected pursuant to their assumption of HSS' rights by way of the HSS and Selective Risk Asset Purchase Agreements.

514.   Aspen's conferral of the above-noted pecuniary benefit on Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 through the issuance of Policy No. CR003UL15 was in reliance on the misrepresentations, misstatements, omission and/or concealment of facts by Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25.

515.   Accordingly Trigen Insurance's, Trigen Hospitality's, Patriot Underwriters' and/or ABC Corporations 1-25's retention of the benefit conferred by Aspen would be inequitable without payment to Aspen for the value of the actual hazard insured and/or risk assumed by Aspen through the issuance of Policy No. CR003UL15.

## COUNT XXII - NEGLIGENCE
### (as to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and ABC Corporations 1-25)

516.   Aspen realleges each allegation set forth in the paragraphs above.

107

517.   Pleading alternatively, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 owed Aspen an independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines.

518.   Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 breached the aforesaid duty.

519.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XXIII - ALTER-EGO LIABILITY
### (as to Patriot National)

520.   Aspen realleges each allegation set forth in the paragraphs above.

521.   Pleading alternatively and as set forth above, Patriot National completely dominates Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25.

522.   Patriot National directed Patriot Services to enter into the March 31, 2015 Trigen Stock Purchase Agreement on its behalf.

523.   As a condition to Patriot Services' purchase of the Trigen shares, Trigen and/or certain of its shareholders were required to immediately pay certain outstanding Demand Notes issued in favor of and held by Patriot National's Chairman, CEO and majority shareholder in his individual capacity.

524.   Patriot National's Chairman, CEO and majority shareholder executed the Trigen Stock Purchase Agreement on behalf of Patriot Services as its President and Chief Executive Officer.

525.   Immediately upon closing of the Trigen Stock Purchase Agreement or shortly thereafter, Patriot National spun-off the recently-acquired Trigen shares into Trigen Insurance, itself a direct subsidiary of Patriot National.

526.   By way of an April 1, 2015 Press Release, Patriot National notified the public and the SEC that Patriot National had acquired Trigen Insurance.

527.   That same day, using Trigen Insurance is a façade for its own purposes, Patriot National acquired the assets of HSS and Selective Risk through the HSS and Selective Risk Asset Purchase Agreements.

528.   Thereafter, Patriot National directed Trigen Insurance to spin-off the purchased HSS assets into Trigen Hospitality, a wholly-owned subsidiary of Patriot Underwriters.

529.   At the time of execution of the HSS and Selective Risk Management Asset Purchase Agreements, Trigen Insurance was insufficiently capitalized to meet its obligations thereunder.

530.   On or around April 8, 2015, Patriot National issued and filed with the SEC a Press Release announcing Patriot National's acquisition of HSS' assets.

531.   Patriot National strategically placed its own officers within executive positions for Patriot Services, Trigen Insurance, Patriot Underwriters, Trigen Hospitality and/or ABC Corporations 1-25.

532.   In most if not all instances -- including but not limited to the Asset and Stock Purchase Agreements set forth above -- significant corporate actions undertaken by Patriot Services, Trigen Insurance, Patriot Underwriters, Trigen Hospitality and/or ABC Corporations 1-25 are executed by individuals serving as officers in both Patriot National and its affiliates.

533.   In light of the ubiquity of this occurrence and the circumstances surrounding each of the relevant transactions, the executing officers have effectively ceased to function independently of their capacity as Patriot National executives.

534.   Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have utilized and continue to utilize common key personnel with respect to HSS' operations, including but not limited to Snow.

535.   Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have failed to observe the corporate formalities and keep adequate records as purportedly independent entities.

110

536.   Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have failed to maintain separate bank accounts and accounting records and commingled accounts and funds.

537.   This disregard for the corporate formalities and commingling of funds includes but is not limited to the issuance and/or transfer of 1,579,166 shares of Patriot National Common Stock by Patriot National to Snow in February 2016, even though all payments owed to Snow and/or HSS under the HSS and Selective Risk Asset Purchase Agreements entered into by Trigen Insurance at the direction and on behalf of Patriot National were purportedly made by or around May 14, 2015.

538.   Neither Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters nor ABC Corporations 1-25 have ever paid shareholder dividends.

539.   Patriot National exercises total control over the assets of Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, and uses such assets as its own.

540.   Specifically, Patriot National repeatedly used the assets of its affiliates -- including those of Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 -- as collateral and/or guaranty for various credit and financing agreements Patriot National entered into with third-party lenders.

111

541.   Patriot National has used Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 to defraud Aspen through misrepresentations, misstatements, omissions and/or concealment of facts in connection with the applications for coverage under the Aspen Policies, including but not limited to Policy No. CR003UL15.

542.   As set forth above, Patriot National has used Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 as its alter egos.

543.   Fundamental injustice will result if Aspen is not permitted to recover from Patriot National because Aspen's damages will exceed any premium paid for the Aspen Policies and HSS, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations are without sufficient assets.

544.   Accordingly, Aspen is entitled to disregard the corporate formalities and separateness of Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, such that liability against one constitutes liability against all.

## COUNT XXIV – VIOLATION OF THE LANHAM ACT
### (as to the HSS Program Enterprise)

545.   Aspen realleges each allegation set forth in the paragraphs above.

546.   The HSS Program Enterprise has used the Aspen trade name, and represented that they were selling Aspen insurance policies, after March 30, 2016, the date upon which the last of the HSS Program Aspen Policies were cancelled.

112

547.   Member-insureds of the HSS Programs, including Adelphia, were told by the HSS Program Enterprise that Aspen was involved in post-March 30, 2016 insurance coverage placement for the purpose of confusing, causing mistake, and/or deceiving the member-insureds into thinking that they were actually purchasing insurance coverage through Aspen.

548.   No such insurance coverage through Aspen was ever placed.

549.   Said Defendants' unauthorized use of name, mark, image, good will of Aspen was a false and/or misleading representation of fact.

550.   Said Defendants' unauthorized use of name, mark, image, good will of Aspen is likely to cause confusion, mistake or deception as to the affiliation, connection or association of Defendants with Aspen or its approval of Defendants services or products.

551.   Aspen has and will continue to be damages by these acts.

552.   This case is an exceptional case pursuant to 15. U.S.S. § 1117.

553.   By reason of the foregoing, Aspen hereby asserts a claim against the HSS Program Enterprise for injunctive and monetary relief pursuant to Section 43(a) of the Lanham Act, 15 U.S.C. § 1125(a), with regards to the false designation of origin and false descriptions and representations in commerce by the HSS Program Enterprise regarding the HSS Programs insurance coverage after March 30, 2016.

## COUNT XXV – PASSING OFF
### (as to the HSS Program Enterprise)

554.   Aspen realleges each allegation set forth in the paragraphs above.

555.   Member-insureds of the HSS Programs, including Adelphia, were told by the HSS Program Enterprise that Aspen was involved in post-March 30, 2016 insurance coverage placement for the purpose of confusing, causing mistake, and/or deceiving the member-insureds into thinking that they were actually purchasing insurance coverage through Aspen after March 30, 2016.

556.   No such insurance coverage through Aspen was ever placed.

557.   The HSS Program Enterprise's representations that the insurance policies or services sold were affiliated with Aspen , with full knowledge that  they were not, has and will continue to cause confusion in the market and negatively impact Aspen's business reputation.

558.   Aspen was and will continue to be damaged by these deceptive business practices by HSS Program Enterprise.


559.   By reason of the foregoing, Aspen hereby asserts a claim against the HSS Program Enterprise for passing off with respect to the HSS Program Enterprise' infringement of the mark.

## COUNT XXVI – NEGLIGENT MISREPRESENTATION
### (as to McGriff and Inservco)

560.   Aspen realleges each allegation set forth in the paragraphs above.

561.   The HSS Program Enterprise provided Application Materials to Aspen throughout the underwriting of the HSS Programs.

562.   McGriff and Inservco were both responsible for providing certain Application Materials for Aspen's consideration on behalf of the HSS Program Enterprise.

563.   The information McGriff and Inservco provided to Aspen in connection with the HSS Programs was material to Aspen in determining whether to issue and renew policies in the HSS Programs and calculating related premiums.

564.   Based on the Application Materials provided by McGriff and Inservco, including the Inservco Loss Runs, Aspen reasonably relied on the representations of McGriff and Inservco as reflecting the true and correct insured risk of the HSS Programs.

565.   McGriff and Inservco knew or should have known that Aspen would rely on the Application Materials being prepared and reviewed by McGriff and Inservco in connection with the HSS Programs.

566.   McGriff and Inservco knew or should have known, through the exercise of reasonable diligence, that the Application Materials did not represent true and accurate information.

567.   Aspen actually relied on McGriff and Inservco to provide Application Materials with complete and accurate information for the purposes of underwriting the HSS Programs.

568.   McGriff and Inservco had a duty to provide Aspen with Application Materials that were true and correct.

569.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## COUNT XXVII – NEGLIGENT SUPPLY OF INFORMATION
### (as to McGriff and Inservco)

570.   Aspen realleges each allegation set forth in the paragraphs above.

571.   The HSS Program Enterprise provided Application Materials to Aspen throughout the underwriting of the HSS Programs.

572.   McGriff and Inservco were both responsible for providing certain Application Materials for Aspen's consideration on behalf of the HSS Program Enterprise.

573.   The information McGriff and Inservco provided to Aspen in connection with the HSS Programs was material to Aspen in determining whether to issue and renew policies in the HSS Programs and calculating related premiums.

574.   McGriff and Inservco knew or should have known, by the exercise of reasonable diligence, that their responses and provision of information to Aspen was not true and accurate.

116

575.   Based on the Application Materials provided by McGriff and Inservco, including the Inservco Loss Runs, Aspen reasonably relied on the representations of McGriff and Inservco as reflecting the true and correct insured risk of the HSS Programs.

576.   Aspen actually relied on McGriff and Inservco to provide Application Materials with complete and accurate information for the purposes of underwriting the HSS Programs.

577.   McGriff and Inservco both had contractual relationships with HSS, and received monetary compensation for their actions and omissions through that contractual relationship in preparing and reviewing Application Materials.

578.   Under Pennsylvania law, a business entity that negligently fails to provide complete and accurate information to another business is subject to liability for the damages resulting from the reliance on the incorrect or incomplete information. Section 522 of the Restatement (Second) of Torts states:

> Information Negligently Supplied for the Guidance of Others.
> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information

579.   The foregoing acts and omissions constitute a negligent supply of information by McGriff and Inservco to Aspen.

580.   McGriff and Inservco had a duty to provide Aspen with Application Materials that were true and correct.

581.   As a direct, proximate and foreseeable result of the breach of the aforesaid duty, Aspen has been, and continues to be, damaged.

## <u>PRAYER FOR RELIEF</u>

WHEREFORE, Aspen respectfully requests that the Court enter judgment against Defendants and in its favor as follows:

a.   Rescinding the Aspen Policies due to misrepresentations, misstatements, omissions and/or concealments of facts by and on behalf of HSS that are material to the acceptance of the risk by Aspen;

b.   Rescinding the Aspen Policies due to misrepresentations, misstatements, omissions and/or concealments of facts by and on behalf of HSS that are material to the hazard assumed by Aspen;

c.   Rescinding the Aspen Policies because Aspen in good faith would not have issued the Aspen Policies had the misrepresentations, misstatements, omissions and/or concealments of facts not been made to Aspen by and on behalf of HSS, or had the true information been known;

d.   Rescinding the Aspen Policies due to the fraudulent misrepresentations, misstatements, omissions and/or concealments of facts by and on behalf of HSS;

e.   Declaring that Aspen is entitled to retain some or all of the premium paid for the Aspen Policies as an off-set to the costs and expenses Aspen has incurred as a result of the issuance of the Aspen Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

f.   Declaring that Aspen is entitled to restitution of the costs and expenses Aspen has incurred as a result of the issuance of the Aspen

Policies, including but not limited to any defense and/or indemnity payments made by Aspen under the HSS Programs.

g.     A declaration as to the respective rights and obligations of Aspen and HSS, and specifically a judgment declaring that Aspen owes no coverage for the pending Underlying Claims or any claim made or to be made under the Aspen Policies;

h.     A declaration as to the respective rights and obligations of Aspen and HSS with respect to defense and indemnity coverage in connection with the Underlying Claims;

i.     Holding that the HSS Program Enterprise, McGriff, and Inservcoare liable to Aspen for fraud in connection with the knowing misrepresentations, misstatements, omissions and/or concealments of facts in connection with the applications for coverage under certain of the Aspen Policies, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

j.     Holding that the HSS Program Enterprise and McGriff as its agent are liable to Aspen for fraud in connection with the knowing misrepresentations regarding enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

k.     Holding that the HSS Program Enterprise is liable to Aspen for conspiracy and conspiracy to defraud in connection with its knowing misrepresentations, misstatements, omissions and/or concealments of facts in connection with the applications for coverage under certain of the Aspen Policies as well as its knowing misrepresentations regarding enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

l.     Holding that HSS and McGriff are liable to Aspen for negligence arising from its breach of the independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including

119

compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

m.      Holding that Selective Risk is liable to Aspen for negligence arising from its breach of the independent duty of care in connection with the administration of the HSS Programs, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post- judgment interest, in an amount to be determined at trial;

n.      Holding that Selective Law is liable to Aspen for negligence arising from its breach of the independent duty of care in connection with the administration of the HSS Programs, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post- judgment interest, in an amount to be determined at trial;

o.      Holding that the HSS Program Enterprise is liable to Aspen for violations of 18 U.S.C. § 1962, et seq., and awarding Aspen's damages, including compensatory and consequential damages, attorney's fees and cost, treble damages, plus pre-and post- judgment interest, in an amount to be determined at trial;

p.      A declaration that Aspen is entitled to disregard the corporate formalities and purported separateness of HSS, Snow and/or Carman, and permitting Aspen to recover damages from Snow and/or Carman for any liability attributable to HSS in an amount to be determined at trial;

q.      Holding that Snow and/or Carman are liable to Aspen for negligence arising from the breach of the independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

r.      A declaration that Snow, Connelly, and O'Donnell are liable to Aspen in their individual capacity as an active participant in HSS' material misrepresentations, misstatements, omissions and/or concealments of facts in connection with the applications for coverage under the Aspen Policies and the failure to ensure compliance with the HSS Underwriting Guidelines,

5137659-3

and awarding judgment against Snow, Connelly, and O'Donnell as liable participants in an amount to be determined at trial;

s.       A declaration that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen as successors to HSS, and permitting Aspen to recover damages from said Defendants for any liability attributable to HSS in an amount to be determined at trial;

t.       Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen for fraud in connection with their knowing misrepresentations, misstatements, omissions and/or concealments of facts in connection with the application for coverage under Policy No. CR003UL15, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

u.       Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen for fraud in connection with their knowing misrepresentations regarding enforcement of the HSS Underwriting Guidelines in connection with the application for coverage under Policy No. CR003UL15, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

v.       Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 have been unjustly enriched through the retention of premium in connection with Aspen's reliance on their representations, and ordering payment to Aspen for the value of the actual hazard insured and/or risk assumed, in an amount to be determined at trial;

w.       Holding that Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 are liable to Aspen for negligence arising from the breach of the independent duty of care in connection with the administration of the HSS Programs and the enforcement of the HSS Underwriting Guidelines, and awarding Aspen's damages, including compensatory and consequential damages, attorneys' fees and costs, plus pre- and post-judgment interest, in an amount to be determined at trial;

5137659-3

x.      A declaration that Aspen is entitled to disregard the corporate formalities and purported separateness of Patriot National, Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25, and permitting Aspen to recover damages from Patriot National for any liability attributable to Trigen Insurance, Trigen Hospitality, Patriot Underwriters and/or ABC Corporations 1-25 in an amount to be determined at trial;

y.      Ordering Snow, O'Donnell, Connelly, HSS, Selective Risk, Carman and Selective Law to provide an accounting to Aspen regarding all monies received and/or spent by each and any of them regarding the HSS Programs and/or Aspen Policies;

z.      As to Aspen's Claim for Violation of the Lanham Act and Passing Off, that the HSS Program Enterprise, their agents, servants, employees, officers, attorneys, successors and assigns, and all persons acting in concert with them, be enjoined in this and all other judicial districts in the United States, preliminarily during the course of this litigation and permanently from: 1) manufacturing, distributing, selling, offering for sale, holding for sale or advertising any products, merchandise or goods bearing the name, trademark, or likeness of Aspen or any colorable variation or imitation thereof; and 2) representing that any products, merchandise or goods manufactured, distributed, sold, held for sale or advertised by them is sponsored or authorized by Aspen in this district or any other district in which Aspen seeks to enforce this Court's injunction order.

aa.     As to Aspen's Claim for Violation of the Lanham Act and Passing Off, that the HSS Program Enterprise account to Aspen for any and all profits derived by them from the sale of products or services through the improper and unauthorized use;

bb.     As to Aspen's Claim for Violation of the Lanham Act and Passing Off, that the HSS Program Enterprise account for all entities to whom they have purportedly sold Aspen insurance coverage after March 30, 2016, and notify each and every of them that no such insurance coverage exists.

cc.     As to Aspen's Claim for Violation of the Lanham Act, that the HSS Program Enterprise be found liable to Aspen for a monetary judgment for the maximum damages allowable pursuant to 15 U.S.C. § 1125.

dd.     Holding McGriff and Inservco are liable to Aspen for their negligent misrepresentation and negligent supply of information in breaching their

duty of care to Aspen by not providing true and correct Application Materials for Aspen's consideration in underwriting the HSS Program;

ee.    A declaration that Aspen is entitled to a judgment for its reasonable attorney's fees and costs of this suit; and

ff.    For such other and further relief as the Court deems just and proper.

CONNELL FOLEY LLP

*/s/William D. Deveau*_____

Dated: August 23, 2019

William D. Deveau (*pro hac vice*)
185 Hudson Street, Suite 2510
Jersey City, NJ 07311
Tel:   (201) 521-1000
Fax:   (201) 521-0100
wdeveau@connellfoley.com
        and
Jonathan P. McHenry (*pro hac vice*)
Patrick J. Hughes (I.D. No. 41403)
J. Christopher Henschel (pro hac vice)

Connell Foley LLP
85 Livingston Avenue
Roseland, New Jersey 07068
Tel: (973) 535-0500
Fax: (973) 535-9217
Attorneys for Plaintiff,
Aspen Specialty Insurance Company