UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ASPEN SPECIALTY INSURANCE COMPANY, Plaintiff | CIVIL ACTION |
| v. | NO. 16-cv-01133-JD |
| HOSPITALITY SUPPORTIVE SYSTEMS, LLC, et al., Defendants. | JURY TRIAL DEMANDED |
| | |
| HOSPITALITY SUPPORTIVE SYSTEMS, LLC, Plaintiff | |
| v. | |
| ASPEN SPECIALTY INSURANCE COMPANY, Defendant. | |

MEMORANDUM OF LAW OF
DEFENDANTS HSS, SNOW, CARMAN CORPORATION, SELECTIVE LAW GROUP LLC,
SELECTIVE RISK MANAGEMENT LLC, CONNELLY AND O'DONNELL
TO DISMISS SECOND AMENDED COMPLAINT

Aspen's Second Amended Complaint purports to assert new claims under the RICO and

Lanham Act statutes, presumably to intimidate the defendants and advance their war of attrition.

Along the way, they magnify a garden variety tort claim into three different RICO "enterprises,"

blame the generic enterprises as a whole for unparticularized fraud and twist the Lanham Act in

ways that make it virtually unrecognizable.  Moreover, their fraud, conspiracy and negligence

claims against the "enterprises" are asserted against new parties long after the passage of the

applicable statutes of limitations.  Such rogue pleading should not be tolerated, and warrants

dismissal of the claims asserted against movants in Counts I through XVII, as well as XXIV and

XXV.

I.    FACTS AND PROCEDURAL HISTORY

As alleged in the Second Amended Complaint, HSS is an insurance purchasing group which solicits business owners and operators within the hospitality and restaurant industry to enter into a property and liability insurance sharing program.  (Second Amended Complaint at ¶34.)  HSS secures insurance coverage through various property and liability insurance carriers as the primary named insured on such policies.  (Id. at ¶42).  Aspen, an insurance company, in turn, issued a series of commercial insurance policies to HSS between 2011 and 2015, providing general liability, liquor liability and excess liability coverage to HSS and its group members, individual restaurant, tavern and bar owners who became additional named insureds under one or more of the policies.  (Id. at ¶¶58-61).  On or about February 29, 2016, Aspen notified HSS that, effective March 30, 2016, Aspen was prematurely cancelling the four policies still in effect.  (Id. at ¶276.)   Aspen alleges that HSS, along with co-defendants The Carman Corporation ("Carman"), Selective Risk Group, LLC ("SRG"), Selective Law Group, LLC ("SLG"), Edward E. Snow ("Snow"), John W. Connelly, Jr. ("Connelly"), and Charles M. O'Donnell, Esq. ("O'Donnell") (collectively, the "HSS Defendants") violated the Lanham Act by thereafter issuing certificates of insurance to member-insureds which referenced Aspen coverage still in place, on the assumption that the cancellation was wrongful and would be invalidated.  (Id. at ¶¶311-318, 547 and 550.)

Aspen alleges that Snow is and was the sole shareholder, principal and/or member of HSS (id. at ¶¶35 & 453); that Snow and O'Donnell were shareholders of co-defendant SRM, HSS's third-party claims administrator (id. at ¶¶54, 56, and 112-13); that Snow is and was the president, CEO, and treasurer of Carman (id. at ¶¶115 and 454); that O'Donnell is the president

and CEO of SLG, retained by HSS as claims defense counsel (id. at ¶¶54-56 and 113); that Carman shares a common office location, officers and personnel with HSS (id. at ¶¶455-56); that HSS and Carman share common officers, including Snow, and that Snow dominates both entities, which operate as one entity (id. at ¶¶456-58); and that Snow failed to disclose to Aspen that "the three entities" (presumably SRM, SLG and perhaps HSS or Carman) "were related parties" by virtue of common ownership by Snow and O'Donnell.  (Id. at ¶114) (There is no allegation that attorney O'Donnell has an interest in Carmen or HSS, so the three entities at issue are unclear.)  In conclusory fashion, the Second Amended Complaint also alleges that Snow and/or Carman "used HSS to defraud Aspen" and "used HSS as their alter ego."  (Id. at ¶¶462-63).  Aspen alleges further that Snow executed certain asset purchase agreements with respect to HSS and SRM in May 2015 among HSS, O'Donnell, and co-defendants Trigen Insurance Solutions, Inc. ("Trigen") and SRM without Aspen's prior knowledge or authorization (id. at ¶¶122-26, 130, and 133); that HSS and SRM were acquired by defendant Patriot National Insurance Co. ("Patriot")[1] and later by defendant Trigen in exchange for monetary consideration (id. at ¶¶121, 125-26, and 527); and that HSS and SRM were parties to amendments to the asset purchase agreements with Trigen (id. at ¶130).

The bulk of Aspen's Second Amended Complaint concerns its allegations that the HSS Defendants engaged in a conspiracy to defraud Aspen, specifically to deceive it into issuing and renewing insurance coverage at artificially deflated premiums by failing to disclose the accurate and complete claims history for certain additional insureds when it secured initial coverage or

---

[1] Patriot is defined by Aspen in its Second Amended Complaint as defendant Patriot Underwriters, Inc., together with defendant Patriot National, Inc.  Both Patriot entities and both Trigen entities named in the caption have been severed from the case by this Court, in light of Patriot's bankruptcy filing.  Movants are confused by Aspen's continuing insistence that these entities be named as defendants, in light of the bankruptcy and Court rulings.

renewal coverage.  (Id. at ¶¶ 136, 167, 182, 189-90, 206-07, 219, 230, 240, 250, 259, 269, 279, 282).  The HSS Defendants' scheme of alleged late transmission of notice of certain claims, and alleged failure to report such claims prior to the issuance or renewal of its policies, are pleaded as material misrepresentations or negligence by HSS and various other HSS Defendants.  (Id. at ¶¶ 332, 348, 356, 361, 378, 385, 393, 397, 401, and 467).  The same alleged conduct is also pleaded as violations of the Racketeer Influenced and Corrupt Organizations Act ("RICO").  (Id. at ¶¶ 407 and 441).

Aspen alleges that the HSS Defendants each performed specific roles within a RICO enterprise.  (Id. at ¶¶ 138-44).  HSS and Carman, through Snow and Connelly, marketed, underwrote, and manage the accounts, as well as handled all communications with Aspen and the additional insureds.  (Id. at ¶¶ 138-39).  SRM, through Snow and O'Donnell, investigated and evaluated claims as a third-party administrator, and made the decision of whether to deny or settle claims in order to avoid reporting them to Aspen.  (Id. at ¶¶ 140-41).  SLG, through O'Donnell, also investigated claims and represented the insureds in litigation, and through Snow and O'Donnell, evaluated claims for potential liability and whether to avoid reporting them to Aspen.  (Id. at ¶¶ 142-43).  Additionally, O'Donnell, in his role at SRM and SLG, manufactured false loss runs during the underwriting periods of the Aspen policies.  (Id. at ¶ 144).  Aspen also alleges that the HSS Defendants conducted weekly meetings where they discussed all claims and determined whether to report a claim to Aspen and, if so, when to report it.  (Id. at ¶¶ 157 and 160).

Aspen filed its initial Complaint on March 10, 2016 but waited to serve it.  In the meantime, HSS filed suit in the Court of Common Pleas of Delaware County on or about March 16, 2016.  The next day, Aspen served its Complaint and shortly thereafter removed the HSS

action to this Court on March 22, 2016.

On January 13, 2017, this Court consolidated the two actions and directed Aspen and HSS to proceed with discovery on Aspen's claim for rescission and HSS's claim for breach of contract. (Document 30). Beginning with that Order, the Court set deadlines regarding amendment and joinder of parties— first without leave of court, and then by motion. (Document 31).

Both parties timely filed amended complaints thereafter. Aspen's amended complaint added eight defendants. (Document 33). Claims against two of the defendants, SLG and SRM, were dismissed by this Court on August 20, 2018. (Document 105).

Claims against Patriot National Insurance Co. and its related entities were severed by this Court on August 10, 2018 (Document 100), following the commencement of bankruptcy proceedings by Patriot on January 30, 2018. (See Notice filed on February 1, 2018, Document 78). In the meantime, massive discovery proceeded between the parties through much of 2017 and 2018, until the Court stayed discovery, other than consensual discovery, on January 9, 2019 (Document 123) pending mediation before Judge Rueter, which commenced but was not completed.

Aspen filed its motion for leave to file a Second Amended Complaint on August 23, 2019. (Document 137). The undersigned parties opposed the motion on multiple grounds. (Document 139). The Court granted leave in its scheduling order dated December 16, 2019. (Document 145). The undersigned parties sought reconsideration of that Order on December 26, 2019. (Document 147). The Court denied reconsideration by Order dated January 9, 2020. (Document 154). In the meantime, Aspen served its pleading on January 2, 2020 (Document 151), after stipulating with the undersigned to a response deadline of January 28, 2020

(Document 158), which was further extended to January 31, 2020 (Document 172).

II.   ARGUMENT

A.   APPLICABLE STANDARD AND SCOPE.

A Rule 12(b)(6) motion tests the sufficiency of a complaint to state a legally cognizable claim. Avellino v. Herron, 991 F. Supp. 722 (E.D. Pa. 1997)(Robreno, J.). Although the court must review the allegations of the complaint in a light most favorable to the plaintiff (Markowitz v. Northeast Land Co., 906 F.2d 100 (3d Cir. 1990)), it "need not accept as true unsupported conclusions and unwarranted inferences" cast as factual allegations. Doug Grant, Inc. v. Greate Bay Casino Corp., 232 F.3d 173, 174 (3d Cir. 2000), cert. denied, 532 U.S. 1038 (2001).

Although the Court must accept all facts alleged as true and draw all reasonable conclusions arising from those facts in favor of plaintiffs, Allegheny General Hospital v. Phillip Morris, 228 F.3d 429, 434-35 (3d Cir. 2000), "a plaintiff's obligation to provide the grounds of his entitlement to relief requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." Bell Atlantic Corp. v. Twombly, 550 U.S. 544 (2007). Rather, "[f]actual allegations must be enough to raise a right to relief above the speculative level on the assumption that all of the complaint's allegations are true (even if doubtful in fact)." Id. at 555. This requires "either direct or inferential allegations respecting all the material elements necessary to sustain recovery under some viable legal theory." Haspel v. State Farm Mutual Auto. Ins. Co., 241 Fed. Appx. 837, 839 (3d Cir. 2007) (unpublished), quoting Twombly, 550 U.S. at 562; accord, Nolan v. Duffy Connors LLP, 542 F. Supp. 2d 429, 431 (E.D. Pa. 2008)(Dalzell, J.).

"Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009), citing Twombly, 550

U.S. at 555); <u>Phillips v. County of Allegheny</u>, 515 F.3d 224, 232 (3d Cir. 2008) ("We caution that without some factual allegation in the complaint, a claimant cannot satisfy the requirement that he or she provide not only 'fair notice,' but also the 'grounds' on which the claim rests."), citing <u>Twombly</u>, 550 U.S. at 556 n.3. To survive a motion to dismiss, a plaintiff must plead "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." <u>Iqbal</u>, 556 U.S. at 678, citing <u>Twombly</u>, 550 U.S. at 556.

B. <u>HSS, SNOW AND CARMAN REITERATE THEIR PREVIOUS CHALLENGES TO THE CLAIMS ASSERTED AGAINST THEM IN COUNTS I THROUGH V AND XIV AND XV.</u>

As HSS, Snow and Carman have been parties to one or more of the previous pleadings, they reiterate and incorporate herein their prior motions to dismiss the claims that previously have been asserted against them. (See, HSS motion to dismiss Complaint, Document 12; and Carman et al. motion to dismiss Amended Complaint, Document 52.) Those pre-existing claims encompass Count I for equitable rescission (Count I in the Complaint and Amended Complaint); Count II for rescission based on fraud (Count II in the Complaint and Amended Complaint), Count III for declaratory relief against HSS (Count III in the Complaint and Amended Complaint); Count IV for declaratory relief for fraud against HSS (Count IV in the Complaint and Amended Complaint); and Count V for declaratory relief of no coverage against HSS (Count V in the Complaint and Amended Complaint).

In those prior motions we unsuccessfully invoked the gist of the action doctrine, economic loss doctrine, election of remedies and the absence of a rescission remedy as to expired policies, impact of rescission on additional insureds, jurisdictional deficiencies, cursory pleading as to defendant Snow, absence of tort liability and lack of pleaded grounds for liability of SLG, SRM and Carman.

We renew these challenges without any expectation that these prior arguments will alter prior rulings, but rather to preserve these issues for appeal.  HSS, Snow and Carman nevertheless join with all movants herein in challenging other, more heavily modified, counts, as indicated below.

C.    ASPEN HAS FAILED TO ALLEGE ANY FACTS GIVING RISE TO LIABILITY OF DEFENDANT JOHN CONNELLY.

Defendant John Connelly, a former employee of HSS and current employee of Carman, is lumped together with the other movants herein as part of an alleged "enterprise" for fraud (Count VII and VIII), RICO (Counts XII and XIII), conspiracy (Count XVI), participation liability (Count XVII), Lanham Act violations (XXIV) and "passing off" (Count XXV). The facts as alleged are insufficient to support liability under any of the foregoing theories.

As noted above, the allegations specific to defendant Connelly are thin at best.  The Second Amended Complaint states that Connelly was involved in "numerous misstatements, omissions and concealments of fact" (Second Amended Complaint at ¶32) and other "actions" (id. at ¶31) but identifies none.  It attributes unspecified "Application Materials" to Connelly, Snow and O'Donnell, without identifying who did what, input they had, or even what documents constitute such materials or what those documents said.  (Id. at ¶106).  It alleges generically that "Claims Reporting" likewise was done by or at the direction of those three individuals, without identifying who did what, input they had or which claims were reported by which defendants. (Id. at ¶107) In conclusory fashion, the Second Amended Complaint also alleges that Connelly, together with *all* of the movants herein, operated as a joint enterprise, with "each entity and person having a specific role in the enterprise," but does not identify such roles.  It alleges that Connelly and Snow operated as a "clearing house" for communications and "roles," but offers no elaboration of this claim.  (¶138).  It alleges that Connelly directed that a claim called "Yager,"

which later was settled without the need for funds from Aspen, be removed from a loss run. (¶151-55).   Connelly was an "attendee" of weekly meetings at which claims were evaluated. (¶158).   His role or actions at such meetings is not even mentioned.   Connelly, together with Snow, O'Donnell, HSS, Carman, SLG and SRM all "attempted to resolve" the Crowley, Glynn, Egan, Possinger, Kocher, Howard, McQueen and Lukk claims without notice to Aspen (¶¶179, 203, 216, 227, 237, 247, 267), but his role with regard thereto is not identified.

Connelly sent a letter to Aspen brokers McGriff and CRC in 2015, acknowledging apologetically that certain claims had not been reported to Aspen and assuring them that the reporting would be updated immediately. (¶185) "HSS, Snow, and Connelly" jointly "made an affirmative representation" in June of 2015 in an unspecified communication that no unreported claims other than the Crowley claim were pending.   (¶186-87).   Connelly in a June 2015 email said he was "hopeful" that that there was a marked improvement in claims reporting. (¶188). Connelly, together with Snow and O'Donnell, allegedly had an unspecified role in email submissions by a KPatterson and/or RSharrar regarding Palmer, Rack's and Dirty Frank's loss history. (¶306). Connelly is further alleged to have been "employed by or associated with" one of the RICO enterprises alleged in the pleading (¶¶408-9) and communicated among all of the defendants and with Aspen in unspecified ways in furtherance of a scheme. (¶¶417-18).  He is alleged to have "participated directly in the negotiation and procurement of the Aspen Policies, as well as the various representations made to Aspen" (¶477) and unidentified misrepresentations relating thereto (¶478)

Such conclusory allegations are woefully inadequate to establish a claim for relief.

D. <u>COUNTS VII AND VIII FOR FRAUD BY THE ALLEGED "ENTERPRISE" LACK SPECIFICITY AS TO EACH PARTICULAR DEFENDANT AND FAIL TO STATE A CLAIM.</u>

In Count VII of its Second Amended Complaint, Aspen alleges that the movants made numerous misrepresentations regarding insurance applications and loss runs provided to Aspen which omitted loss and/or claims information for additional insureds under the Aspen policies. Second Amended Complaint at ¶¶378-79. In Count VIII, Aspen alleges that the movants repeatedly misrepresented to Aspen that it would ensure compliance with certain underwriting guidelines by any proposed additional insureds under the Aspen policies. <u>Id</u>. at ¶¶385-86. Aspen alleges that it relied on these misrepresentations in deciding to issue the Aspen policies and setting the terms of coverage in those policies. <u>Id</u>. at ¶¶382, 388. The allegations in Count VIII are at best future promises of performance, which cannot form the basis of a fraud claim. <u>See</u>, <u>e.g.</u>, <u>Shoemaker v. Commonwealth Bank</u>, 700 A.2d 1003, 1006 (Pa. Super. 1997)("[I]t is well-established that the breach of a promise to do something in the future is not actionable in fraud."); <u>Edelstein v. Carole House Apartments</u>, 220 Pa. Super. 298, 303, 286 A.2d 658, 661 (1971)("breach of a promise to do something in the future is not fraud"). Alternatively, they are promises sounding in contract, governed by the gist of the action doctrine, previously briefed and incorporated herein.

Moreover, Aspen's generic allegations in both counts fail to satisfy the heightened pleading standard under Fed. R. Civ. P. 9(b), given the absence of any identification of which defendants made which misrepresentations.

A plaintiff asserting a cause of action for fraud must sufficiently allege: (1) a representation; (2) material to the transaction at hand; (3) made falsely, with knowledge of its falsity or recklessness on whether it is true or false; (4) with the intent of misleading another into

relying on it; (5) justifiable reliance on the misrepresentation; and (6) the resulting injury was proximately caused by the reliance. <u>Santana Prods., Inc. v. Bobrick Washroom Equip., Inc.</u>, 401 F.3d 123, 136 (3d Cir. 2005).

Rule 9(b) imposes a heightened pleading standard for Aspen's fraud-based claims and provides, in part: "In alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake." Fed.R.Civ.P. 9(b).  This heightened standard "requires plaintiffs to plead with particularity the 'circumstances' of the alleged fraud in order to place the defendants on notice of the precise misconduct with which they are charged, and to safeguard defendants against spurious charges of immoral and fraudulent behavior." <u>Seville Industrial Machinery Corp. v. Southernmost Machinery Corp.</u>, 742 F.2d 786, 791 (3d Cir. 1984). Under Rule 9(b)'s heightened pleading requirements, a plaintiff must allege "who made the misrepresentation, to whom that misrepresentation was made, and the 'general content' of the misrepresentation." <u>Aetna Inc. v .Health Diagnostic Lab.</u>, 2015 WL 9460072, at *4 (E.D. Pa. Dec. 28, 2015), quoting <u>Lum</u>, 361 F.3d 217, 224 (3d Cir. 2004).  Likewise, a plaintiff must "allege the date, time and place of the alleged fraud[,] or otherwise inject precision or some measure of substantiation into a fraud allegation." <u>Frederico v. Home Depot,</u> 507 F.3d 188, 200 (3d Cir. 2007).  At a minimum, the plaintiff must include the essential factual background – the "'who, what, when, where, and how' of the events at issue." <u>In re Rockefeller Center Properties Securities Litigation</u>, 311 F.3d 198, 217 (3d Cir. 2002).  The focus of this analysis is on whether "each allegation of fraud adequately describes the nature and subject of the alleged misrepresentation." <u>Seville</u>, 742 F.3d at 791.

Here, Aspen asserts its fraud claims against all of the movants but fails to plead any of the specific details for each of the movants' individual misrepresentations.  Second Amended

Complaint at ¶ 378 ("HSS, together with the HSS Program Enterprise . . . committed numerous instances of knowing misrepresentations, misstatement, omission and/or concealment of facts in connection with the application for coverage under certain of the Aspen Policies."); id. at ¶385 ("[T]he HSS Program Enterprise, through HSS . . . repeatedly represented that it would ensure compliance with the HSS Underwriting Guidelines by any proposed participants/additional named insureds for the HSS Programs.")   Rather, it attributes *all* of the alleged misrepresentations to *all* of the movants in the aggregate.   Aspen's conclusory allegations and failure to the plead the "who, what, when, where, and how" or the date, time, and place of each alleged misrepresentation made by each of the movants flies in the face of heightened pleading requirements under Rule 9. Kolar v. Preferred Real Estate Investments, Civil Action No. 07-3864, 2008 WL 2552860, at *6 (E.D. Pa. June 19, 2008)(Tucker, J.) ("[C]onclusory allegations contain neither the precision nor substantiation necessary to satisfy Rule 9(b)'s heightened pleading standard.").   Accordingly, Aspen's fraud claims against the movants must be dismissed with prejudice.

E.   TO THE EXTENT THAT FRAUD CLAIMS ARE ALLEGED AGAINST CONNELLY, O'DONNELL, SRM AND/OR SLG IN COUNT VII, THEY ARE BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.

As noted above, defendants Connelly, O'Donnell, SLG and SRM were added to the litigation by the filing of the Second Amended Complaint. (SLG and SRM had been named in the Amended Complaint, but were dismissed by Order dated August 20, 2018. See Doc. 105) Aspen filed its motion for leave, together with its draft pleading, on August 23, 2019 (Doc. 137). The Court granted Aspen's motion by Order dated December 16, 2019 (Doc. 145), and the pleading was officially filed of record later that day (Doc. 146) and served on the four new defendants on or about January 2, 2020.   The Second Amended Complaint includes each of those

four movants in Counts VII and VIII for fraud (which merely names as a party to the count the alleged "HSS Program Enterprise").

Count VII alleges that movants SLG (a law firm), SRM (a claims administrator/law firm), O'Donnell (principal of SLG and SRM) and Connelly (employee of HSS, and then Carman) were among the aggregate members of the "enterprise" which "committed numerous instances of knowing misrepresentation, misstatement, omission and/or concealment of facts in connection with applications for coverage…" (Second Amended Complaint at ¶378) in loss runs and application materials (¶379), specific examples of which were "deliberate omissions of: the Crowley Claim, the Glynn Claim, the Egan Claim, the Howard Claim, the Kocher Claim, the Possinger Claim, the Lukk Claim, and the McQueen Claim." (¶380).

All of these claims (with the exception of Lukk and McQueen) were addressed at length in Aspen's original Complaint (Doc. 1) at ¶¶58-101, giving rise to Aspen's claims for fraud and rescission in that original March 10, 2016 pleading.  Paragraph 102 of that Complaint also referenced "additional claims" of which it had been put on notice.

Moreover, *all eight* of those claims had been reported to Aspen at least several months prior to the filing of their 2016 Complaint. The Second Amended Complaint acknowledges that Aspen has known of the Crowley claim since January 6, 2015 (Second Amended Complaint at ¶180); has known of the Glynn, Egan and Howard claims since January 19, 2016 (¶¶204, 216 and 248); has known of the Kocher and Possinger claims since January 20, 2016 (¶¶228 & 238); has known of the Lukk claim since January 22, 2016 (¶268); and has known of the McQueen claim since December 18, 2015 (¶258).  Significantly, paragraphs 21 and 22 of the *original* Complaint addressed the role of SLG and SRM in the claims reporting process. (Doc. 1, ¶¶21-22).

Under applicable Pennsylvania law, claims of fraud and misrepresentation must be filed within two years.  See 42 Pa.C.S. § 5524.  No reasonable basis has been pleaded for Aspen's failure to assert its fraud claims against parties it clearly knew about within the applicable statute of limitations period.  To the extent fraud has been pleaded with specificity at all under Fed.R.Civ.P. 9(b) (which itself is questionable, given that no specific person, document or communication is cited with respect to the eight claims above), the two-year statute of limitations long ago elapsed with regard to fraud arising from the failure to disclose those eight claims. Given Aspen's knowledge of all eight claims in early 2016, its belief (rightly or wrongly) as alleged in the original complaint that SLG and SRM were involved in the claims reporting process, any fraud claims against those two entities and their principal O'Donnell, or against former HSS employee Connelly, long ago expired.

F.   THE FRAUD CLAIMS ALLEGED AGAINST ALL MOVANTS IN COUNT VIII ARE BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS AND FAIL TO STATE A COLORABLE CLAIM OF FRAUD IN ANY EVENT.

Count VIII, in turn, alleges that movants "repeatedly represented that it would ensure compliance with" underwriting guidelines by additional named insureds.  (Second Amended Complaint at ¶385) but did not do so (¶389).  Count VII goes on to allege that "additional specific examples of Underwriting Misrepresentation include the submission to Aspen of applications for: Palmer's, Rack's, and Dirty Frank's." (¶390).  Those applications each were submitted long before the original 2016 Complaint.  See id. at ¶293 (alleging Palmer submission on 10/30/14), ¶296 (alleging Racks submission on 5/16/12); ¶300 (alleging Dirty Frank's submission on 12/11/13).

Moreover nowhere in the Second Amended Complaint is it alleged that any of the movants *knew* of the alleged prior guilty plea of Palmer Social Club, prior judgment against

Rack's Bar or absence of food service at Dirty Frank's.

As for the claim that movants failed to insure that proposed member-insureds qualified for coverage, that is not a valid basis for a fraud claim.

G.     THE NEGLIGENCE CLAIMS ALLEGED AGAINST SRM AND SLG IN COUNTS X AND XI ARE BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.

Likewise, to the extent that Aspen argues in Count X that SRM was negligent and in Count XI that SLG was negligent in failing to see to it that Aspen was timely notified of the enumerated claims, the statutory period under 42 Pa.C.S. § 5524 likewise bars such a claim against the newly added defendants.  As such, those counts must be dismissed as well.

H.     TO THE EXTENT ANY CONSPIRACY CLAIMS ARE ALLEGED IN COUNT XVI AGAINST ANY OF THE MOVANTS, SUCH CLAIMS ARE BARRED BY THE TWO-YEAR STATUTE OF LIMITATIONS.

Aspen waited until its Second Amended Complaint to allege a claim for conspiracy.  See Second Amended Complaint at Count XVI.  Under Pennsylvania law, the applicable statute of limitations applicable to a claim for civil conspiracy is the same as the period applicable to the underlying tort. Reynolds v. Fed. Bureau of Prisons, No. 09-3096, 2010 WL 744127, at *8 (E.D.Pa. Mar. 2, 2010) ("Under Pennsylvania law, the statute of limitations for civil conspiracy is the same as the statute of limitations for the underlying tort.").

Here, Aspen indicates in Count XVI that its focus it on "the common objective of deceiving and/or defrauding Aspen regarding the extent of the loss history and claims made in the HSS Program." See Second Amended Complaint at ¶471 and at p. 119, subsection k.  As such, the two year statute of limitations applicable to fraud claims would govern, as above.  See also, Pierce v. Rosetta Corp., 1992 WL 165817 at *9-10 (E.D. Pa. June 12, 1992); Ammlung v. City of Chester, 494 F.2d 811, 814-15 (3d Cir. 1974) (barring conspiracy claim under two-year

statute of limitations).   We incorporate by reference the preceding sections of this memorandum, demonstrating that well over two years before this conspiracy claim was asserted—indeed, before the 2016 Complaint was filed— Aspen was aware of the loss history and claims which it now alleges to have been concealed from it.

This cursorily pleaded count must therefore be dismissed as to all movants.

I.   COUNTS XII AND XIII FOR ALLEGED RICO VIOLATIONS ARE FATALLY FLAWED.

1.   Aspen's Claim Against the Movants for Violation of Section 1962(c) of RICO Lacks the Element of Distinctiveness and Fails to Plead a RICO Enterprise.

In Count XII of its Second Amended Complaint, Aspen alleges that the movants engaged in a widespread conspiracy to defraud it by failing to report the number and severity of claims of the bar and restaurant insureds, and that such illegal conduct amounts to a violation of section 1962(c) of the Racketeer Influenced and Corrupt Organizations Act ("RICO").   As Aspen has failed to satisfy the "distinctiveness" requirement and does not plead a valid RICO enterprise, this claim should be dismissed.

Before even reaching the enterprise and distinctiveness analyses, the Court must be wary of Aspen's attempt to twist the allegations in its Second Amended Complaint into a RICO violation.  This matter concerns a business dispute and not a grand scheme to violate RICO.  The essence of Aspen's claims is whether representations made by the defendants or their intermediaries regarding the claims and loss history of the member-insureds were fraudulent. Courts have warned plaintiffs not to attempt to apply RICO to ordinary business disputes, which is exactly what Aspen is trying to do here.  See, e.g., Midwest Grinding Co. v. Spitz, 976 F.2d 1016, 1025-26 (7th Cir. 1992) ("RICO has not federalized every state common-law cause of action available to remedy business deals gone sour."); Calcasieu v. Marine Nat. Bank v. Grant,

943 F.2d 1453, 1463 (5th Cir. 1991) ("[A]lthough Congress wrote RICO in broad, sweeping terms, it did not intend to extend RICO to every [allegedly] fraudulent commercial transaction."). Courts have determined that such attempts are an abuse of the RICO statute and not intended by Congress. See, e.g., McDonald v. Schencker, 18 F.3d 491, 499 (7th Cir. 1994) ("On the surface at least, magnifying a dispute over attorneys' fees into a federal RICO case would appear frivolous."); Midwest Grinding, 976 F.2d at 1025 ("[C]ivil RICO plaintiffs persist in trying to fit a square peg in a round hole by squeezing garden-variety business disputes into civil RICO actions.").

Courts have also found that such abuses, which cannot be underscored, have deleterious effects on a defendant because of the stigmatizing effect of a RICO charge. See, e.g., Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 803 (7th Cir. 2008) (affirming dismissal of RICO claim and warning against permitting a plaintiff "with a largely groundless claim to simply take up the time of a number of other people, with the right to do so representing an in terrorem increment of the settlement value, rather than a reasonably founded hope that the [discovery] process will reveal relevant evidence").

Finally, the Third Circuit has warned against cases that rely on mail fraud and wire fraud as RICO predicate acts: "[t]he inclusion within the scope of civil RICO of these types of fraud, more prevalent in the commercial world than in the world of racketeers, has caused concern that RICO sweeps to broad a swathe." Tabas v. Tabas, 47 F.3d 1280, 1290 (3d Cir. 1995), citing Note, "Civil RICO: The Temptation and Impropriety of Judicial Restraint," 95 Har. L. Rev. 1101, 1105 (1982) ("Given the prevalence of mail and wire use in commercial transactions, RICO's provision for a private cause of action predicated on violations of the mail and wire fraud statutes virtually federalizes common law fraud").

a. <u>Movants are not separate and distinct from the alleged enterprise.</u>

Aspen's section 1962(c) claim fails because the movant/defendants are not separate and distinct from the alleged enterprises. Section 1962(c) prohibits persons employed by or associated with an enterprise from conducting the enterprise's affairs through a pattern of racketeering. 18 U.S.C. § 1962(c). To state a claim under section 1962(c), a plaintiff must allege that (1) a person conducted (2) an enterprise (3) through a pattern (4) of racketeering activity. <u>Id.</u>; <u>Sedima, S.P.R.L. v. Imrex Co., Inc.</u>, 473 U.S. 479, 496 (1985). The statutory language of section 1962(c) requires the RICO defendant or person to be separate and distinct from the alleged enterprise. <u>Kehr Packages, Inc. v. Fidelcor, Inc.</u>, 926 F.2d 1406, 1411 (3d Cir. 1991) (stating that because § 1962(c) requires a finding that the defendant "person" conducted or participated in the conduct of the affairs of an "enterprise" through a pattern of racketeering activity, the "person" charged with a violation of section 1962(c) must be separate and distinct from the "enterprise"). The plaintiff must allege the existence of two distinct entities: the "person" and the "enterprise," which cannot simply be the "person" referred to by a different name. <u>Cedric Kushner Promotions, Ltd. v. King</u>, 533 U.S. 158, 161 (2001) (the language of section 1962(c) creates a pleading requirement of distinctiveness: "to establish liability under §1962(c) one must allege and prove the existence of two distinct entities: (1) a 'person'; and (2) an 'enterprise' that is not simply the same 'person' referred to by a different name.").

RICO defines a "person" as "any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3). A RICO "enterprise" includes "any individual, partnership, corporation, association, or other legal entity, and "any union or group of individuals associated in fact although not a legal entity." <u>Id</u>. § 1961(4). An enterprise may include any union or group of individuals associated in fact provided that the members of the *de*

*facto* association joined together in pursuit of a common purpose. <u>United States v. Turkette</u>, 452 U.S. 576, 580 (1981). However, "[i]f the members of the enterprise are the same as the persons, [section 1962(c)'s] distinctness requirement has not been met, as the 'person' and the 'enterprise' must not be identical." <u>Zavala v. Wal-Mart Stores, Inc.</u>, 447 F.Supp.2d 379, 383 (D.N.J. 2006).

Here, Aspen alleges that each of the movants (*i.e.*, HSS, Carman, Snow, Connelly, Selective Risk, Selective Law, and O'Donnell) is a separate legal entity (specifically, three individuals, one corporation, and three limited liability companies – and therefore each is a "person" that is capable of holding legal or beneficial interest in property. Second Amended Complaint at ¶¶ 405-06. Aspen also alleges three association-in-fact enterprises. The first is the "HSS Program Enterprise," comprised of HSS, Carman, Snow, Connelly, Selective Risk, Selective Law, and O'Donnell, which is an "association-in-fact enterprise for the common and continuing purpose described herein and constitutes an enterprise within the meaning of 18 U.S.C. § 1961(4) engaged in and whose racketeering activities affect interstate commerce." <u>Id.</u> at ¶ 408. Aspen further alleges that "Snow, Connelly, and O'Donnell are employed by or associated with" this first enterprise. <u>Id.</u> at ¶ 408. Pled in the alternative, Aspen alleges a second RICO enterprise comprised of HSS, Carman, Snow, and Connelly, which Aspen claims is "a separate enterprise from the enterprise of Selective Law, Selective Risk, Snow and O'Donnell within the meaning of 18 U.S.C. § 1961(4)." <u>Id.</u> ¶ 409. This allegation appears to allege in the alternative a third RICO enterprise comprised of Selective Law, Selective Risk, Snow, and O'Donnell. <u>Id.</u>

While it appears on its face that Aspen has properly plead that each of the movants identified as an "HSS Defendant" is a RICO person, and that these defendants formed three separate association-in-fact enterprises, Aspen has failed to satisfy section 1962(c)'s

distinctiveness requirement because Aspen's RICO persons and RICO enterprises are one and the same.  Kushner, 533 U.S. at 161; Zavala, 447 F.Supp.2d at 383; Kolar v. Preferred Real Estate Investments, Inc., Civil Action No. 07-3864, 2008 WL 2552860, at *4-5 (E.D. Pa. June 19, 2008) (finding that section 1962(c) claim fails because plaintiff's RICO persons and RICO enterprise were the same).  Stated differently, each RICO person alleged by Aspen is also a member of the alleged enterprise: (1) HSS, Carman, Snow, Connelly, Selective Risk, Selective Law, and O'Donnell are both persons and members of the first RICO enterprise; (2) HSS, Carman, Snow, and Connelly are both persons and members of the second RICO enterprise; and (3) Selective Law, Selective Risk, Snow, and O'Donnell are both persons and members of the third enterprise.  Id. at ¶¶ 408-09.  Such allegations are fatal to Aspen's section 1962(c) claim.  Zavala, 447 F.Supp.2d at 383 ("If the members of the enterprise are the same as the persons, the distinctness requirement has not been met, as the 'person' and the 'enterprise' must not be identical.").  Accordingly, this claim should be dismissed as to the movants.

> b. The allegations do not establish the required structure to prove the existence of a RICO enterprise.

Aspen's section 1962(c) claim also fails because it did not plead sufficient allegations to establish the existence of a RICO enterprise.  To prove the existence of a RICO enterprise, a plaintiff must prove: (1) an ongoing organization, formal or informal; (2) that the various associates function as a continuing unit; and (3) that the enterprise has an existence separate and apart from the alleged pattern of racketeering activity.  Turkette, 452 U.S. at 583.  For association-in-fact enterprises, as alleged by Aspen, a plaintiff must show a "structure," that is, a common "purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."  Boyle v. United States, 556 U.S. 938, 946 (2009).

Here, Aspen fails to allege the required structure to prove the existence of a RICO enterprise. Rather, Aspen pleads a scattershot litany of allegations concerning the activities of the members of the *three* alleged RICO enterprises. Such diffuse pleading is not sufficient to establish an enterprise. See Cedar Swamp Holdings, Inc. v. Zaman, 487 F. Supp. 2d 444, 450 (S.D.N.Y. 2007) ("[M]erely stringing together a list of defendants and labeling them an enterprise is insufficient to state a RICO claim.").

What can be discerned from the Second Amended Complaint is that the movants performed specific roles within an enterprise (it is unclear which one), embodied in the following allegations: "HSS, through Snow and Connelly, operated as a clearing house for a variety of different roles, including marketing, underwriting, member-insured communications, carrier communications, and accounts management[;]" "Carman, through Snow and Connelly, also operated as a clearing house for a variety of different roles, including marketing, underwriting, member-insured communications, carrier communications, and accounts management[;]" "Selective Risk, through Snow and O'Donnell, investigated claims as the SIR third party administrator, using the pool of money collected from premium charges to attempt to adjust claims through denial or settlement in order to avoid reporting to Aspen[;]" "Selective Risk, through Snow and O'Donnell, evaluated claims from potential liability, including whether and how a Claim should be withheld from Aspen[;]" "Selective Law, through O'Donnell, also investigated claims and got involved in litigations as SIR counsel, using the pool of money collected from premium charges to attempt to settle and/or litigate those claims with the goal of obtaining a defense verdict[;]" "Selective Law, through Snow and O'Donnell, evaluated claims for potential liability, including whether and how a Claim should be withheld from Aspen[;]" "O'Donnell also utilized his position at Selective Risk and Selective Law within the context of

the HSS Program Enterprise to manufacture false loss runs during the actual underwriting periods of the Aspen Policies." Id. at ¶¶ 138-44. It can also be inferred from these allegations that certain of the movants were aware of the activities of other members of the alleged enterprise in advancing the enterprise's scheme. See id.

Despite Aspen's recitation of the roles of the movants, it fails to attribute acts made by a specific RICO defendant to one of the three alleged enterprises. For example, Snow is alleged to be a member of all three associated-in-fact enterprises. But it is unclear whether the allegations setting forth Snow's actions were in furtherance Enterprise 1, 2, or 3. More globally, it is unclear from the Second Amended Complaint the differences among each of the three alleged associated-in-fact enterprises. Aspen fails to delineate with any specificity which actions are attributable to which enterprise and what the common purpose was for each enterprise. It is simply a mishmash of allegations. Twombly requires more than what Aspen has done, specifically "a RICO claim must plead facts plausibly implying the existence of an enterprise with the structural attributes identified in Boyle: a shared 'purpose, relationships, among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose.'" In re Insurance Brokerage Antitrust Litigation, 618 F.3d 300, 369-70 (3d Cir. 2010) (quoting Boyle, 556 U.S. at 946); see Rao v. BP Prods. N. Am., 589 F.3d 389, 400 (7th Cir. 2009) (upholding dismissal of RICO claims because, inter alia, plaintiff's allegations of an association-in-fact enterprise "do not indicate how the different actors are associated and do not suggest a group of persons acting together for a common purpose or course of conduct"). Aspen fails to provide an adequate pleading of its allegations regarding the three alternative enterprises, thus not allowing the movants to understand and defend themselves. See Phillips v. County of Allegheny, 515 F.3d 224, 234 (3d Cir. 2008) (Twombly "requires a complaint with

enough factual matter (taken as true) to suggest [each] required element" of the claim alleged). This is critically important in all cases but especially in RICO cases due to their complexity. See Limestone Dev. Corp. v. Vill. of Lemont, 520 F.3d 797, 803 (7th Cir. 2008) (Twombly's concern is just "as applicable to a RICO case, which resembles an antitrust case in point of complexity and the availability of punitive damages and of attorneys' fees to the successful plaintiff. RICO cases, like antitrust cases, are "big" cases and the defendant should not be put to the expense of big-case discovery on the basis of a threadbare claim.").

Moreover, the fact that certain of the movants performed particular roles and were aware of each other's actions does not satisfy Boyle's structure requirement. Indeed, the Third Circuit has held that allegations of "a conspiracy to perform the underlying criminal offenses, standing alone, is not sufficient to allege the existence of an enterprise." Seville Indus. Mach. Corp. v. Southmost Mach. Corp., 742 F.2d 786, 790 n.5 (3d Cir. 1984)l see Gates v. Enrst & Young, 93-CV-2332, 1994 WL 444709, *1 (E.D. Pa. Aug. 15, 1994) ("An enterprise is not merely a conspiracy and it should not be confused with an agreement to commit the alleged racketeering activity.").

There are cases within this circuit and outside this circuit which are instructive. For example, in Stachon v. United Consumers Club, the alleged association-in-fact enterprise consisted of a "buying club," its franchisees, its officers and directors, its members, and participating wholesalers and manufacturers. 229 F.3d 673, 675 (7th Cir. 2000). Plaintiffs alleged that the defendants fraudulently represented that members could purchase quality merchandise at wholesale prices and the buying power of the club. Id. at 674. The court held that plaintiffs failed to allege a "command structure" that was distinct from the buying club, and that the fact that the buying club had business dealings with over 20 years with numerous

manufacturers, wholesalers, and members did not establish an "ongoing structured organization." Id. at 676.

Similarly, in In re American Investors Life Ins. Co. Annuity Marketing and Sales Practice Litigation ("American Investors"), the plaintiffs alleged that three groups of defendants formed a RICO enterprise to sell annuities to elderly buyers under fraudulent terms. MDL No. 1712, 2006 WL 1531152, at *4-5 (E.D. Pa. June 2, 2006). The three groups of defendants were the "annuity group," which issued, underwrote, and profited from the fraudulent sales; the "sales group," which contacted potential customers and induced them to purchase fraudulent living trust kits; and the "attorney group," which allegedly prepared the living trust instruments." Id. at *4-5. The court held that the plaintiffs failed to plead how the defendants "would have worked together to make decisions or resolve disputes." Id. at *7. The court acknowledged that each group of defendants performed distinct roles, but held that was not sufficient to allege a decision-making structure because "[p]articipants in any conspiracy will play certain roles and have some idea of what the other participants are doing." Id. at *8. Further, and importantly, the court highlighted that the plaintiffs had alleged an association-in-fact enterprise, as opposed to an enterprise consisting of a parent company and its subsidiaries, where a court can reasonably assume an organizational structure between a parent and its subsidiaries. Id. at *9, discussing and distinguishing the Third Circuit's decision in Shearin v. E.F. Hutton Group, Inc., 885 F.2d 1162 (3d Cir. 1989).

Both Stachon and American Investors were decided before the Supreme Court's decision in Boyle which softened the "structure" requirement for proving a RICO enterprise. But they are still instructive as in each case, similar to this case, the alleged RICO defendants were a combination of businesses and individual owners or employees who were alleged to be an

association-in-fact enterprise, and the conduct alleged to be illegal under RICO consisted of the defendants' business activities in their respective industries.   Aspen tries to shoehorn the movants' business activities into a RICO violation, as did the plaintiffs in <u>Stachon</u> and <u>American Investors</u>.   Aspen, however, takes the extra step of alleging three separate association-in-fact enterprises, but fails to separate the activities of each alleged RICO enterprise thus preventing each HSS Defendant from properly defending, let alone understanding, the allegations against them.   This pleading failure is not permitted under <u>Twombly</u>.   Accordingly, due to Aspen's failure to properly plead an "enterprise," the Court should dismiss Aspen's section 1962(c) claim with prejudice.

> 2.   Aspen's Claim against the Movants for Violation of Section 1962(d) of RICO
> Likewise Fails.

Aspen asserts that the movants and presumably the three RICO enterprises plead in the prior count are liable under section 1962(d).   Without a RICO enterprise, such a claim cannot succeed.   Therefore, this claim fails and should be dismissed with prejudice.

Section 1962(d) makes it unlawful for any person "to conspire to violate any of the provisions of subsections (a), (b) or (c) of this section." 18 U.S.C. § 1962(d).   To state a claim under section 1962(d), a plaintiff must show that the defendants knowingly agreed to engage in the commission of a pattern of racketeering activity.   <u>See</u> <u>Smith v. Berg</u>, 247 F.3d 532, 538 n.11 (3d Cir. 2001) (finding that liability under section 1962(d) "will arise only from services which were purposefully and knowingly directed at facilitating a criminal pattern of racketeering activity.").

"Any claim under section 1962(d) based on a conspiracy to violate the other subsections of section 1962 necessarily must fail if the substantive claims are themselves deficient." <u>Lightning Lube, Inc. v. Witco Corp.</u>, 4 F.3d 1153, 1191 (3d Cir. 1993), citing <u>Leonard v.</u>

Shearson Lehman/Am. Express, 687 F.Supp. 177, 182 (E.D. Pa. 1988); Kolar v. Preferred Real Estate Investments, 361 Fed. Appx. 354, 366 n. 13 (3d Cir. 2010) ("If the substantive RICO claims fail on the merits, as they do here, Lightning Lube controls.").

Aspen has failed to satisfy both the distinctiveness requirement and plead the existence of a RICO enterprise; therefore, it cannot prove that the movants knowingly agreed to facilitate such enterprise's activities, and its RICO conspiracy claim must also fail. Smith, 247 F.3d at 538 n.11; Marshall, 2007 WL 2892938, at *18 ("[B]ecause [plaintiff] has failed to establish the existence of a RICO enterprise, she cannot prove that the Defendants knowingly agreed to facilitate any such enterprise's activities[,]" and thus the section 1962(d) claim fails.); Harry Miller, 468 F.Supp.2d at 719-20 ("Because [plaintiff] cannot prove the existence of any racketeering enterprise, [plaintiff] cannot prove there was an agreement to facilitate the enterprise's activities[,]" and thus cannot prove a section 1962(d) violation.); see Stachon, 229 F.3d at 677 ("Since Appellants fail to establish a violation of section 1962(c), their section 1962(d) claim based on the same facts must fail as well.").[2]

---

[2]The Court should not permit Aspen an opportunity to amend its RICO claims, or any other "new" claims raised for the first time in its Second Amended Complaint, when deciding this motion to dismiss. As demonstrated in this motion, Aspen's RICO claims are futile as Aspen cannot establish a RICO "person" distinct from the RICO "enterprise,"nor the existence of an "enterprise." Zavala, 447 F.Supp.2d at 384-85 (plaintiff's failure to satisfy "distinctiveness" requirement "is not an omission that can be remedied by amendment; rather, it is woven into the fabric of the Second Amended Complaint, and could not be removed without restructuring the entire RICO theory," and thus amendment is futile); see Rager v. Smith, No. 3:17-cv-0649, 2018 WL 3239823, at *4 (M.D. Pa. July 3, 2018) ("Affording Rager the opportunity to amend would prove futile as he simply cannot establish deliberate indifference on the part of these Defendants."). Additionally, a "third" amended complaint would result in even more unnecessary delay of this already protracted litigation, which is a valid reason for denying another opportunity to amend. See Forman v. Davis, 371 U.S. 178, 182 (1962) ("[T]he grant or denial of an opportunity to amend is within the discretion of the District Court . . . .").

J.      COUNT XXIV FOR VIOLATION OF THE LANHAM ACT REFLECTS A MISPERCEPTION OF THAT STATUTE.

Aspen's claim for violation of the Lanham Act, when viewed in conjunction with publicly-available documents, reflects a misperception of the statute itself and a wholesale mischaracterization of those documents.

Specifically, Aspen alleges that, although it did not issue any new or renewed policies to HSS after the HSS Programs expired on March 30, 2016. (Second Amended Complaint at ¶311) and "has not had any discussions with HSS to extend, renew, or grant new coverage to HSS or the HSS Programs since the HSS Programs expired on March 30, 2016" (Id. ¶312), HSS and Snow nevertheless have "continued to misrepresent and falsely advertise the existence of a continuing business relation with Aspen." Id. ¶313. As an example, Aspen cites Adelphia Restaurant's allegation in its complaint that it was issued Certificates of Insurance under HSS header and signature which identified Aspen as purportedly providing insurance coverage to Adelphia and identifies a policy what was cancelled by Aspen. (Id. at ¶¶314-15). Aspen alleges that Adelphia was provided numerous documents counterfeiting Aspen's marks and trade name in order to deceive Adelphia into thinking Aspen issued coverage to Adelphia. (Id. ¶318).

Aspen alleges that this behavior violates Section 43(a) of the Lanham Act, 15 U.S.C. §1125(a). Specifically, it claims that member-insureds of the HSS Programs were told by the HSS Program Enterprise that Aspen was involved in post-March 30, 2016 insurance coverage placement for the purpose of confusing, causing mistake, and/or deceiving the member-insureds into thinking that they were actually purchasing insurance coverage through Aspen. (Id. ¶547).

Aspen further asserts that the unauthorized use by the HSS Program Enterprise of Aspen's name, mark, image, and good will is likely to cause confusion, mistake, or deception as to the affiliation, connection, or association of such Defendants with Aspen or its approval of

such Defendants' services or products. Id. ¶ 550.  At the appropriate time and in the appropriate forum, the Court may need to decide whether this conduct rose to the level of actionable negligence or misrepresentation as to the existence of coverage following Aspen's premature and bad faith cancellation.  To twist these facts into a Lanham Act claim, however, is unsustainable as a matter of law.

As noted above, when deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), a court "may consider (1) exhibits attached to the complaint, (2) matters of public record, and (3) all documents that are integral to or explicitly relied upon in the complaint." Angstadt v. Midd-West Sch. Dist., 377 F.3d 338, 342 (3d Cir. 2004).  "[T[he Court need not accept as true allegations that contradict matters properly subject to judicial notice or exhibit." Garcia v. New Jersey State Prison, No. CIV. 05-3159 AET, 2007 WL 2669332, at *1 (D.N.J. Sept. 6, 2007).

Even a cursory review of the documents referenced by Aspen from the Adelphia Complaint shows that they neither are "counterfeiting" Aspen's trademarks or trade name.  To the contrary, the certificates, attached hereto as Exhibits A through C each state as follows:

> THIS CERTIFICATE IS ISSUED AS A MATTER OF INFORMATION ONLY AND CONFERS NO RIGHTS UPON THE CERTIFICATE HOLDER.  THIS CERTIFICATE DOES NOT AMEND, EXTEND OR ALTER THE COVERAGE AFFORDED BY THE POLICIES BELOW.

Nowhere do the documents appear as though they were issued by Aspen.  Indeed, neither were some of the documents issued by HSS.  Rather, exhibit A was issued by Patriot, and Exhibits B and C were issued by Trigen.

There are three Certificates at issue. The first (ECF No. 90-7 in Case No. 19-0189) identifies Defendant Patriot Underwriters, Inc. as the "Producer," Aspen as the "Insurer," HSS as the "Insured," Adelphia as the "Covered Member," and Snow as the "Authorized

Representative." The second Certificate identifies Trigen as the "Producer," HSS as the "Insured," Adelphia as the "Covered Member," and Daniel Stango as the "Authorized Representative." The third Certificate identifies Trigen as the "Producer," HSS as the "Insured," Adelphia as the "Covered Member," and Daniel Stango as the "Authorized Representative." A simple review of the Certificates reveals that the Producer on the Certificates is either Patriot Underwriters, Inc. or Trigen, not HSS. The Producers are the entities that issue certificates of insurance. Additionally, HSS is not listed as the Insured on the first Certificate, but is listed as the Insured on the second and third Certificates. And, as state above, at the time of issuance of the Certificates, all assets of HSS were owned by Patriot, as alleged by Aspen in its Second Amended Complaint. Second Amended Complaint at ¶129. Therefore, HSS could not have been the entity that issued the Certificates. Accordingly, this claim fails as to the movants.

1. This claim fails as to all movants as Aspen cannot satisfy the elements of the claim.

a. Applicable law

Section 43(a) of the Lanham Act, 15 U.S.C. 1125(a), provides as follows:

(2) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—

(A) is likely to cause confusion, or to cause mistake, or to deceive as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person, or

(B) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,

> shall be liable in a civil action by any person who believes that he
> or she is or is likely to be damaged by such act.

Section 43(a) establishes "two distinct bases of liability: false association, §1125(a)(1)(A), and false advertising, § 1125(a)(1)(B)." Lexmark International v. Static Control Components, 572 U.S. 118, 122 (2014). Aspen alleges a "false association" claim under §1125(a)(1)(A) against the movants. Section 1125(a)(1)(A) prohibits "false or misleading" claims that are "likely to cause confusion, or to cause mistake, or to deceive as to . . . the origin, sponsorship, or approval of his or her goods, services, or commercial activities by another person[.]" 15 U.S.C. § 1125(a)(1)(A). That provision is "the foremost federal vehicle for the assertion of . . . infringement of . . . unregistered marks, names and trade dress[.]" J. Thomas McCarthy, 5 McCarthy on Trademarks and Unfair Competition § 27:9.

To establish a false association trademark claim under the Lanham Act for an unregistered mark, the plaintiff must demonstrate that "(1) the marks are valid and legally protectable; (2) the marks are owned by the plaintiff; and (3) the defendant's use of the marks to identify goods or services is likely to create confusion concerning the origin of the goods or services." Ford Motor Co. v. Summit Motor Prod., 930 F.2d 277, 291 (internal quotation marks omitted).

A "valid and legally protectable mark" must be "distinctive," which can be proved in two ways. Parks LLC v. Tyson Foods, 863 F.3d 220, 230 (3d Cir. 2017). "Some marks are, by their very nature, considered distinctive." Id., citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 11:2. "Such inherently distinctive marks include ones that are arbitrary or fanciful, such as APPLE for computers or SHELL for gasoline, [J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition] at § 11:11, as well as ones that are suggestive

of a product's function but not descriptive such as PENGUIN for freezers or SAMSON for weight training machines, [J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition] at § 11:67." Id.  "On the other hand, marks that are merely descriptive of the product are not inherently distinctive and secondary meaning must be proven before such a name will be protectable." Id., citing J. Thomas McCarthy, 2 McCarthy on Trademarks and Unfair Competition § 11:2; see Commerce Nat'l Ins. Servs., Inc. v. Commerce Ins. Agency, 214 F.3d 432, 438 (3d Cir. 2000) ("If the mark has not been federally registered . . . then validity depends on proof of secondary meaning, unless the unregistered or contestable mark is inherently distinctive." (internal quotation marks omitted).  Notably, "the Lanham Act protects descriptive terms if they have acquired secondary meaning associating the term with the claimant." E.T. Browne Drug Co. v. Cococare Products, 538 F.3d 185, 191 (3d Cir. 2008).

The E.T. Brown Court explained "secondary meaning" as follows:

> Secondary meaning is a new and additional meaning that attaches to a word or symbol that is not inherently distinctive. *See generally* 2 McCarthy on Trademarks § 15:1. We have explained:

> Secondary meaning exists when the trademark is interpreted by the consuming public to be not only an identification of the product, but also a representation of the product's origin. Secondary meaning is generally established through extensive advertising which creates in the mind of consumers an association between different products bearing the same mark. This association suggests that the products originate from a single source. Once a trademark which could not otherwise have exclusive appropriation achieves secondary meaning, competitors can be prevented from using a similar mark. The purpose of this rule is to minimize confusion of the public as to the origin of the product and to avoid diversion of customers misled by a similar mark.

> Scott Paper Co. v. Scott's Liquid Gold, Inc., 589 F.2d 1225, 1228 (3d Cir. 1978) (citations omitted).

> We have identified an eleven-item, non-exhaustive list of factors relevant to the factual determination whether a term has acquired

secondary meaning:

> (1) the extent of sales and advertising leading to buyer association; (2) length of use; (3) exclusivity of use; (4) the fact of copying; (5) customer surveys; (6) customer testimony; (7) the use of the mark in trade journals; (8) the size of the company; (9) the number of sales; (10) the number of customers; and, (11) actual confusion.

Commerce Nat'l Ins. Services, Inc. v. Commerce Ins. Agency, Inc., 214 F.3d 432, 438 (3d Cir. 2000). "[T]he evidentiary bar must be placed somewhat higher" when the challenged term is particularly descriptive. Id. at 441.

E.T. Browne Drug, 538 F.2d at 198-99.

### b. There are no allegations that O'Donnell, Connelly, Carman, Selective Law, and Selective Risk participated in the illegal conduct alleged by Aspen.

Neither Carman, Selective Law, Selective Risk, Connelly nor O'Donnell is alleged to have had any personal involvement in any of the unlawful activity alleged by Aspen, and without a causal connection between their actions (or inactions) and the violation alleged, this claim must be dismissed against them.

#### i. The claim fails the commerce requirement.

Aspen alleges only a false association claim under §125(a)(1)(A). To be successful on such a claim, a plaintiff must allege *defendant's "use in commerce"* of "any word, term, name, symbol, or device" or "any false designation of origin, false or misleading description of fact, or false or misleading representation of fact[.]" 15 U.S.C. § 1125(a)(1)(A) (emphasis added). Aspen fails to allege that the movants used Aspen's mark in commerce. Aspen alleges that the movants misrepresented to the additional insureds that they had coverage with Aspen by providing false Certificates of Insurance with Aspen's name on them. Second Amended Complaint at ¶¶ 311-15. Aspen does not allege how this activity is considered commerce.

Moreover, the Certificates are not signed by anyone at Aspen or purported to be signed by anyone at Aspen.  And, there is a disclaimer at the top of each Certificate providing that it does not affect the coverage under the actual policy terms. *See* Exhibits A-C ("This Certificate is issued as a matter of information only and confers no rights upon the certificate holder. This certificate does not amend, extend or alter the coverage afforded by the policies below.").  Under these facts, the claim as alleged does not amount to a Lanham Act violation. This is not activity that the Lanham Act was enacted to address.

### ii. The claim fails the Lexmark test.

Even if this Court decides that Aspen sufficiently plead that the movants used Aspen's mark in commerce, the analysis is not over. Aspen must also satisfy Lexmark's two-part inquiry: (1) whether plaintiff's allegations fall within §1125(a)(1)(A)'s zone of interests; and (2) whether plaintiff has alleged "proximate causation of a cognizable injury." Lexmark Intern., Inc. v. Static Control Components, Inc., 572 U.S. 118, 130-33 (2014). ("The zone-of-interests test is therefore an appropriate tool for determining who may invoke the cause of action in § 1125(a)" and "a plaintiff suing under § 1125(a) ordinarily must show economic or reputational injury flowing directly from the deception wrought by the defendant[.]")

To meet the zone of interests test, a plaintiff must sufficiently allege facts showing its claim furthers an enumerated purpose of § 1125(a)(1)(A). Lexmark, 572 U.S. at 130. But, the "breadth of the zone of interests varies according to the provisions of law at issue." Id. at 130. Stated differently, although the zone of interests test "is not 'especially demanding'" in the context of the Administrative Procedure Act's "'generous review provisions'", it may require more of a plaintiff bringing suit under another statute. Id. However, "[i]dentifying the interests protected by the Lanham Act . . . requires no guesswork, since the Act includes an 'unusual, and

extraordinarily helpful,' detailed statement of the statute's purposes." Id. at 131, quoting H.B. Halicki Productions v. United Artists Communications, Inc., 812 F.2d 1213, 1214 (9th Cir. 1987). Those purposes are provided in 15 U.S.C. § 1127, which states:

> The intent of this chapter is to regulate commerce within the control of Congress by making actionable the deceptive and misleading use of marks in such commerce; to protect registered marks used in such commerce from interference by State, or territorial legislation; to protect persons engaged in such commerce against unfair competition; to prevent fraud and deception in such commerce by the use of reproductions, copies, counterfeits, or colorable imitations of registered marks; and to provide rights and remedies stipulated by treaties and conventions          respecting trademarks, trade names, and unfair competition entered into between the United States and foreign nations.

15 U.S.C. § 1127.

The Lexmark Court went on to state that "[m]ost of the [Lanham Act's] enumerated purposes are relevant to false-association cases." Lexmark, 572 U.S. at 131. "Among § 1127's purposes is Congress's intent to 'protect persons . . . against unfair competition' by 'making actionable the deceptive and misleading use of marks' in 'commerce.'" Farm Fresh Direct Direct By a Cut Above LLC v. Downey, 2017 WL 4865481, at *9 (D. Md. Oct. 26, 2017), quoting 15 U.S.C. § 1127); see also Belmora, LLC v. Bayer Consumer Care AG, 819 F.3d 697, 711 (4th Cir. 2016) (drawing upon this purpose in a Lanham Act, false association case).

A plaintiff must then allege sufficient facts to show its "injuries are proximately caused by violations of [§ 1125(a)(1)(A)]", rather than a cause "that is 'too remote' from the defendant's unlawful conduct." Lexmark, 572 U.S. at 132 (citations omitted) (stating that harm is too remote when it "is purely derivative of 'misfortunes visited upon a third person by the defendant's acts.'"). To show proximate cause in a § 1125(a)(1)(A) claim, the plaintiff must allege "'economic or reputational injury flowing directly from the deception wrought by the defendant's'" false association. Belmora, 819 F.3d at 711-12, quoting Lexmark, 572 U.S. 133.

Here, Aspen fails to allege any economic or reputation injury flowing from the alleged illegal conduct. All it alleges is that it "[h]as and will continue to be damages by these acts."(Second Amended Complaint at ¶ 551). Thus, the claim fails for this reason.

Relatedly, the claim fails as to all movants because Aspen has failed to allege any damages. Under the Lanham Act, a plaintiff may seek an injunction to stop the infringing activity, as well as recovery as damages defendant's profits, any damages sustained by the plaintiff, and the costs of the action. 15 U.S.C. §§ 1116(a), 1117(a). Here, regarding injunctive relief, Aspen does not allege that any of the movants are currently issuing Certificates of Insurance regarding Aspen insurance coverage, which is supported by Snow and HSS' counsel's statement by letter dated February 14, 2019, that "[t]hey long ago ceased issuing any certificates with respect to Aspen insurance coverage." Second Amended Complaint at ¶ 326. Therefore, there is no injunctive relief to seek in this case. Regarding money damages, Aspen fails to plead that it has suffered any. It does not plead that the movants have earned profits as a result of the alleged illegal conduct, nor does it plead that it has suffered any recoverable monetary damages. Again, all it alleges is that it "[h]as and will continue to be damages by these acts." Id. ¶ 551. That is not sufficient under the Iqbal/Twombly standard.

K.   COUNT XXV FOR "PASSING OFF" IS NOT RECOGNIZED IN PENNSYLVANIA.

Just as Aspen's claim for Lanham Act violations is unsustainable, so too is its claim in Count XXV that defendants are liable for "passing off." See Second Amended Complaint at ¶¶ 554-59. The allegations supporting this claim are the same as those supporting Aspen's Lanham Act claim, namely that the movants improperly represented to the member-insureds, including Adelphia, that the Aspen policies were in effect post-March 30, 2016. Id. at ¶¶ 555-57. This claim fails for similar reasons as the Lanham Act claim and should be dismissed with prejudice.

"Passing off" is a version of unfair competition recognized at common law.  Judge

Padova described this claim in a 2010 opinion:

> Pennsylvania common law traditionally defines unfair competition
> as the "passing off" of a rival's goods as one's own, creating
> confusion between one's own goods and the goods of one's rival.
> However, the doctrine of unfair competition in Pennsylvania is not
> restricted to passing off.  Pennsylvania courts have recognized a
> cause of action for the common law tort of unfair competition
> where there is evidence of, among other things, trademark, trade
> name, and patent rights infringement, misrepresentation, tortious
> interference with contract, improper inducement of another's
> employees, and unlawful use of confidential information.  For
> example, in Colteryahn Dairy, the Supreme Court of Pennsylvania
> held that it was unfair competition to make false or misleading
> representations regarding the circumstances under which an
> employee left a former employer.  Additionally, we recognize that
> the Pennsylvania common law tort of unfair competition is
> coextensive with the definition set forth in the Restatement (Third)
> of Unfair Competition.  Under Section 1 of the Restatement, "[a]s
> a general matter, if the means of competition are otherwise tortious
> with respect to the injured party, they will also ordinarily constitute
> an unfair method of competition." Restatement (Third) of Unfair
> Competition  § 1 cmt. g. Nevertheless, the term may not be
> construed as a virtual catch-all for any form of wrongful business
> conduct" or to "include all forms of modern business torts.

Giordano v. Claudio, 714 F.Supp.2d 508, 521-22 (E.D. Pa. 2010) (certain internal quotations and

citations omitted).

Similar to its Lanham Act claim, Aspen alleges that all of the illegal conduct allegedly

committed by the movants supporting its Passing Off claim occurred after March 2016.  *See*

Second Amended Complaint at ¶¶ 309-17.  Aspen pleads that defendant Patriot purchased HSS

and Selective Risk on or around April 1, 2015.  Id. at ¶ 121.  Although the general rule is that the

purchasing company in an asset-purchase transaction is not responsible for the debts and

liabilities of the selling company simply because it acquired the seller's property, an exception to

rule applicable here is if "the purchaser expressly or implicitly agreed to assume liability."

Continental Ins. Co. v. Schneider, Inc., 873 A.2d 1286, 1291 (Pa. 2005).  Aspen's alleges that Trigen, wholly-owned direct subsidiary of Patriot, acquired the liabilities of HSS and Selective Risk.  Id. at ¶¶ 122-26.  Accordingly, Patriot and/or Trigen Insurance (bankrupt debtors) are the proper parties for this claim, not movants.

Additionally, as argued above, HSS cannot be the party that supplied the Certificates of Insurance at issue as it was not the producer on the three Certificate of Insurance at issue, HSS is not listed as the insured on all Certificates, and all assets of HSS were owned by Patriot at the time of issuance of the Certificates.

Aspen also fails to assert any allegations that O'Donnell, Connelly, Carman, Selective Law, or Selective Risk participated in the illegal conduct at issue.  See Donsco, Inc. v. Casper Corp., 587 F.2d 602, 606 (3d Cir. 1978) (liability for unfair competition only attaches where a defendant is an "actual participant" in the tort).  Therefore, this claim fails as to these defendants.

Finally, Aspen fails to allege any damages for this claim.  "A person likely to be damaged by unfair competition of another may obtain an injunction against a continuation of the conduct [and] [t]he court may also award appropriate monetary relief." Restatement (Third) of Unfair Competition § 1 cmt. (g).  Here, there is no basis for an injunction as Aspen does not allege that any of the movants are currently issuing Certificate of Insurance regarding Aspen insurance coverage.  Similarly, there is no basis for monetary damages as Aspen fails to plead that it has suffered any specific and recoverable damages.  For these reasons, Aspen's Passing Off claim as to the movants should be dismissed with prejudice.

L.      COUNT VI, AS A "CATCH-ALL" COUNT, IS NOT SUSTAINABLE.

Aspen asserts as Count VI of its Second Amended Complaint a claim reserving its right to bring additional claims for rescission and declaratory judgment related to its rights and

obligations under the Aspen Policies that it may learn of later in this litigation.  Claims reserving such rights are not permitted and fail to state a claim.  <u>Curley v. Cumberland Farms Dairy,</u> 728 F. Supp. 1123, 1140 (D.N.J. 1989) ("Such a reservation of rights . . . fails to state a claim, and will be dismissed."); <u>Fireman's Fund Ins. Co. v. Safeco Ins. Co. of America</u>, No. 3:07-CV-86, 2007 WL 4233317, at *3 (W.D.N.C. Nov. 28, 2007) ("Here, FFIC's claim for relief entitled 'reservation of rights' fails to state a viable claim against [defendants] . . . [and] [t]his claim will therefore be dismissed.").  Therefore, this claim should be dismissed with prejudice.

III.    <u>CONCLUSION</u>

For all of the foregoing reasons, movants respectfully request that this Honorable Court enter the proposed Order submitted herewith, dismissing Counts VI through XVII, as well as XXIV and XXV of the Second Amended Complaint as to each of them, with prejudice.

Respectfully submitted,

WEIR & PARTNERS LLP

By: /s/Marc J. Zucker
   Walter Weir Jr.
   Marc J. Zucker
   David D. Dzara
Suite 500, The Widener Building
1339 Chestnut Street
Philadelphia, PA  19107
(215) 241-7792
Fax: (215) 665-8464
mzucker@weirpartners.com

Attorneys for Defendants/Movants Hospitality
Supportive Systems LLC, Edward Snow, The
Carman Corporation, Selective Law Group LLC
and Selective Risk Management LLC, Charles
O'Donnell and John Connelly Jr.

DATED:  January 31, 2020