

Connell Foley LLP
Harborside 5
185 Hudson Street, Suite 2510
Jersey City, NJ 07311
P 201.521.1000  F 201.521.0100

**William D. Deveau**
Partner
Direct Dial 201.631.7807
WDeveau@connellfoley.com

June 2, 2020

**VIA ECF:**
Magistrate Judge Thomas J. Rueter
U.S. District Court - Eastern District of Pennsylvania
601 Market Street
Philadelphia, PA 19106
Fax: (215) 580-2141

> Re:    Aspen Specialty Ins. Co. v. Hospitality Supportive Systems, LLC, et al.
> Civil Action No. 2:16-cv-01133-JD
> *Request for Additional Rulings on Pending Motions ECF 117, ECF 148, and*
> *ECF 152*

Dear Judge Rueter:

On behalf of Aspen Specialty Insurance Company ("Aspen"), this letter responds to the May 27, 2020 letter on behalf of the HSS Parties, comprised of Hospitality Supportive Systems, LLC ("HSS"), Carman Corporation ("Carman"), Edward Snow ("Snow"), Selective Risk Management, LLC ("SRM"), and Selective Law Group, LLC ("SLG").

To put it kindly, the letter submitted by counsel for the HSS Parties is quite remarkable.

After having engaged in widespread, systemic fraud for many years against Aspen and the other parties to this litigation, the HSS Parties have extended their unconscionable conduct in this litigation by flaunting their basic discovery obligations through endless dilatory tactics. By way of example, and as set forth more fully herein, there are currently three (3) omnibus discovery motions pending against the HSS Parties, and likely soon to be a number more based upon recently issued additional deficiency notices and demands by the intervenors in this case (See Exhibit A).

Undeniably, Mr. Zucker's May 27, 2020 submission is little more than a thinly veiled attempt to distract this Court from the HSS Parties' massive and ongoing discovery deficiencies and improprieties. However, the sharp practices and baseless ad hominum attacks must end now, and the HSS Parties must be held accountable for their ongoing failure to satisfy even the most basic discovery obligations under the Federal Rules of Civil Procedure.

June 2, 2020
Page 2

Also remarkable, if not deeply concerning, is the lack of candor displayed in the May 27 submission.  While certainly lengthy, the following is a non-exhaustive listing of several whoppers contained in Mr. Zucker's letter brief:

- Mr. Zucker claims that Aspen "misrepresents" the meet and confer efforts leading up to its May 8, 2020 letter and that Aspen "knew that we would be responding later that day." Aspen is accused of "gamesmanship" and "rushing to file" its letter.
  - In reality, Aspen waited until approximately 7:17 PM on a Friday night to submit its letter, having received nothing from the HSS Parties.

- Mr. Zucker claims that the Patriot National production is "millions" of documents. In reality, the Patriot National production is approximately 460,000 documents.

- Mr. Zucker claims that "at additional time and expense, [the HSS Parties] created and sent Aspen [their] own summary of claims," and that this claims chart was "created in order to facilitate [their] release to Aspen of claim documents" "with the hope [of] collaborating [with Aspen]." In reality, this summary of claims was only provided by the HSS Parties after this Honorable Court compelled the HSS Parties to amend their dilatory, evasive, and incomplete responses to Aspen's interrogatories on January 28, 2020. See, HSS Letter Exhibit 3, "Underlying Claim Information Chart for SLG, SRM and HSS's Supplemental Responses to Aspen's First Set of Interrogatories."

- Mr. Zucker claims that any prior references to a 17,000 entry SHC privilege log were merely "inadvertent error" and "should not have been twisted into anything nefarious." In reality, the HSS Parties opposition to Aspen's first motion to compel (at ECF 121), signed by Mr. Zucker, is based entirely on the existence of the 17,000 entry SHC privilege log and states:

  - "Respondents have performed a Herculean task… The largest of these logs, relating to 45 bankers' boxes of documents produced by SLG and SRM, involved more than 17,000 entries."
  - "As for Aspen's complaint that the source of the documents in the log is unclear, the issue is a red herring. The vast majority of the entries in these logs are from SLG and SRM (which Aspen well knows, because of the SHC prefix in the Bates number), The source of all documents was HSS, as reflected by an HSS prefix in the Bates number."
  - "Aspen's carping is doubly ironic in that the sources of most of these [privileged] documents – SLG and SRM – are entities against whom all claims have been dismissed."

Mr. Zucker also claims that his office did not have any input in the drafting of the Patriot National bankruptcy order attached to his letter as Exhibit 1. In reality, after Patriot National's initial bankruptcy filing, Aspen filed a motion in Delaware Bankruptcy Court for a modification of the Chapter 11 plan and discharge injunction to continue the instant litigation in late 2018. Both

June 2, 2020
Page 3

Patriot National and HSS filed objections to that motion. Aspen's motion was ultimately resolved through the order attached as Exhibit 1 to Mr. Zucker's letter. To be sure, the Bankruptcy court considered, and ultimately rejected, HSS' objections.

Mr. Zucker also falsely submits that "Aspen's counsel shut out the undersigned entirely from any negotiation of which documents would be produced," that he was not "even remotely involved in the process of negotiating access to Patriot documents through the Delaware bankruptcy court," that Aspen and Patriot "rode roughshod" over Mr. Zucker's "attempts to have input in the negotiation," and that the stipulation was negotiated without his "signature or approval." In reality, Mr. Zucker's office participated extensively in this process, and was twice invited by Aspen to submit its own proposed consent order as between HSS and Aspen, which was refused both times. When the smoke clears, Mr. Zucker's chief complaint seems to be his unhappiness with the decision and order of the Delaware Bankruptcy Court - - a litigation risk which could have easily been avoided by entering into the suggested consent order with Aspen. In addition, there are many documents which refute Mr. Zucker's editorialized account.

- Attached as Exhibit B is a September 28, 2018 email from Mr. Zucker's bankruptcy partner, Jeffrey Ciacnulli, stating "I also note that we discussed our interest in being part of any discussions that might lead to an agreed-upon order on the pending motion and you will advise if that is acceptable."

- Attached as Exhibit C is HSS' filed objection to Aspen's motion.

- Attached as Exhibit D is an October 11, 2018 email chain with HSS, Patriot National, and Aspen discussing hearing schedules.

- Attached as Exhibit E is a November 15, 2018 email from Aspen to Patriot National and HSS discussing the stipulation to resolve the pending issues before the Court and stating "if Jeff [Cianculli] can confirm that HSS will withdraw its objection based upon these revisions, I think Chuck [Counsel for Patriot National] and I are good to resubmit to Chambers."

- Attached as Exhibit F is a November 15, 2018 email chain with HSS and Patriot National discussing additional proposed changes by HSS, which the Patriot National entities and Aspen were not interested in making.

- Attached as Exhibit G is a November 19, 2018 email from HSS to Aspen following up on their proposed changes.

- Attached as Exhibit H is Aspen's response of the same day to HSS inviting them to propose a separate consent order between HSS and Aspen to resolve their objection to Aspen's motion.

- Attached as Exhibit I is HSS' refusal to do so.

June 2, 2020
Page 4

- Attached as Exhibit J is Aspen's November 19, 2018 email to HSS once again inviting HSS to submit a supplemental stipulation, with the caveat that "Aspen will not entertain any proposals that do not include HSS signatures."

- Instead of taking Aspen up on its offer to attempt to negotiate a supplemental stipulation, HSS decided to let the Court decide the motion, which resulted in HSS' objection being overruled.

- Mr. Zucker traveled from Philadelphia to Wilmington, was present in the courtroom, and raised no further objection to the consent order between Patriot National and Aspen entered by the Delaware Bankruptcy Court.

- For eighteen months, Mr. Zucker made no effort to contact Aspen or Patriot National to raise any objections regarding the execution of the Delaware Bankruptcy Court's Order.

- While simultaneously excoriating Aspen for receiving documents under a Court Order, Mr. Zucker states that he is unsure whether he has standing to raise a challenge or assert privilege over the Patriot National documents.

Aspen hopes that these exhibits and inconsistencies will help to inform the Court when evaluating Mr. Zucker's frivolous submission.

Aspen now addresses the original reason it requested this Court's intervention - - namely, resolving the balance of the issues raised by Aspen's three pending motions to compel.

## I.     The HSS Parties' May 27, 2020 Letter is Indicative of Why Further Rulings Are Necessary.

At the outset, Aspen has made all efforts to ensure that no confidential information has been filed on this docket. To the extent that this Honorable Court disagrees with Aspen's judgment and believes that any of Aspen's letters should contain redactions, Aspen will immediately comply. However, Aspen respectfully submits that the most efficient approach is simply unsealing the January 28, 2020 Order pursuant to Paragraph 4 of the Confidentiality Order in this matter (ECF 61).  The HSS Parties hypocritically pontificate about the "truth seeking function of our system of justice" while simultaneously attempting to litigate their misdeeds in the shadows.

Next, we address the HSS Parties implication (though it is never actually stated) that Aspen has somehow violated Rule 37(a). Aspen refers this Honorable Court to the three fully briefed pending motions, which address years of history in this matter, as well as this Honorable Court's Orders dated January 28, 2020 and February 26, 2020, which expressly granted Aspen permission to seek this relief. Furthermore, Aspen attaches as Exhibit K and L its March 2, 2020 and May 1, 2020 meet and confer letters to the HSS Parties. Aspen also notes that there have been numerous emails exchanged between Aspen and the HSS Parties since the entry of the Orders to Compel.

5457943-2

June 2, 2020
Page 5

By way of its three pending motions to compel, Aspen respectfully requests rulings from this Honorable Court to address the chaotic document production and ill-conceived privilege claims by the HSS Parties. The only games being played have always been by the HSS Parties, and Aspen asks that this Court put a stop to it.

## A.  The HSS Parties Do Not Address the Germantown Case

As per Your Honor's February 26, 2020 Order, Aspen requests a ruling on whether any applicable privileges claimed through Selective Law Group are waived as to Aspen under Germantown Cab Co. v. Pinelands Ins. Co. Risk Retention Group, Inc., 2015 WL 4540212 (Phila. C.P. July 23, 2015). As counsel within the SIR of the HSS Programs, SLG represented the interests of both Aspen and the member-insureds of the HSS Programs. In that capacity, it is wholly improper, and unethical, for SLG to be providing "coverage advice" simultaneously adverse to Aspen.

The HSS Parties have not addressed this issue at all. Aspen adds only that a ruling in its favor on this issue will further simplify the privilege review process.

## B.  The HSS Parties Do Not Address Aspen's Request for an *In Camera* Review

Pursuant to Your Honor's January 28, 2020 Order, Aspen requested that this Honorable Court perform an *in camera* review of all documents identified on the current privilege logs of the HSS Parties. The HSS Parties have not responded to this request either. Once again, a ruling in Aspen's favor on the Germantown case would greatly reduce the documents at issue (or potentially obviate the need) for such a review. Likewise, and respectfully, issuing rulings on Aspen's other arguments as to why there is no privilege could have the same effect.

## C.  The HSS Parties Continue to Play Games in Response to the Orders to Compel

The HSS Parties have only produced three (3) Master Weekly Claims Catalogs. The HSS Parties admit that there are hundreds of unique versions of these documents. The HSS Parties contend that despite the Federal Rules of Civil Procedure, the Federal Rules of Evidence, valid document demands, and now Orders to Compel, the HSS Parties are somehow under no obligation to provide these documents to Aspen. Aspen fails to see how such a position serves the "truth seeking function of our system of justice."

Aspen, along with the intervenors, accuse the HSS Parties of engaging in a widespread and systemic fraud in the HSS Programs. These information repositories, along with thousands of other related and similar documents identified in the exhibits of Aspen's pending motions to compel, painstakingly detail that fraud, and the HSS Parties have fought tooth and nail to avoid their production.  Even in the face of Orders largely rejecting their privilege claims and compelling the further production of these documents, the HSS Parties continue to resist. Aspen has fully briefed and requested further rulings on a number of other topics that bear upon the privilege claims at issue here, including but not limited to the application of the Germantown case. Aspen also implores this Court to consider Aspen's arguments regarding the "at issue" doctrine, as well as the respective privilege standards applied to insurance brokers, third party administrators, and law firms, as extensively briefed.

June 2, 2020
Page 6

     The HSS Parties also heavily rely upon the "claim chart" that was purportedly created by them "at additional time and expense" for the purpose of "collaborating" with Aspen. This is certainly a - - unique - - way to describe *compelled interrogatory answers*. See, Court Order of January 28, 2020; HSS Parties Ex. 3, "Underlying Claim Information Chart for SLG, SRM and HSS's Supplemental Responses to Aspen's First Set of Interrogatories."  Bafflingly, Aspen is accused of making "no effort to correct or supplement that list." These are, quite literally, party admissions in a $40,000,000+ fraud case. Aspen is aware of no requirement under the Federal Rules of Civil Procedure or otherwise stating that it is obliged to "correct or supplement" the interrogatory responses of an opposing party, nor is Aspen inclined to do so with respect to this chart. To be sure, Aspen looks forward to using this chart during depositions after these paper discovery issues are resolved.

     Aspen is entitled under the Federal Rules of Civil Procedure and the Federal Rules of Evidence to receive all responsive, relevant and non-privileged information in the possession of the HSS Parties. Aspen should not be refused thousands of primary documents because of interrogatory responses, especially when those documents may contradict or refute those very responses. What is more, the HSS Parties complaints that Aspen has not done enough to "correct or supplement" their interrogatories ring hollow in the face of their refusal to turn over the very documents that would be used to make corrections or supplementations.

     Relatedly, discovery to date has revealed countless instances of the HSS Parties waiting months or years before reporting (if at all) a claim to Aspen. Without waiver of any of Aspen's claims, affirmative defenses, and reservations of rights with respect to the intervenors and any other member-insured, such behavior was clearly and obviously is to the detriment of the member-insureds, who expected that their claim was being reported and handled by a major insurance company, not being held onto for as long as possible by their insurance broker. These documents are important not only to Aspen's case, but to the intervenors as well. The reason why the HSS Parties have resorted to a letter filled with conspiracy theories and ad hominem attacks is because they are highly aware of what will happen if the Court disagrees with their dubious privilege claims.[1]

     On theme, the HSS Parties further contend that this entire issue "may be moot," because of the Patriot National production that they are so offended by. Aspen will more fully address the

---

[1] Mr. Zucker also complains that his clients face potential liability (assumedly from the member-insureds) if they turn over privileged documents. Even if that was the case, and Mr. Zucker somehow turned over an actually privileged document, there are confidentiality and inadvertent production protections entered in this matter. Aspen has also repeatedly offered the additional protections of an F.R.E. 502 stipulation and order to the HSS Parties, which they have refused every single time. Furthermore, and as revealed during the January hearing, for the past four years, Mr. Zucker has not bothered to inform the hundreds of member-insureds that his office is asserting privilege claims on their behalf. On top of that, the overwhelming majority of claims at issue have already been fully resolved, with Aspen paying approximately $40,000,000+ in defense and indemnity payments. The HSS Parties have shown nothing but disregard towards their obligations to the member-insureds, and their hollow concern is nothing but a self-interested ploy to continue to avoid turning over documents.

5457943-2

June 2, 2020
Page 7

Patriot National production below, however, in a totally nonsensical argument, the HSS Parties contend that because a non-Party has produced documents in this case, the HSS Parties are now relieved of their own discovery obligations, which they have evaded for over four years. Apparently, and despite admitting that they have not yet reviewed the Patriot National Production, the HSS Parties submit that all of the documents they are currently withholding were produced by Patriot National. Aspen is at a loss as to how the HSS Parties could make such a representation. Likewise, and as stated above, on information and belief, the Patriot National production is comprised of ESI exclusively post-dating the Asset Purchase Agreement. Once again, Aspen fails to see how a post-April 2015 document production contains all of the documents at issue here when the HSS Program fraud dates back to 2011, and likely earlier. Aspen also notes that it seeks documents from parties who were never part of the Asset Purchase Agreement.

In the same breath, the HSS Parties also submit that they "intend to ask that the Court bar Aspen from utilizing any of the Patriot documents in discovery or at trial." It is entirely unclear upon what basis the HSS Parties will seek to bar the use of documents that were produced under Court Order. However, if that was the case and Aspen is somehow barred from using the Patriot National document production, the instant pending issues are not moot, and this is yet another reason why Aspen respectfully requests that this Court to address the scope of the HSS Parties' document productions now. As the HSS Parties continue to make their obscure threats and circular arguments, Aspen and the intervenors continue to wait for their paper discovery.

Regardless, the HSS Parties cannot and should not be allowed to avoid their discovery obligations regarding the investigation into their sweeping fraud simply because a non-party also produced documents. Aspen is once again reminded of the HSS Parties pontificating about the "truth seeking function of our system of justice."

### D. This Court Should Sanction the HSS Parties for the Misrepresentations Regarding their Document Productions and Privilege Logs, Which Have Gone On For Years and Continue to this Day

The HSS Parties submitted an *entire* brief in opposition to Aspen's first Motion to Compel challenging the form of the HSS Parties privilege logs based upon the purported existence of a 17,000 entry SHC privilege log. See, ECF 117, 121, Aspen Letter dated December 4, 2018. ***Now, the HSS Parties submit that no such privilege log exists***, citing "inadvertent error." See, discussion of ECF 121, *supra*. Aspen immediately responded by letter dated December 4, 2018 stating that no such privilege log was ever produced, and has repeatedly sought the production of this log from the HSS Parties since.

The HSS Parties would have this Court believe that actually, this was all a typo, an "inadvertent error." When the HSS Parties referenced a 17,000 entry SHC privilege log on behalf of SLG and SRM that was the result of a "Herculean" effort in reviewing "45 bankers boxes," what they really meant to say a 14,500 entry ESI-based "HSSA" Bates stamped privilege log on behalf of HSS, Carman, Snow, SLG and SRM. This revelation comes only after being faced with motions to compel and for sanctions, and ***eighteen (18) months*** after Aspen first stated that it never received this purported privilege log. Then, the HSS Parties have the gall to claim that they "don't

June 2, 2020
Page 8

know why Aspen believes that certain documents are missing," and that they are "unable to comprehend Aspen's position."

This is unconscionable.

In addition, Aspen has had its vendor perform further analytics on the documents sent by the HSS Parties after the Orders to Compel. Only the HSSHC bates stamped production appears to be fully accounted for.

The main HSSA Privilege Log at issue in the Orders to Compel dated January 4, 2019 contained 16,282 Entries. Aspen notes that the HSSA privilege log Aspen submitted for this Court's review in November of 2018 (ECF 117) contained approximately 2,000 *less* entries. In response to the Order to Compel on the HSSA bates stamped documents, the HSS Parties produced a total of 9,407 documents along with a privilege log identifying approximately 5,312 entries.[2] This means that **approximately 1,561 documents have disappeared from the HSSA privilege log since the Court's Orders to Compel**. Respectfully, Aspen has been asking this Court since 2018 to compel the HSS Parties to identify all documents on its privilege logs by Bates range, and not by Control ID, because doing so creates accountability for the world of documents at issue and allows Aspen to compare produced documents to the privilege log, and vise versa. Aspen simply has no way to know what "Control ID" document identified on a privilege log corresponds to a subsequently re-produced (in this case, compelled) "Bates" document. It is obvious that the HSS Parties have exploited this to game their productions and privilege logs. *Cf.*, HSSA Privilege Logs submitted with ECF 117 and ECF 148.

Likewise, the December 10, 2018 RSHC privilege log contains approximately 116 entries. Following the Orders to Compel, the HSS Parties produced a privilege log with just 3 entries, and produced another 133 documents. This means that approximately twenty new documents are being identified *after* the orders to compel.

Finally, and in light of the recent revelations that there is no 17,000 entry SHC privilege log, Aspen does not know how to make heads or tails of the 87 entry SHC privilege log produced by the HSS Parties in response to the Orders to Compel. It is quite literally impossible to say whether the HSS Parties have abided by their discovery obligations, or hid (or produced additional previously hidden) documents because there is no baseline to compare the SHC privilege logs with, and because it is entirely unclear whether the HSS Parties were being truthful in ECF 121 or in their May 27, 2020 submission.

---

[2]  This is based upon the following production sets: March 11, 2020 Production (PROD008_Aspen_R with 119 Documents; PROD009_Aspen_R with 20 Documents; PROD013_Aspen_R with 209 Documents; PROD014_Aspen with 1,801 Documents); March 29, 2020 Production (PROD015_Aspen with 1,356 Documents); April 11, 2020 Production (PROD008_Aspen_R002 with 597 Documents; PROD009_Aspen_R002 with 20 Documents; PROD0013_Aspen_R002 with 30 Documents;PROD0016_Aspen with 2,405 Documents); April 25, 2020 Production (Court Deadline to Respond to Orders to Compel) (PROD017_Aspen with 2,850 Documents)

June 2, 2020
Page 9

### E. The HSS Parties Should Be Compelled to Provide Individual Privilege Logs Containing Basic Information

In light of the foregoing privilege log issues, and pursuant to Paragraph 7 of Your Honor's January 28, 2020 Order, Aspen reiterates its request for a ruling on the deficiencies in the form of the HSS Parties current privilege logs.

As the HSS Parties story regarding its document productions once again changes, Aspen implores this Honorable Court to compel each HSS Party defendant to simply identify which Bates ranges it produced, and provide its own separate and independent privilege log identifying the documents over which that defendant claims privilege, including Bates numbers, in order, for all documents appearing on the privilege log; the author, sender, and recipients where applicable; and adequate document descriptions, as briefed before this Honorable Court.[3]

### F. Aspen Requests a Ruling on the Balance of Arguments Currently Pending Before this Honorable Court

A number of pending issues can be resolved by this Court which will potentially further narrow the scope of applicable privilege claims of the HSS Parties documents. Pursuant to Your Honor's January 28, 2020 Order, Aspen requests that this Honorable Court rule on the balance of arguments pending in Aspen's Motion to Compel at ECF 148. Aspen also requests that this Honorable Court Compel HSS to respond to Aspen's Second Request for the Production of Documents #2, as briefed in Aspen's Motion to Compel at ECF 117.

## II.     The Burden of Asserting Privilege Lies Solely with the HSS Parties, Not Aspen

The HSS Parties privilege claims are the subject of three pending motions by Aspen, and so far, two orders compelling the production of documents and information to Aspen. Bizarrely, and despite this, Aspen is being attacked by the HSS Parties for, essentially, not acting as their co-counsel.

It is hornbook law that the burden of asserting any privilege lies solely upon the HSS Parties, not with Aspen. This Honorable Court explicitly defined the limited category of documents over which the HSS Parties can assert privilege: (1) privilege remains over claims where Aspen disclaimed coverage and (2) privilege can be asserted, for the time being, over attorney-client privileged documents regarding coverage issues or reservation of rights letters. The privilege review here could not be more simple: (1) is there a disclaimer?; (2) is this

---

[3] Aspen notes that yesterday, June 1, 2020, the HSS Parties produced even further revised privilege logs to Aspen. Although Aspen has not yet had an opportunity to fully review these privilege logs in depth, there are still a number of glaring deficiencies. Most importantly, the HSS Parties continue to refuse to provide individual privilege logs on behalf of each defendant. Aspen further notes that, once again, the email sender and recipient column has been manually entered - - by hand - - to hide the true capacity of the sender or recipient. The June 1, 2020 privilege logs will be the subject of further submission by Aspen under separate cover.

June 2, 2020
Page 10

document discussing coverage advice from coverage counsel? If the answer to both questions is "NO" then the document must be produced.

Rather stunningly, the HSS Parties would have this Court believe that, as the persons and entities responsible for running the HSS Programs, they have no idea or ability how to discern what claims were disclaimed, as if there are not hundreds of Master Weekly Claims Meeting Charts that would contain exactly this type of information, and as if there is no breach of contract allegation against Aspen by the HSS Parties for improper disclaimers. This begs the question of what the HSS Parties' basis for asserting privilege (and filing the instant action against Aspen) was in the first place.

Out of the hundreds of claims in the HSS Programs, Aspen has disclaimed only a handful. Despite the HSS Parties creative account in their May 27, 2020 letter, Aspen's April 9, 2020 correspondence on the disclaimed/reserved claims stated in pertinent part:[4]

> Your clients have noted eighty (80) claims in their discovery responses where it is alleged that Aspen breached the contract by issuing an ROR or disclaiming.  Of those 80 claims, there are 17 in which no indemnity was provided by Aspen.  Only 7 of those pre-date Aspen's cancellation:
>
> Kramer v. Green Rock.  Green Rock is not an insured.  I believe this may be the subject of litigation with McGriff?
>
> Acosta v. Adelphia.  Aspen disclaimed as uncovered under the Policy. Unrelated to notice.  Adelphia pursuing Aspen in this litigation.
>
> Seymour v. Westy's.  Aspen received notice after the claim was settled. Aspen disclaimed. Certainly a claim relevant to the issues in this litigation.
>
> Nelson Diaz v. Erin's Pub.  Aspen still defending significant damages claim under ROR on late notice.  Matter may have settled?
>
> Lushtak v. West End Hall.  Property damage claim.  Settled within the SIR. Perhaps HSS is seeking defense costs in excess of SIR?  If so, please send proofs.
>
> Crispo v. High Tides. Apparently settled for $1,500 within the SIR.  Perhaps HSS is seeking defense costs in excess of SIR?  If so, please send proofs.

---

[4] This email also addressed the HSS Parties' request for an extension of time to respond under the Court Ordered deadlines, which Aspen of course granted.

5457943-2

June 2, 2020
Page 11

> Perrin-Jackson v. Relish.  Aspen defended and obtained defense
> verdict. Aspen paid $8,000 in defense.
>
> Two claims we have no info:
>
> Taveras v. Eurolounge (Neither Aspen nor this firm has any info
> on this claim).
>
> Johnson v. Adelphia (No info on this claim).  Adelphia does not
> seem to be pursuing Aspen for this either.
>
> As you know, it is Aspen's position that it is entitled to all
> communications and documents related to the 300 plus claims in
> the HSS Program, unless it disclaimed indemnity.  As you can
> see, outside of post cancellation clams, there appears to be one
> (1) claim that fit this description: Seymour v. Westy's.   All other
> claims where there was a reservation of rights have resulted in
> indemnity payments by Aspen.  If you have conflicting information
> please advise. Aspen raised concerns regarding your clients'
> breach of contract claims by letter to you dated March 2, 2020.   I
> don't believe we received a response.
>
> Perhaps we should discuss this further when you have a moment.
>
> See, Exhibit M.

Mr. Zucker responded to this email by stating: "Thanks, Will. Let's get past this latest
hurdle and then we can talk about the next ones on both ends." See, Exhibit M. Aspen points
out this email is now being described as "plainly inaccurate." Mr. Zucker then went on to
deceitfully request whether Aspen was "accept[ing] coverage of all claims on our [compelled
interrogatory responses] other than as indicated below?" As any experienced coverage counsel
will inform this Court, this is absolutely not a request for the identification of disclaimed claims.
This interrogative is very specifically worded to prejudice Aspen's reservations of rights and
coverage positions on hundreds of claims if answered in the affirmative. This is not an attempt at
"collaborating" with Aspen, this is an attempt to undermine Aspen's entire case in an ill-
conceived "gotcha" moment.

It also bears repeating that the HSS Parties are being completely *insincere* with this
Honorable Court about the "claims chart" they prepared. See, HSS Parties Letter at Section 4.
Again, the HSS Parties were ***compelled*** to create that chart ***by court order*** as an
***interrogatory response***. Cf. ("We assembled our own list as best as we could and emailed it to
Aspen on March 5, 2020… Aspen provided no correction or supplementation…Had Aspen been
even minimally cooperative in this regard, hundreds of hours would have been saved…"). The
HSS Parties complaints that Aspen has not done enough to "supplement or correct" these
interrogatory responses are, frankly, delusional contentions about Aspen's obligations. Aspen
and the HSS Parties are engaged in a $40,000,000+ fraud litigation, and the HSS Parties are
complaining that Aspen is not "approving" their interrogatory responses? Not assisting them

June 2, 2020
Page 12

enough in making disingenuous privilege arguments against Aspen? Aspen identified the disclaimed claims for the HSS Parties, but Aspen and its counsel are not under an obligation to otherwise assist the HSS Parties in fabricating a case against Aspen.

### III.    The Patriot National Production

We refer this Honorable Court to the Court Order issued by the United States Bankruptcy Court for the District of Delaware (the "BK Order") attached the HSS Parties' letter. The BK Order explicitly states that "The Court retains jurisdiction with respect to all matters arising from or related to the implementation of this Order." Perhaps recognizing the significant uphill battle they face manufacturing allegations against Aspen in Delaware eighteen months after the BK Order was entered with their involvement, the HSS Parties instead pathetically attempt an attack upon the undersigned. In any event, there is no pending motion regarding the Patriot National production. However, Aspen is compelled to address the outrageous accusations made by counsel for the HSS Parties.

Weir & Partners filed an appearance in the Patriot National Bankruptcy years ago on behalf of the HSS Parties, and has made multiple filings in that action (including a nearly $40,000,000 notice of claim against Patriot National based upon the HSS Parties potential liability in this action). To be clear, the HSS Parties were involved in the process of drafting the BK Order, as discussed above. The HSS Parties exchanged dozens of emails and phone calls with Aspen and Patriot National and provided redlines and comments. The HSS Parties refused to sign any proposed stipulations, and twice refused Aspen's invitation to enter into an additional stipulation and consent order. Despite this refusal, Mr. Zucker traveled to, and was present during, the hearing where the United States Bankruptcy Court for the District of Delaware entered the BK Order.

Based upon the HSS Parties' over the top response to the Patriot National production, it is now abundantly clear that this is just another long-planned "gotcha" moment whereby the HSS Parties are going to attempt to "ask that the Court bar Aspen from utilizing any of the Patriot documents in discovery or at trial" and file "a sanctions motion that [the HSS Parties] believe to be significant and worthy of greater scrutiny than the issues raised by Aspen" - - a very interesting choice of phrase, considering the current pending motions, and an obvious attempt at "look here, not there." Should either of these ill-conceived motions be filed, Aspen stands ready to address them, along with any "inadvertent errors" they may contain. See, discussion of EF 121, *supra.*

In any event, the assertion that "Aspen's counsel shut out the undersigned entirely from any negotiation of which documents would be produced" or that Aspen and Patriot National "rode roughshod" over Weir & Partners is literal fabrication, as the appended exhibits detail. Weir & Partners and the HSS Parties are sophisticated litigants who were given the option of a three-party stipulation, and then afterwards a direct stipulation with Aspen. To be sure, the HSS Parties participated in a joint process in drafting the order, and had the opportunity to voice any objections in Delaware during the entry of the BK Order, and then had more than a year and half to reach out to Patriot National to discuss any perceived issues with how the Order should be executed or file any protective motions they saw fit. Instead, the HSS parties remained totally silent, until now.

Furthermore, with copy to all counsel in this litigation, Aspen responded to the HSS Parties' incessant accusations in a May 11, 2020 letter (Exhibit N), which stated in pertinent part:

5457943-2

June 2, 2020
Page 13

As you are keenly aware, your office had significant and intimate involvement in drafting the language of that Order. Additionally, and peculiarly in light of your current accusations, your office repeatedly refused to be a participant in the process outlined by the Order and refused to be a signatory to the Order. In addition, you personally appeared before the Delaware Court when the Order was entered. Your decision to sit on these issues until now, more than a year and a half later, after the Order and production were finalized, is remarkable. We note that you have not made any attempt to meet and confer about these issues with Patriot National, and bizarrely, blame Aspen for Patriot National's production pursuant to Court Order.

In any event, Patriot National and Aspen began the process so-ordered by the Bankruptcy Court in late-December of 2018. Almost immediately afterwards, on January 4, 2019, this case entered a yearlong discovery stay. At certain points during the stay, including after the failed mediation in March of 2019, Patriot National and Aspen addressed the protocols outlined by the Court Order. When the stay finally lifted twelve months later, Aspen again reached out to Patriot National in January of 2020 regarding whether the production was final and expressed its intent to provide the production to the other parties in this case. After it was clear that the production by Patriot National was final, you were provided with the documents. It was only then that you raised these supposed privilege concerns for the first time and inflammatory allegations that Aspen somehow acted improperly by abiding by the terms of the Bankruptcy Court's Order and receiving documents from Patriot National. Regardless, the record on this issue is clear. Furthermore, and in light of your recent privilege claims, we have repeatedly told you that we are now awaiting your further input before sending these documents to anyone else. In addition, as you know, we welcome any meet and confer with Patriot and with you regarding the supposed privilege claims by your clients over documents owned by Patriot National.

Aspen is further confounded by the HSS Parties other allegations of "misconduct" by Aspen. Among these allegations are that a different password was needed for unzipping documents (which Aspen shared with the HSS Parties forthwith)[5]; that the documents are in a "non-searchable form" (Aspen has the same production as the HSS Parties); that certain files had "viruses" (Aspen's vendor ran two different industry leading virus programs and detected nothing,

---

[5] Mr. Zucker's office has provided multiple incorrect passwords to Aspen to unzip production files. Aspen has never accused the HSS Parties of misconduct based on such an innocuous, and frankly common, event.

5457943-2

which Aspen shared with the HSS Parties); and that others had no images (again, Aspen is entirely unsure what it is supposed to do rectify this issue in Patriot National's production).

The HSS Parties received the exact load files that Aspen has, so it is totally unclear what benefit would be served by the HSS Parties request that Aspen re-produce anything to them. Indeed, and as far as Aspen is aware, the HSS Parties have made no attempts to contact or rectify any of these issues with Patriot National, the producing party of these documents.

Finally, Aspen once again notes that it sought confirmation from Patriot National that the production was final and could be shared with the other parties to this case. This is the basis for the HSS Parties threatened sanctions motion, which we have been promised will be great and significant. In the very same breath, the HSS Parties hypocritically demand that Aspen cannot share the Patriot National production with any other party until they have had the opportunity to review it. Aspen is being pilloried for taking the exact same steps that the HSS Parties take now.

## IV.    Intervenor Documents

The HSS Parties claim that they are "in the process of working with each of the intervenors to address their requests, and have no doubt that if they are dissatisfied they will advise the Court." The appended Exhibit A for this Honorable Court's consideration is an email chain from May 4, 2020 which directly contradicts this assertion. In the email chain, counsel for Adelphia, Chickie's and Pete's, and Ravel all state that they have received "<u>nothing</u>" from the HSS Parties. (emphasis original to Chickie's and Pete's response).

Aspen will clear up the HSS Parties confusion as to why this issue was raised. As briefly discussed above, the HSS Parties are continuing to withhold volumes of responsive, relevant, and non-privileged documents evidencing their fraud at the expense of the member-insureds and to the benefit only of the HSS Parties defense against the fraud claims. In the words of counsel for Adelphia to counsel for the HSS Parties:

> Aside from the fact that this production is woefully deficient, your clients have not produced a single page relating to any of the post-rescission action claims identified in Adelphia's second amended complaint, which are the subject matter of the dec action for coverage against Aspen and Amtrust.  How can this be?  How is it in the interests of Adelphia and the other " member insureds" for the HSS defendants to withhold the very evidence needed to support the HSS dec action for coverage on behalf of the member insureds?  Instead, your response has been to raise issues of attorney-client privilege relating to protecting the confidences of my client and member insureds regarding their communications with one or more of your clients, presumably, SRM as the investigative arm of SLG, SLG and/or O'Donnell and its legal and paralegal associates.  Any good-faith effort to prosecute the dec action for the member insureds would require the production of the disputed underlying claim files for which coverage is sought. See, Exhibit A.

June 2, 2020
Page 15

## V.     Conclusion

In closing, the HSS Parties and their counsel have exhausted any and all tactics, including illegitimate ones, to evade addressing the disastrous wake resulting from their fraud. The HSS Parties fraudulently induced the member-insureds and Aspen into entering the insurance contracts, lied about the claims reporting, and then "sold" the "assets" of their scheme to the now-bankrupt Patriot National to the tune of $20,000,000. To add insult to injury, they have literally stolen "premiums" from the intervening parties, used up their $2 million in E&O insuring coverage hiding the evidence (as discussed above), and pocketed the return premium from Aspen for themselves instead of giving it to the member insureds, all while refusing to contribute any funds to resolve the intervening party liabilities.

Aspen looks forward to further guidance and intervention from the Court.

Respectfully submitted,

*/s/ William D. Deveau*

William D. Deveau

WDD/

5457943-2